O873RHE1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MARGARET RHEE-KARN,

4              Plaintiff,

5        v.                            15 CV 09946

6  SUSAN CHANA LASK, ESQ., A/K/A
   SUSAN LUSK, A/K/A SUSAN LESK,,
7
                Defendant.
8                                      Trial
   ------------------------------x
9                                      New York, N.Y.
                                       August 7, 2024
10                                     9:30 a.m.

11 Before:

12              HON. ROBERT W. LEHRBURGER,

13                                     U.S. Magistrate Judge
                                       -and a Jury-
14

15                      APPEARANCES

16 LAW OFFICE OF DOUGLAS R. DOLLINGER, ESQ., P.C.
        Attorney for Plaintiff
17 BY:  DOUGLAS R. DOLLINGER

18 WOODS LONERGAN, PLLC
        Attorney for Plaintiff
19 BY:  LAWRENCE R. LONERGAN

20 KEAHON, FLEISCHER & FERRANTE
        Attorney for Defendant
21 BY:  JOSEPH FERRANTE

22 Also Present:  Susan Chana Lask, Esq., Pro Se

23

24

25

O873RHE1

```
 1              (In open court; jury not present)

 2              THE COURT:  All right.  Good morning, all.  Let me

 3    ask, is there anything we need to discuss, Mr. Dollinger?

 4              MR. DOLLINGER:  Not that I am aware of, your Honor.

 5              THE COURT:  Mr. Ferrante, Ms. Lask, anything from you?

 6              MS. LASK:  No, we're just going to continue cross a

 7    little bit.

 8              THE COURT:  Can we call in the jury?

 9              (Jury present)

10              THE COURT:  Good morning, all.  I hope you all had a

11    good evening.  I'm glad you're here on time and very much

12    appreciate that.

13              I understand there is a little difficulty with one of

14    the monitors, so we're playing musical chairs a bit.  It all

15    looks good.

16              We are going to continue today with the

17    cross-examination of the plaintiff.  So, can you, Ms. Karn, can

18    you retake the stand, please.  You understand you're still

19    under oath, yes?

20              THE WITNESS:  Yes, your Honor.

21              THE COURT:  All right.  Ms. Lask, you may proceed.

22              MR. DOLLINGER:  Your Honor, your Honor, is Ms. Lask

23    going to proceed with the witness continued?

24              THE COURT:  That's what it sounds like.

25              MR. DOLLINGER:  Note the objection.
```

O873RHE1                         Rhee-Karn - Cross

```
 1              THE COURT:  What's the basis?

 2              MR. DOLLINGER:  Your Honor, protocol in this district,

 3    in any district --

 4              MS. LASK:  I was doing something.  I didn't hear one

 5    word.

 6              THE COURT:  Mr. Dollinger is objecting to you doing

 7    the examination rather than Mr. Ferrante.

 8              MS. LASK:  I'm co-counsel, your Honor.

 9              THE COURT:  Mr. Dollinger, state your objection.

10              MR. DOLLINGER:  Your Honor, I'm doing this 30-some-odd

11    years and I'm pretty sure that it should be consistent.  But,

12    if the Court wants to allow it, as long as I can do it, I don't

13    have a problem.

14              THE COURT:  I am going to overrule the objection.

15    I'll allow it.  But we're not going to have anymore switching

16    of defense counsel on this witness.

17              MS. LASK:  Yes.  May I proceed, your Honor?

18              THE COURT:  Yes, you may.

19     MARGARET RHEE-KARN,

20         having been previously sworn, testified as follows:

21    CROSS-EXAMINATION (Continued)

22    BY MS. LASK:

23    Q.  Good morning, Ms. Karn.

24    A.  Good morning.

25    Q.  Yesterday was a long day for all of us, I apologize.  But,
```

O873RHE1                        Rhee-Karn - Cross

1    it is a case that's important and I'd just like to continue

2    your cross because you said quite a few things that I'd like to

3    explore with you a little more.

4            So, it's just your testimony and what you said and I'm

5    going to ask you questions, and one of the first things you

6    said, well, it wasn't the exact first thing, but it was

7    something in your testimony, you were asked how many attorneys

8    you had in the state custody case.  There was a state court

9    custody case you said you retained me for and we asked how many

10   attorneys you had before and you said one, David Scott,

11   correct?

12   A.  Correct.

13   Q.  Okay, Ms. Karn.  Let me show you something and maybe we

14   could get the correct amount of attorneys if you may.  I am

15   going to show you what was filed in this court September 14,

16   2017, and you're familiar with it I suppose?

17   A.  John Factor are you talking about?

18   Q.  May I finish my question?

19   A.  Sure.

20   Q.  The Referee Burnett was your state custody court judge or

21   referee we'll say, correct?  She was handling the case?

22   A.  Correct.

23   Q.  And she ultimately issued an opinion May 14 of 2014,

24   correct?

25   A.  No, that was Douglas Hoffman.  It was a different judge.

O873RHE1                        Rhee-Karn - Cross

1    Q.  So I am going to --

2    A.  Yeah.

3    Q.  I'm going show you Referee Burnett's decision on May 14,

4    2014 in your custody case.  Not the entire thing, just what's

5    relevant to what you said, okay?

6            So, I am just going to put on here just the cover page

7    so we know what we're looking at do.  You see that it says

8    Margaret Rhee-Karn v. Kenneth Karn in the family court decision

9    and order after trial.

10           Are we looking at the same thing, the first page?

11   A.  Yes.

12   Q.  Would you --

13           THE COURT:  Ms. Lask, is this an exhibit that's been

14   marked as an exhibit or is it new for cross-examination?

15           MS. LASK:  It's new for cross, your Honor.

16           THE COURT:  Let's mark it as Defendant's 11.

17           MR. LONERGAN:  It's not been admitted to evidence,

18   this document, is it?

19           THE COURT:  I think she's laying the foundation right

20   now.

21           MR. LONERGAN:  Is there a certified copy of this

22   document?

23           THE COURT:  Are you objecting?

24           MR. LONERGAN:  To admit that the document into

25   evidence, Judge, they need a certified copy.  They just can't

O873RHE1                        Rhee-Karn - Cross

1    come in with an electronic copy of a document in a federal jury

2    trial.

3              THE COURT:  Ms. Lask?

4              MS. LASK:  Your Honor, if you look up here and I

5    stated before I even put it on, it has the PACER headers.  This

6    is something -- let me use my pen.  Right here.  The PACER

7    headers.  It is a filed document in this case, your Honor.

8              MR. LONERGAN:  I can go and write this document myself

9    in 10 minutes.  I need a certified copy.

10             MS. LASK:  I object to that.

11             THE COURT:  The objection is overruled.

12             It can be used for cross-examination.  I'm just having

13   them identified for cross-examination purposes.  I'm not

14   admitting them as official exhibits.

15             MS. LASK:  Thank you.

16   Q.  So that's the first page of Referee Burnett who ultimately

17   gave the decision on May 14, 2014.  And to help you out, hold

18   on, I will show you just the last page of that same document

19   filed with the same PACER headers, page 12 of 12, and it is

20   entered -- I apologize October 15, I was a day off, 2014, by

21   Referee Burnett not Judge Hoffman, correct?

22   A.  Okay.  I can't see the full --

23   Q.  There you go.  So it was signed by Referee Burnett.

24   A.  I know that Douglas Hoffman --

25   Q.  The question is yes or no.

O873RHE1                           Rhee-Karn - Cross

1   A.  This is what you have but I question the document.

2   Q.  I'm sorry, what?

3   A.  From my recollection, Douglas Hoffman was the

4   administrative judge, because Burnett, after we filed the

5   federal and everyone hated us, she stepped down.

6              MS. LASK:  Your Honor, it is a yes or no question.

7              THE COURT:  One at a time.

8              THE WITNESS:  I'm just saying --

9              THE COURT:  Both of you, please, one at a time.  You

10  can't interrupt each other.  It makes it impossible for the

11  court reporter.  It makes it difficult nor us all.

12             MS. LASK:  Yes.

13             THE COURT:  Ms. Lask, let the witness finish her

14  answer.  And she's either going to be familiar with this

15  document or she's not.

16             MS. LASK:  I understand.

17             THE COURT:  Proceed.

18  A.  I know that Douglas Hoffman was the judge that gave the

19  decision.  Perhaps Marva since she started the case has

20  basically her signature.  That's my answer.

21  Q.  Well, we're looking exactly at the document, Ms. Karn, and

22  it says Marva Burnett the referee signed it.  Yes or no?

23  A.  Yes, it does.

24  Q.  So that is signed by the referee.  That was the final order

25  in your case.  And as part of that order I am going to go back

O873RHE1                          Rhee-Karn - Cross

1    to page 2 of it, I showed you the cover page, page 2 with the
2    same PACER headings on it.  PACER is the electronic filing in
3    the court.  This federal court.  And yesterday you said that
4    you had one attorney.  It was David Scott before me, correct?
5    A.  Correct.
6    Q.  So second page, let's get some correct information here, of
7    that order, it says page 2 of 12.  Remember I put up 12 pages.
8    I'm sorry.  Take off that.  And there it says that.  You see
9    the PACER heading, if we look real quickly at the second
10   paragraph, it actually says the mother's first attorney was
11   Jonathan Factor.  That's attorney number 1.  Correct?
12   A.   It was not my family court attorney.  He was an attorney
13   that reviewed my prenuptial.  He was part of the prenuptial
14   prior to my wedding, and he reviewed it with me after as I
15   proceeded with divorce.  I did not retain him as a family court
16   attorney.
17            MS. LASK:  May I get an instruction for yes or no or
18   can we --
19            THE COURT:  Not in this case.  She answered your
20   question and she clarified who the attorney was.
21   Q.  So are you saying the judge is wrong, that she's saying
22   Jonathan Factor was your attorney and he was discharged?
23   A.  Yes, she was wrong.
24            MR. LONERGAN:  That's just combative.
25            THE COURT:  Sustained.

O873RHE1                    Rhee-Karn - Cross

1   Q.  And then the court order by the judge says David Scott was

2   substituted in.  Is that correct?

3   A.  Correct.

4   Q.  He was substituted in and Mr. Factor left in 2010 and then

5   Mr. I don't know the name, Bedka also appeared for you in that

6   family court?

7   A.  Excuse me.  I have to just correct myself.  He wasn't

8   substituted in.  He was my first family law attorney that I

9   retained.  Mr. Bedka is his co-counsel, they have a practice

10  together.

11  Q.  Before you hired me, you retained me, you said in the end

12  of May of 2012, June 2012, I don't remember the exact date you

13  said yesterday.  But it looks like this case was going on from

14  2010 to -- if we look at that paragraph when you hired and

15  fired these attorneys and they were replaced by Susan Lask on

16  June 1st, 2012, that's 2 years later; am I correct?

17  A.  I hired you in June 2012, yes.

18  Q.  Two years later after your case was going on?

19  A.  Right.  It was going on forever, right.

20  Q.  Hmm-hmm.  Let me remove this.  And in this same document,

21  yesterday, you said that there was no contempt issues in the

22  underlying -- in the family court custody case by you.  Is that

23  correct?  You said it yesterday?

24  A.  Excuse me?  Trying to understand.  What do you mean?

25  Q.  Yesterday you testified when we asked if there were

O873RHE1                        Rhee-Karn - Cross

1    contempt issues during the family court case, you said no.

2    Correct?

3    A.   Specifically what contempt are you talking about?

4    Q.   Do you know what contempt of court is?

5    A.   There was a lot of drama, as I mentioned before, on both

6    sides.  And a lot -- in fact actually you precipitated a lot of

7    the drama.

8              MS. LASK:  Strike this.

9              THE COURT:  Overruled.

10   Q.   How could I precipitate drama between you --

11             MR. DOLLINGER:  Objection, your Honor.

12             THE COURT:  Sustained.

13             MS. LASK:  Withdrawn.

14   Q.   Ms. Karn, do you know and what the question was and you did

15   not answer, what is contempt of court?

16             MR. LONERGAN:  Objection.  She's not an attorney.

17             THE COURT:  Sustained.  She's not a lawyer.  You are

18   not here to ask her about that.

19   Q.   You were in the case and you knew your case better than

20   anyone, didn't you?

21   A.   Yes, I was.  It was over 10 years ago.

22   Q.   And --

23   A.   And there was a lot of different orders to show causes, you

24   know, motions made, lies made, both sides.  It was drama

25   between the attorneys.  And yes, there were contempt and I

1    don't know specifically what you're talking about.

2            My daughter was taken from me, couldn't have her

3    overnights for reasons that I never even had a trial for.

4    That's why I hired you.  So yes, there was a lot of drama.  It

5    was a nightmare.

6    Q.  And I was fighting for you during that drama, wasn't I?

7    A.  Right.  And you made it worse actually.

8            THE COURT:  Both of you.  We are not here for

9    discussion of the merits.  That has been ruled on.  We are here

10    to determine what was done during the window of period of time

11    we talked about yesterday.

12            MS. LASK:  May I approach?

13            THE COURT:  No.  You may ask a question.

14    Q.  The same document, so you testified that there wasn't

15    contempt but in the same document --

16            MR. LONERGAN:  Objection.

17            THE COURT:  Let her finish her question.

18    Q.  The order says and here is the header again, page 10 of 12,

19    during the pendency, as far as not following orders, the

20    mother --

21            THE COURT:  I see why there was an objection even

22    before reading it.

23            Ms. Lask, this is not relevant to the issue at hand.

24    If there was contempt, there was contempt.  And if you dealt

25    with contempt, you can testify about that on direct.  The

O873RHE1                          Rhee-Karn - Cross

1    witness has testified to what she knows about the question you

2    asked.

3              Further, a document like this, while the Court may

4    take judicial notice of it, because it's a judicial document,

5    does not mean it can be taken for the truth of what's in there.

6              MS. LASK:  Your Honor, and this is a court order from

7    the referee in the case and --

8              THE COURT:  I understand that.  That's what it is.

9              MS. LASK:  She testified yesterday to certain things

10   that this court order says the exact opposite, and there one

11   more question I'd like to ask.

12             THE COURT:  Okay.

13   Q.  Yesterday, considering this court order, yesterday you said

14   the custody that was taken away from you, it was your daughter,

15   is that correct?  You had a daughter?

16   A.  Right.

17   Q.  And you said it was temporarily taken away.  It was just

18   temporary?

19   A.  Right.

20   Q.  When was that custody ever given back to you?

21   A.  Well, in the end I lost custody.

22   Q.  Well, if it was -- I just want to be clear what temporary

23   and permanent means?

24   A.  Temporary.

25             MR. LONERGAN:  This is horrible, Judge.  This is not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    relevant.

2              THE COURT:  Is there an objection?

3              MR. LONERGAN:  Absolutely.

4              THE COURT:  Sustained.

5              Ms. Lask, proceed to something relevant, please.

6              MS. LASK:  Counsel is laughing at the table but

7    besides that, she had said yesterday it was temporary.  I want

8    to know the difference.  She testified to it.  We didn't even

9    ask.  She said it.  She opened the door.

10             THE COURT:  There is nothing that's opened the door.

11   This is not relevant.  It's totally tangential to what the

12   issue is for trial.

13             MS. LASK:  Credibility, your Honor, when someone says

14   one thing.

15             THE COURT:  I totally understand the issue of

16   credibility.  You are asking questions about the law and about

17   decisions.  She said what she knows or doesn't know.  You're

18   treating the document as truth.  Please move on.

19             MS. LASK:  Would the Court note my objection, please.

20             THE COURT:  Duly noted.

21   Q.  Yesterday you testified that when you hired me, I was

22   researching about different things and you said civil rights

23   almost from the out the gate.

24   A.  Excuse me?

25   Q.  Almost out the gate, almost from the start when you hired

O873RHE1                              Rhee-Karn - Cross

1   me, I was researching civil rights, is that correct?

2   A.  I hired you for my family court child custody case.

3   Q.  Well, when there's a family court child custody case, isn't

4   there research and things that have to be done?

5          MR. LONERGAN:  Your Honor, objection.  Relevance.

6          THE COURT:  Sustained.

7   Q.  You testified yesterday that there was a lot of research,

8   is that correct?

9   A.  Well, I retained you and I was in a situation where I had a

10  temporary order.  My daughter was removed from me without a

11  trial, and you were doing research on how am I going to get my

12  daughter back.  One of the things you researched is that my

13  constitutional rights have been violated by the family court.

14  I never got to -- the other side, just my ex's attorney in

15  their affidavit and in court just said I was abusive.  No

16  trial.  And you know, that was unconstitutional that I did

17  not -- there is no due process.  That's what you were

18  investigating.  And that's where we went down the direction of

19  the federal.

20  Q.  Well, you went way beyond the scope of what I asked.

21         THE COURT:  No, she didn't.

22  Q.  In the state custody case, you're testifying that I was

23  researching the civil rights and arguing that too as well,

24  correct?

25  A.  Yeah, because we communicated a lot.  A wealth of e-mails

O873RHE1                         Rhee-Karn - Cross

1   where you're telling me about my rights were violated, we need

2   to go to the federal.  We have these e-mails.

3   Q.  I said we need to go to the federal and I was giving you

4   advice we need to go to federal?

5   A.  Yes, and also that the family court does not hear

6   constitutional issues, you're not going to get your daughter

7   back in the family court.  Also, as you were working on my

8   family court case, you alienated me.  This is in hindsight.  I

9   realized you had caused so much tension between everyone.

10              MS. LASK:  I am going to move to strike all of this.

11              MR. DOLLINGER:  She opened the door.

12              THE COURT:  She sure did.  So let's move on to

13   something that's actually pertinent.

14   Q.  So, well, she testified that I was doing research and she

15   testified that I told her where it can be done and where it

16   can't, so let me refresh your memory here.

17              I am going to show you, which is part of the case,

18   again you'll see the headers this case up top.  And this is a

19   September 1st, 2012 e-mail from me to you.  And is that

20   correct?  You see September 1st and you see from Susan Lask to

21   Maggie?

22   A.  Yes.

23   Q.  And it says I'm researching?

24              THE COURT:  What document are we looking at?  Is it an

25   exhibit that's been admitted or not?

1            MS. LASK:  It's part of the court record.  It wasn't

2      admitted.  It has an A423 on it.

3            THE COURT:  It's document number 12 for

4      cross-examination.  Go ahead.

5   Q.  In there, just read it to yourself real quick.  And

6      basically, I am going to say in sum and substance, I'm

7      basically giving you the summary of my research or what I'm

8      advising you, and I'm saying Sarah should have had some

9      independent counsel.  And then I say possibly we file motions

10     to stay the proceedings in family court on a constitutional

11     issue.  Is that correct?  It says that?

12  A.  That's what it says.

13  Q.  On a constitutional issue in the family court.  And then it

14     says the entire proceedings are tainted and I say I doubt the

15     judge will sign.  That means the judge in your family court,

16     correct?

17  A.  Correct.

18  Q.  Or I'm telling you we do both, meaning the stay, and the

19     constitutional issue and go to federal court.  And get a stay.

20     And does it specifically say which fed courts, federal courts

21     can't stand family court matters but may be interested in.

22            So is that a definite I'm telling you?

23            THE COURT:  Sustained.  We're not relitigating the

24     merits.  We are litigating what was done for the federal

25     action, the first time, and what was done that was used from

O873RHE1                              Rhee-Karn - Cross

1     the first one for the second one.

2                    MS. LASK:  The Court --

3                    THE COURT:  The merits has been decided.  We are not

4     relitigating it.

5                    MS. LASK:  Your Honor, respectfully note my objection.

6     She opened the door.  She testified to this and I'm trying to

7     get the correct facts.

8                    THE COURT:  You opened the door by asking the

9     questions about the substance.  Overruled.

10                    MS. LASK:  Yesterday she had testified to that.

11    Q.  Couple more things.  You said, you testified yesterday that

12    you went to the federal court and filed the first federal.

13    Correct?

14    A.  I physically went to the family court to file this.

15    Something that you directed me to.

16    Q.  The federal court?

17    A.  The federal court to physically file.

18    Q.  File the --

19    A.  Since I live in New York City, yes.

20    Q.  Right.  That's right.  I remember you said because at the

21    time --

22    A.  Because you directed me.  I have the e-mails to prove it.

23                    MS. LASK:  Your Honor.

24    A.  I mean, I'm not an attorney.

25                    MS. LASK:  I am going to move to strike all of this,

O873RHE1                         Rhee-Karn - Cross

1  but I know your Honor is going to say differently, but in any

2  event, that's my note on the record.

3            THE COURT:  Overruled just so it's official.

4            MS. LASK:  Thank you.

5  Q.  So, because I lived in New Jersey, I was unable to file

6  that federal complaint, correct?  That's what you said?

7  A.  You asked me, as you've asked me favors to file other

8  documents from other cases that I did as a favor because I live

9  in New York City.  Yes, you did ask me.

10 Q.  Your testimony --

11 A.  And you asked me to sign your name.

12 Q.  I am an attorney and I have -- you know what PACER, the

13 PACER system is, the electronic PACER system, correct?  Because

14 you filed an appeal later and used -- and asked me to file your

15 appeal on PACER, correct?  Do you remember that?

16 A.  Correct.

17 Q.  So why didn't I just sit --

18            THE COURT:  All right.

19            MR. DOLLINGER:  Objection.

20 A.  I don't know why you asked me to do that.

21            THE COURT:  We are going to go back to the robing

22 room.

23            (Continued on next page)

24

25

O873RHE1                         Rhee-Karn - Cross

1           (In the robing room)

2           THE COURT:  All right.  The reason I called us in here

3   is because, Ms. Lask, you are going way outside the boundaries

4   of what this trial is about.  If you want to ask about what she

5   knows about the time that was put in for the time period in

6   question, and what was used, if any, for the second, that's

7   fine.  But we are not relitigating any of the merits.

8           I am going to hold you in contempt if you cannot keep

9   yourself on track.

10          MS. LASK:  Your Honor, I'd like to make my record as

11  well.  She opened the door.  This is a credibility -- she

12  testified before that court.  We didn't even ask her she just

13  blew it out there and said you made me file it.  You lived in

14  New Jersey.  She said it.  The jury heard it.  What are they

15  going to think.  This is a truth finding process.  If she said

16  something that's not true, I am allowed on cross.

17          THE COURT:  Who physically filed that complaint?

18          MS. LASK:  She did.

19          THE COURT:  As she testified.  There is nothing to

20  impeach on that.

21          MS. LASK:  She testified because you lived in New

22  Jersey.  Impossible.  We have PACER.  All I had to do if I

23  wanted that filed is hit a button.

24          THE COURT:  What does that have to do with the issues

25  in the case?

1          MS. LASK:  She opened the door and said it.  The jury

2     heard it.

3          THE COURT:  You opened the door by going way outside

4     what the issues are.  This is totally irrelevant to the issues.

5          MR. FERRANTE:  If I may, the only thing I would add is

6     it's just simply for credibility purposes.

7          THE COURT:  This doesn't go to credibility though.

8     She's not lying or making things up.  She's saying what she

9     remembers and it is her opinion about what why you did

10    something.  If you don't want that to come out, then stick to

11    the issue.

12         MS. LASK:  We didn't ask her though.  She blurted out

13    yesterday like she's blurting everything out because she's

14    trying to make a different impression in front of the court.

15         THE COURT:  You will do much better in containing that

16    if you stay within the boundaries of what the issues are.

17         MS. LASK:  But when they're hearing this whole other

18    scenario that she's blurting out.

19         THE COURT:  There is no other scenario.  She filed it

20    physically.  That's totally irrelevant.  And you drafted it.

21    Fine.  Maybe with her, I guess.  And then there is a question

22    of how much time you spent doing that and preparing it and what

23    you used.  And part of the problem is, you are asking a witness

24    who doesn't know everything that you did.  That's for you to

25    testify about.  You are asking her to -- and actually

O873RHE1                        Rhee-Karn - Cross

1    Mr. Ferrante established yesterday she worked on, you worked on

2    many things at the same time.  Those hours that are recorded,

3    they aren't necessarily all for the federal case.  You will be

4    able to explain all that.

5              But trying to draw all of that out with her when she

6    doesn't really know what you did is really confusing I think to

7    the jury.

8              MS. LASK:  Okay.

9              THE COURT:  And we have limited time.

10             MS. LASK:  I know.  That's why try I'm trying to blow

11   through that.

12             THE COURT:  I am going to impose a time limit on the

13   cross-examinations if you cannot stay within the bounds.

14             MS. LASK:  Well, I don't want to go much more than 15

15   minutes anyway in any event.  Efficiency is key.

16             THE COURT:  Why don't you focus on the issues because

17   you're not scoring any points on credibility by what you are

18   asking now.  You're just provoking a fight about how did it go.

19   She's not happy but how it went, and you're just going to bring

20   out more on that.

21             MS. LASK:  When she blurts it out, they hear it.  And

22   she's doing it.  All they are going to think is this bad lawyer

23   made her do this.  Okay, and your Honor, she's not an innocent

24   lamb and I could bring it out.

25             THE COURT:  No one is saying she is.

O873RHE1                        Rhee-Karn - Cross

1              MS. LASK:  She is saying to them, so I have the right

2    to take out the e-mails and say, well, here you are saying do

3    this.  Here you are saying that.  She opened it.  She -- she

4    said it.  She blurted it out.

5              THE COURT:  When you say "it," specify.

6              MS. LASK:  Okay, yes, sir.  One of the first things

7    she came out of the gate and said, she made me file it, I

8    didn't know what was going on.  Something like that.  And then

9    throughout it she said I don't know what's going on, you are

10   the lawyer.  I can show you she said it.  We didn't ask her

11   that.  She wants to paint a picture.  She sure painted it all

12   on me, innocent lamb.  I have 15 documents -- I wasn't going to

13   go through all of this them.

14             THE COURT:  She testified yesterday she did work

15   closely with you.  There are many e-mails.  She did have input.

16   There is no question about that.

17             MS. LASK:  And at the same time she was saying I don't

18   know, I didn't understand.

19             THE COURT:  She didn't say that.  She said I don't

20   know everything what this means in the billing, which I don't

21   blame her for saying, because they were abbreviations.  And

22   she's not a lawyer.  She may not know what they all mean.

23             MS. LASK:  Let me ask her about it.

24             THE COURT:  If you want to ask her about the records

25   during the time period that we're talking about, you can ask

O873RHE1                        Rhee-Karn - Cross

1    her if she knows what they are.

2              MS. LASK:  Well, but I would go a little further and

3    say, well, didn't you have the opportunity, you get the bills

4    correct -- should I say this now?

5              THE COURT:  Of course you can ask have you received

6    these?  Do you have any questions?  Did you ask?

7              MS. LASK:  Yeah.

8              THE COURT:  That's relevant.  All we are doing right

9    now is totally extraneous and it's not challenging credibility.

10   It is totally a tangent.  I don't want to waste any more time

11   here.  I don't want to waste any more of the jury's time.  We

12   are going to go in and you are going to focus on the issues

13   which are the time spent and the substance done during the time

14   window that's at issue.  And then if you want, anything that

15   was reused for the second federal action.  Understood?

16             MS. LASK:  Yes, your Honor.

17             THE COURT:  That's what we are doing.

18             MR. DOLLINGER:  Judge, one issue I ask the Court is in

19   reading Judge Cote's decision and the Court of Appeals, I don't

20   want to invoke any angst related to how that order reads, but

21   it does say concerning I believe is the language it uses.  So

22   it's not just the actual filing of the complaint.  It is those

23   matters associated with it.

24             THE COURT:  For the federal action, of course.

25             MR. DOLLINGER:  Judge, I just don't want to waste

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O873RHE1                         Rhee-Karn - Cross

1    time.

2              THE COURT:  All right.

3              MS. LASK:  I'm sorry, I didn't understand.

4              THE COURT:  You didn't understand?  The federal

5    action, the first federal action is not just a complaint.

6    There may have been other things associated with it.  There is

7    research, it was filed, I don't know what happened after.

8    Anything about that is fair game about what the time was spent

9    on for the first federal action.  That's all.

10             MS. LASK:  Your Honor, regarding that, so he wants to

11   pull out all these bills after the time period in question is

12   what I understood was happening.  Correct?

13             THE COURT:  I have no idea if that's happening or not.

14   But what I understand is they want to ask about time.  If you

15   are going to be saying material is used from the first federal

16   action in the second federal action, it may be fair game to

17   say, well, then why didn't this take less time when you were

18   doing it for the second action.  I don't know if that's what

19   the time records show or will support that.

20             MR. LONERGAN:  That's certainly defendant's

21   preponderance to prove that, to show that.

22             THE COURT:  It's fair questioning.  Again we're

23   focusing on the procedural aspect of what was used, how much

24   time did you spend, things like that.

25             We are going to go back in there.  As I said, I am now

O873RHE1                          Rhee-Karn - Cross

1    going to hold folks in contempt if they cannot follow my orders

2    and directions.

3           One other housekeeping thing is I realized I started

4    with 10 for the defendant's cross-examinations.  I was thinking

5    they only went up to 4.  I am starting with 110, 111, 112 to

6    designate them as cross and then the next will be 113.

7           MS. LASK:  One last thing and I do have a problem with

8    I ask her a question and she tells a whole other story.  It is

9    a yes or no.

10          THE COURT:  I will listen for yes or no, and if you

11   think she hasn't answered yes or no, you can raise it.  I just

12   think there are several questions there where it wasn't a

13   simple yes or no.  So be careful with the questions.  We are go

14   going to go back in.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O873RHE1                         Rhee-Karn - Cross

1              (In open court)

2              THE COURT:  Just a housekeeping thing.  So as not to

3     confuse the jury, the documents or exhibits that I was

4     referring to as defendant's cross-examination exhibits I

5     started at too low a number.  So I am going to use hundreds.

6     110, 111, 112, the next one will be 113.  Thank you.

7              Ms. Lask, please proceed.

8     BY MS. LASK:

9     Q.  Ms. Karn, yesterday you testified you went over two bills.

10    The time period that is relevant to this case is October 24,

11    2012, to February 5, 2013?

12    A.  Correct.

13    Q.  Short period, four months or so, correct?

14    A.  Correct.

15    Q.  And you testified that a lot of things were happening,

16    state, federal, different things about that I was working on

17    for what you described as a very complicated custody case with

18    your husband, right, and you?  I was working on various things.

19    We went over that, right?

20    A.  Right.

21    Q.  So I notice on your bill, that you -- February 5 was the

22    time period, and you testified to everything up to February 4

23    but you did not testify what happened on February 5.  Is there

24    a reason do you recall?

25    A.  I think that's based on the judgment.  I mean, I feel like

O873RHE1                        Rhee-Karn - Cross

1    you know a lot more of it should be included, but I'm following

2    what the Court --

3    Q.  That's not the question.

4    A.  Why didn't I include February 5?  Can I see?

5    Q.  February 5, sure, I'll put it up for you.  This is your

6    exhibit and there is February 5.  You completely ignored it and

7    says e-mails -- I'm sorry.  Yeah, it does.

8           THE COURT:  There are two entries on February 5.

9    Which one?

10   Q.  I was going to get to that.  The first one.

11          THE COURT:  Just to be clear, we are looking again at

12   Plaintiff's Exhibit 2.

13   Q.  I'm pointing right there.  It says FRCP, which is Federal

14   Rule of Civil Procedure 41, voluntary dismissal, correct?

15   A.  Correct.

16   Q.  And what happened on February 5 with that voluntary

17   dismissal?  I'm sorry.  I apologize.  I withdraw.  So we're

18   clarified.  I have very little after this.

19          That's February 5.  And here --

20          MR. FERRANTE:  Your Honor, that is Defense Exhibit 2,

21   the voluntary dismissal, in your binder.

22          THE COURT:  Thank you.

23   Q.  I show you entry on February 5 that is part of this case.

24   And then I'm showing you the FRCP I referred to in the billing

25   41, and there you see it pursuant to Federal Rule of Civil

O873RHE1                          Rhee-Karn - Cross

1    Procedure and those FRCP 41.  This is a filing dated February 4

2    but I filed it electronically myself on February 5.  You see my

3    signature.  And it says notice of voluntary dismissal without

4    prejudice.  Is that correct?

5    A.  Correct.

6    Q.  So, and it is correct I filed that electronically and

7    that's my signature; is that correct?

8    A.  Correct.

9    Q.  And the voluntary dismissal is something that was filed

10   February 4 -- February 5, so you testified that the complaint

11   was filed December 21?

12   A.  Correct.

13   Q.  So would it be a little less than five weeks that this was

14   filed, this voluntary dismissal?

15   A.  Which I didn't know about.

16   Q.  That wasn't the question.  Yes or no?

17   A.  That's what the document says but I didn't learn about it

18   until way after March.  This invoice was from March.

19           THE COURT:  Please answer the question as asked.  If

20   there is something to clarify, your attorney will be able to

21   ask you on redirect.

22           And just for the jury for clarity, I mentioned in my

23   opening description of the case that the first federal action

24   was withdrawn, it was voluntarily dismissed.  This is the

25   document that effected that for the first federal action.

O873RHE1                           Rhee-Karn - Cross

 1  Q.  So the answer is yes?

 2  A.  Yes.

 3  Q.  Voluntarily withdrawn.  And when the first was filed about

 4  five weeks before, by you, you said, and then I filed an

 5  electronic to withdraw it, five weeks, about five weeks later

 6  on February 5, what happened in between then from the

 7  December 21 filing and this withdrawal?

 8           MR. LONERGAN:  Objection.  What do you mean what

 9  happened?

10           THE COURT:  Objection sustained.  Let's get a little

11  more specific and orient the witness.

12           MS. LASK:  I was going to.

13           THE COURT:  Thank you.

14  Q.  Were there any motions filed by any parties on this first

15  filing that you filed December 21, you filed it, let me be

16  clear.  It says the caption Maggie Rhee-Karn v. Referee

17  Burnett, right, Rosemary Rivieccio, Dr. Brandt, and City of New

18  York.

19           Did any of those defendants file an answer to the

20  complaint?

21  A.  You withdrew.

22  Q.  So nothing happened?

23  A.  You withdrew it.

24  Q.  So nothing happened, yes or no?

25  A.  Correct.

O873RHE1                         Rhee-Karn - Cross

1   Q.  So something was filed and in less than five weeks later it
2   was withdrawn immediately, correct?
3   A.  Correct.
4   Q.  Thank you.  Did you pay for anything for December, from
5   February 21 to the 5th for any kind of litigation with respect
6   to that first filing that was withdrawn?  Litigation meaning
7   and I'll be specific again, motions, answers, any other filings
8   on that December 21 date of litigation?
9   A.  Of litigation?  No, we were not in litigation.
10  Q.  Okay.  So something was filed and it was withdrawn
11  immediately.
12          MR. LONERGAN:  Is that testimony, Judge?
13          THE COURT:  It can't be because it is the questioning
14  attorney, so it is to be disregarded.  Objection sustained.
15  Q.  Then I promised to be efficient and I will keep my promise
16  and short.  And the promise is or the next question is, it's
17  very simple.  You testified to all of those -- well, to the
18  bills that are within this damage period of October 24 to
19  February -- it was 5th but you said nothing happened on the 5th
20  but we just established that, correct?  The time period is
21  until February 5, correct?
22  A.  Right.
23  Q.  So, you paid, you had all of those bills as the case was
24  going, correct?
25  A.  Yes, but I didn't get my first invoice until January of

O873RHE1                        Rhee-Karn - Cross

1    2013, which is six months after.

2    Q.  That wasn't the question.  Yes or no.  Did you have those

3    bills?  I didn't ask her when she received anything.

4            THE COURT:  But your question requires clarification

5    because it is vague without a time frame.  So she's answering

6    it correctly.

7    Q.  Do you have, well, the bills are dated January 6.  Did you

8    have the bill on January 6, 2013, that's when you got the bill,

9    correct, of those time periods?

10   A.  I did not get the bill for that time period until March of

11   2013.  I didn't get any -- the first bill I saw was January of

12   2013.  It was over 100,000 was spent.

13           MS. LASK:  No, your Honor --

14           THE COURT:  Ms. Karn, don't add extra.  All you need

15   to do was say it was January 13.

16   Q.  Let me refresh your memory.  This is your own bill and it

17   says January 24, not March.

18   A.  The second one that included --

19   Q.  I'm talking about the first bill you got was January 24,

20   2013.  And I represented you.  We all say that.  We had enough

21   time.  There it is.  January 24, 2013.  It has everything

22   listed and in there on the second page, it has the October 24,

23   it starts with the time period.  Correct?

24   A.  Correct.

25   Q.  You had those bills and you paid the bills for the period,

O873RHE1                          Rhee-Karn - Cross

1    the damages period that we're here for, you paid October 24 to

2    February 5?

3    A.  I paid all your bills, yes.

4    Q.  No, that's not the question.  No, it's not.  The question

5    is, and I was responding to counsel --

6              THE COURT:  She paid your bills.  We also have a

7    stipulation on file that she paid everything.

8    Q.  She said all bills.  I am talking about this bill.  You had

9    it, you paid it.  And you never questioned it, did you?

10   A.  No, I didn't question it.

11   Q.  But you could question, if you had any question, if you

12   thought I don't understand something, I don't understand what

13   this means, you --

14   A.  Because I trusted you, Ms. Lask.  I trusted you as my

15   attorney.  I supported the decisions we both made.

16   Q.  We both made together, correct?

17   A.  We both made together.  You are the attorney.  That's why I

18   retained you.

19   Q.  And you are the client and we were making decisions

20   together, so I was informing you what can and can't be done and

21   you were making decisions?

22   A.  You misinformed me, yes.

23   Q.  All I'm asking is if you had any problem and we were

24   talking a lot you testified yesterday.  If you didn't

25   understand something, or if you looked and said, oh, wow,

O873RHE1                    Rhee-Karn - Cross

1   that's the federal, that's the state.  What should I do, in the

2   bill, meaning something's regarding federal, something's

3   regarding state, you could have asked me about it because you

4   testified yesterday we were talking all the time, correct?  You

5   could have asked any question you wanted?

6   A.   I was in a situation where I lost custody of my child.

7           THE COURT:  Just answer the question.

8   A.   I paid for it.  I didn't ask.  I trusted you.

9   Q.   I trusted my client -- the attorney trusts the client too,

10  don't they, to ask any questions.  That's in your retainer, any

11  retainer or just --

12  A.   The retainer.

13  Q.   I'm sorry?

14          THE COURT:  Ask a question.

15          MR. LONERGAN:  This is really, she's beating her up.

16  Come on, Judge.  This is harassment.  This is combative

17  cross-examination.

18          THE COURT:  The objection is overruled.  But, the

19  question is not yet a question and it needs to be asked

20  clearly.

21          Seems to me the question is, Ms. Karn, that if you had

22  wanted to, if you had a question about the bills, you could

23  have called your attorney and asked.  Is that true?

24          THE WITNESS:  Of course that was true.

25          THE COURT:  Thank you.  Okay.

```
 1            MS. LASK:  Your Honor, no further questions.  And
 2    promise kept.
 3            THE COURT:  Thank you, Ms. Lask.
 4            Any redirect?
 5            MR. DOLLINGER:  Yes.  May I have just a minute to get
 6    the exhibits placed in order?
 7            THE COURT:  Apologies to the jury.  Typically
 8    attorneys will provide copies to the other side of the
 9    documents they are using beforehand.
10    REDIRECT EXAMINATION
11    BY MR. DOLLINGER:
12    Q.  Good morning, Ms. Karn.
13            Good morning, ladies and gentlemen.
14            Referring to Exhibit 2, the Bates stamp is 1461.  And
15    that is an invoice or one of the pages from the invoice from
16    January invoice that Ms. Lask provided to the plaintiff.  I
17    want to ask you, ma'am, Ms. Karn, who prepared Exhibit 3 which
18    is the compilation as the judge described the demonstrative
19    evidence, who prepared that for you, do you know?  Do you
20    recall?
21    A.  I'm sorry.  Can you say that again?
22    Q.  I'll show you the document.  Do you know who prepared that
23    document?
24    A.  Yes, you prepared that.
25            MR. DOLLINGER:  And again that's Exhibit 3, your
```

```
 1    Honor.

 2                THE COURT:  Yes.

 3    Q.  And mea culpa for the February 5 omission.

 4                What I want to ask you about, though we're talking

 5    about and will include the February 5 Article 78 proceedings

 6    and the entries after that.

 7                Now, I want to just first go to the petition.  And

 8    you'll see on February 5 it says -- will you tell us what the

 9    February 5 entry is.

10                THE COURT:  The first one.

11                MR. DOLLINGER:  My apologies, your Honor.  Yes, sir.

12    A.  I guess she read the client e-mails regarding school,

13    drafted I don't know what that is, research Article 78

14    procedure, draft filed FRCP 41 voluntary dismissal.

15    Q.  So we know that the voluntary dismissal was filed by

16    Ms. Lask?

17    A.  Correct.

18    Q.  And when did you become aware that the voluntary withdrawal

19    was filed; do you recall?

20    A.  She mentioned it to me.  It just came up around this time,

21    March maybe.  Yeah.  After, yeah.

22                MR. DOLLINGER:  Your Honor, again, I apologize but I

23    don't believe the witness has her exhibit book.  Mr. Lonergan,

24    would you be kind enough to --

25                THE COURT:  That's fine.  Please bring it up.
```

O873RHE1                          Rhee-Karn - Redirect

1            MR. DOLLINGER:  Thank you, your Honor.

2   Q.  You see that entry, right?

3   A.  Yes.

4   Q.  I am going to ask you Defendant's 19, your Honor.  P0178.

5   Verified petition.  You saw this yesterday, correct?

6   A.  Correct.

7   Q.  Can you tell us what that document is?

8   A.  That is an Article 78.

9   Q.  You see this document?

10  A.  Correct.

11  Q.  Page 20 or pardon me.  Page 201.

12  A.  Correct.

13  Q.  What date did you sign that?

14  A.  The date is February 12, thereabouts.

15  Q.  So this document was?

16  A.  2013.

17  Q.  I'm sorry for interrupting.  So this document was prepared

18  after the claim that you have for October 24 through

19  February 5; is that correct?

20  A.  Correct.

21  Q.  By the way, did you pay for this document?

22  A.  Yes, I paid for that document.

23  Q.  You see it there on the --

24  A.  Yes, on the invoice.

25  Q.  Is that a separate payment from any of the other payments

O873RHE1                              Rhee-Karn - Redirect

1   that you are requesting a refund on?

2            MS. LASK:  Your Honor, objection.

3            THE COURT:  I'm not exactly sure what the question is

4   actually asking.  Can you rephrase a bit.

5            MR. DOLLINGER:  Yes, my apologies, Judge.

6   Q.  What I am asking is are you seeking recovery for the

7   preparation of the Article 78?

8   A.  No, I'm not.

9            MS. LASK:  Objection.

10           THE COURT:  Overruled.

11  Q.  Any date related to the Article 78, are you seeking

12  recovery for any of the dates in preparation of the Article 78?

13  A.  No, I'm not.

14  Q.  Thank you.  Ms. Lask asked you about the final order in

15  your family court proceeding.

16  A.  Correct.

17  Q.  Do you recall the date of that order?

18  A.  June of 2014?

19           (Continued on next page)

20

21

22

23

24

25

O87DRhe2                              Rhee-Karn - Redirect

```
 1              (In open court; jury present)
 2              MR. DOLLINGER:  Your Honor, Exhibit E for the
 3    defendant, decision and order of the family court.
 4              THE COURT:  I'm sorry.  Is this a separate exhibit or
 5    is it part of another exhibit?
 6              MR. DOLLINGER:  This is the Defendant's E, your Honor.
 7              THE COURT:  They don't have letter exhibits, so I'm
 8    assuming this was attached to something as a document.
 9              MR. DOLLINGER:  It's not noted, your Honor.
10              THE COURT:  Pardon?
11              MR. DOLLINGER:  Your Honor --
12              THE COURT:  That's okay.  We just need to identify it
13    for the record properly, but why don't you proceed.
14              MR. DOLLINGER:  Thank you, your Honor.
15    Q.  I'm going to draw your attention to the signature date of
16    the document.
17              Do you see that date?
18    A.  Correct.
19    Q.  Can you read that into the record, please?
20    A.  The date is October 15, 2014.
21    Q.  When did you discharge Ms. Lask?
22    A.  I discharged October 2014.
23    Q.  So it was before the decision now?
24    A.  Correct.
25    Q.  Okay.  Who represented you between the time Ms. Lask was
```

1    discharged, assuming it was sometime early in 2014, and this

2    decision?  Did you have an attorney at all?

3    A.   I was going pro se, and then you represented me towards the

4    end.

5              MS. LASK:  Your Honor, objection, irrelevant.

6              THE COURT:  Yeah.  Mr. Dollinger, we're --

7              MR. DOLLINGER:  I'm going there.  My apologies.

8              Withdrawn, Judge.

9              THE COURT:  Okay.  Just so the jury understands the

10   term "pro se," that's when a litigant represents themselves

11   without a lawyer.

12   Q.   Okay.  I don't want to belabor the point, but, again, you

13   personally filed the first amended complaint -- the first

14   federal complaint in this matter on December 21, 2012, at the

15   direction of Ms. Lask; is that correct?

16   A.   Correct.

17   Q.   Okay.  And did Ms. Lask tell you to execute any of the

18   documents with her signature?

19             MS. LASK:  Your Honor --

20   A.   Yes, she did.

21             MS. LASK:  -- objection.  You've told us --

22             THE COURT:  The objection is sustained.

23             MS. LASK:  And it should be stricken, what she just

24   said, as well.

25             THE COURT:  The objection is sustained.

O87DRhe2                        Rhee-Karn - Redirect

1              MR. DOLLINGER:  Your Honor --

2              THE COURT:  Just go on.

3              MR. DOLLINGER:  Excuse me.  I'm asking again, may I

4    have the document you questioned the witness on related to

5    entries?  I believe it's 1290 of Bates through 1307.  May I

6    have them, please?

7              MS. LASK:  Your Honor --

8              THE COURT:  Hey.  Enough.  Enough.

9              Mr. Dollinger, you're referring to the descriptive

10   time entries; is that right?

11             MR. DOLLINGER:  Correct, your Honor.

12             THE COURT:  Okay.

13             MR. FERRANTE:  Your Honor, if I may on that, the

14   witness claimed to have never seen that, and we went nowhere

15   with it, so it wasn't really used.  And, also, we provided all

16   of our exhibits --

17             MS. LASK:  He has them.

18             MR. DOLLINGER:  Judge.

19             MR. FERRANTE:  -- in the case to plaintiffs, so --

20             THE COURT:  First of all, you did ask about it

21   yesterday of her, and you're right, I limited it.  But since

22   you asked about it, he's at least allowed to ask something, and

23   I need to see what that is.  He may, in fact, be getting

24   testimony that's precisely about what you just said.

25             So just bear with me.  I'm going to give you my copy

O87DRhe2                          Rhee-Karn - Redirect

 1  if I can find it within my book.

 2           MR. DOLLINGER:  Well, they have a copy, your Honor.

 3           MR. FERRANTE:  It's no. 6, your Honor --

 4           THE COURT:  No. 6.  Thank you.

 5           MR. FERRANTE:  -- of the plaintiff's -- the

 6  defendant's --

 7           THE COURT:  I will ask for it back after you use it.

 8           MR. DOLLINGER:  Well, your Honor, the defendant has

 9  it.

10           THE COURT:  Look, I'm just trying to help you to get

11  this going.

12           So, Ms. Shah, can you bring this to counsel, please,

13  at the podium?

14           MR. DOLLINGER:  Thank you.

15  Q.  Very simple question:  You see this document?

16  A.  Yes.

17  Q.  Okay.  Yesterday you were asked questions about the

18  document and your receiving the document and your first -- and

19  whether or not we had gone over the document.  I believe that

20  was some of the questions.

21           Do you recognize that document at all?

22  A.  I only recognize it -- we received it within the last

23  couple weeks, yeah.

24  Q.  So you -- you had a prior attorney in this matter, correct?

25  A.  I did.

O87DRhe2                          Rhee-Karn - Redirect

1   Q.  What was his name?

2   A.  His names was --

3           MS. LASK:  Your Honor, objection.  In what matter?

4   I'm not sure --

5           MR. DOLLINGER:  In this case.

6           MS. LASK:  Which case?

7           THE COURT:  Which case?

8           MR. DOLLINGER:  The case we're on trial on.

9           THE COURT:  So it was an earlier attorney.

10          MR. DOLLINGER:  Yes.  I apologize.

11  A.  Yes, I know --

12          MS. LASK:  Your Honor, objection.  Irrelevant.  We've

13  gone over this.  They're talking about actually back in

14  July 2023.

15          THE DEPUTY CLERK:  Counsel, can you please use the

16  microphone?

17          MS. LASK:  Objection, irrelevant.  This has already

18  been gone over.

19          THE COURT:  Yes.  Sustained.  We're not going to go

20  into the issue of the providing of this document between

21  counsel previously.

22          MR. DOLLINGER:  Note the exception, your Honor.

23          THE COURT:  Duly noted.

24  BY MR. DOLLINGER:

25  Q.  This is the first time that you've seen the document is

O87DRhe2                       Rhee-Karn - Redirect

1    after you discharged Ms. Lask; is that correct?

2    A.  Correct.

3    Q.  You never received it in the mail or by email; is that

4    correct?

5    A.  No.

6    Q.  Have you ever been accused of executing Ms. Lask's

7    signature without her permission?

8              MS. LASK:  Your Honor, objection.  Irrelevant.

9              MR. DOLLINGER:  It's in time relevant --

10             THE COURT:  Hold on.  Why is it relevant?

11             MR. DOLLINGER:  It goes to credibility of the witness,

12   your Honor.

13             MS. LASK:  July 23 --

14             THE COURT:  I think we've already been over this.

15             MR. DOLLINGER:  I need to approach on this, your

16   Honor.

17             (Continued on next page)

18

19

20

21

22

23

24

25

O87DRhe2                    Rhee-Karn - Redirect

```
 1              (At sidebar; jury not present)
 2              MR. DOLLINGER:  Your Honor, Ms. Lask appeared before
 3     this very -- Ms. Lask appeared before this very court and
 4     testified, and there is testimony before Judge Cote, okay, that
 5     the client forged her signature.
 6              THE COURT:  Shhh.
 7              MS. LASK:  Okay.
 8              MR. FERRANTE:  We don't have the sound machine on,
 9     judge.
10              THE COURT:  I'm sorry.  Ms. Shah, do you have the
11     sound machine?
12              THE DEPUTY CLERK:  Yes.
13              THE COURT:  It's not working?
14              THE DEPUTY CLERK:  No.
15              MS. LASK:  All of this, July 23 --
16              THE COURT:  Let's go back here.
17              MS. LASK:  Number one, this was all gone over ad
18     nauseam where he keeps trying the -- he says "this goes to
19     Ms. Lask's credibility."  You just said in there, stick to the
20     bills.  Let's go.  I stopped everything I wanted to do to stick
21     to the bills.  And then he goes back to something you ruled on
22     three times.  Three times.  Three.  July 24, before that --
23     23rd, then he lied about this whole thing and said, oh, this is
24     fake.  You ruled on it again.
25              THE COURT:  Right.  You know --
```

O87DRhe2                          Rhee-Karn - Redirect

1          MS. LASK:  You took Ms. Lask's deposition.  He did --

2          THE COURT:  What is the issue of the forged signature?

3          MR. DOLLINGER:  Your Honor, there are emails that the

4    witness has that show that Ms. Lask was the one that told her

5    to do this.  She gave her direction on how to do it.

6          Wait.  Judge --

7          MR. FERRANTE:  She already testified to that.

8          THE COURT:  Yes.  There's been no testimony that she

9    forged the signature or anything before that.

10          MR. DOLLINGER:  Excuse me.  It is before your Honor.

11    It is in your courtroom.  It is a false statement and goes to

12    her credibility.

13          MS. LASK:  He argued this three times.

14          THE COURT:  Wait.  Wait.  Wait.  You're talking about

15    on the filing of the first federal complaint, right?

16          MR. DOLLINGER:  Yes.

17          THE COURT:  They agreed that it was going to be filed,

18    and it was filed.

19          MR. DOLLINGER:  Uh-huh.

20          THE COURT:  Okay.  Ms. Lask's signature appears on it,

21    and she's saying she authorized your client and your client

22    says she didn't.

23          MR. DOLLINGER:  And now it's an inconsistent

24    statement.

25          THE COURT:  Where is the inconsistency -- hold on --

O87DRhe2                        Rhee-Karn - Redirect

1    in the testimony before the jury?  Where's the inconsistency?

2                MR. DOLLINGER:  Well, the client became aware that the

3    defendant claimed a forgery.

4                MS. LASK:  What?  This was --

5                MR. FERRANTE:  Judge --

6                MR. DOLLINGER:  Judge, it's in the record.  We have

7    the transcript.

8                MR. FERRANTE:  Yes.  We can pull the transcript.  It

9    was ruled on extensively.  It was out --

10                THE COURT:  Hold on.  It's out --

11                THE DEPUTY CLERK:  Judge, before you make any

12    decisions, the jurors need to use the restroom.

13                Can I excuse them?

14                THE COURT:  Yes.  Absolutely.  Ten minutes.

15                MR. LONERGAN:  Your Honor, could I get a word with

16    Mr. Dollinger?

17                THE COURT:  Yes.  Thank you.

18                MR. LONERGAN:  Thank you.

19                MR. DOLLINGER:  Judge, my apologies.  After discussing

20    the matter with Mr. Lonergan, I'll withdraw the question and

21    we'll proceed forward.

22                THE COURT:  Okay.  I appreciate that.

23                MS. LASK:  You --

24                THE COURT:  That's it.

25                The jury was just excused.  You are excused as well.

O87DRhe2                              Rhee-Karn - Redirect

1              MR. LONERGAN:  Thank you, your Honor.

2              THE COURT:  We'll resume in ten minutes.

3              (Recess taken.)

4              THE COURT:  Mr. Dollinger, are you done with that

5    exhibit, the time records?

6              MR. DOLLINGER:  Yes.  Do you want me to hand it up?

7              THE COURT:  When you're done with it.  I just want to

8    get it back.

9              MR. DOLLINGER:  I'm done with it.  I just don't want

10   the Marshals to show up at my house looking for me and this.

11             LAW CLERK:  I'll take it.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  (In open court; jury present)

 2                  THE DEPUTY CLERK:  Parties please rise.  Jury entering

 3     the courtroom.

 4                  THE COURT:  Please be seated.

 5                  Are we ready to resume with redirect?

 6                  MR. DOLLINGER:  Yes, sir.

 7                  THE COURT:  Please do.

 8     Q.  Just a basic follow-up question:  Ms. Karn, do you recall,

 9     was there an appeal of the order from Judge -- the judge in the

10     family court?

11                  How many appeals were there?  Do you recall?

12     A.  I do --

13                  MS. LASK:  Your Honor, objection.  Is this within the

14     scope of the time period?

15                  MR. DOLLINGER:  Within the --

16                  THE COURT:  He's following up on the questions you

17     asked.

18     A.  Yes, I appealed it.

19     Q.  You appealed what?

20     A.  The family court decision.

21     Q.  Which one?

22     A.  The one that -- the final decision.

23     Q.  And what about the temporary decision?

24     A.  Oh, the temporary decision.  That ended up -- I got

25     supervised visitation.  As far as the First Department, I'm not

1    -- I'm not really sure.

2              THE COURT:  If you don't know, that's fine.

3              MR. DOLLINGER:  Thank you, Judge.

4    Q.  What I want to ask you is were you billed for that

5    separately than the first federal action?

6    A.  Yes, I was.

7    Q.  What were the total bills?

8    A.  Total bills for --

9              MR. FERRANTE:  Objection, your Honor.

10   A.  Over 300.

11             THE COURT:  Hold on.  Total bills for everything?

12             MR. DOLLINGER:  Yes.

13             THE COURT:  I think she said it about ten times

14   already.

15             MR. DOLLINGER:  No, she didn't, Judge, within the

16   window.

17             THE COURT:  Within the window.

18   A.  $345,000.

19   Q.  For the entire --

20             MS. LASK:  Objection.

21             THE COURT:  Hold on.

22   Q.  For the entire case?

23   A.  Yes.

24             MS. LASK:  Objection, your Honor.  We're not talking

25   about the --

O87DRhe2                          Rhee-Karn - Recross

1          THE COURT:  Overruled.  But now ask specifically about

2     the window if you're going to do that.

3          MR. DOLLINGER:  For the record, Judge, I withdraw the

4     last -- the prior question on the -- I don't remember what it

5     was, but I'd like to withdraw it on the record, the question we

6     were in the conference room --

7          THE COURT:  Oh, yes.  So the question that was pending

8     when I called up counsel and we had a sidebar, that question is

9     withdrawn.

10          MR. DOLLINGER:  I have no further questions, your

11     Honor.

12          THE COURT:  All right.  Thank you.

13          MS. LASK:  Your Honor, we're looking for something.

14     I'm going to need about five minutes.  Something they raised,

15     and it's in her documents.

16          THE COURT:  Well, we just took a break.

17          MS. LASK:  And during the break I was trying to find

18     it.  I just --

19          THE COURT:  Ms. Karn.

20          MS. LASK:  We're trying to get it up on the screen.

21          THE DEPUTY CLERK:  It was just up.  There you go.

22          THE COURT:  Recross.

23     RECROSS EXAMINATION

24     BY MS. LASK:

25     Q.  So, Ms. Karn, you had testified that you terminated me in

O87DRhe2                          Rhee-Karn - Recross

1    June of 2014.  Is there any termination letter that you have

2    proof of where you terminated me?

3    A.  I -- yeah, there is an email.

4    Q.  Where?

5    A.  I would have to pull it up in my files.  It's over ten

6    years ago.

7    Q.  Well, there's an email.  What did it say?

8    A.  Basically, I wrote that I cannot send any more money,

9    because you asked me for another retainer, $60,000, and I just

10   have to -- I can't do this anymore.  And then you --

11   Q.  And then --

12            THE COURT:  Let her finish her answer.

13            THE WITNESS:  Excuse me?

14            THE COURT:  Were you done or was there more?

15            THE WITNESS:  If I recall, the email, I thanked you

16   for your work but I said -- and things were completely going

17   nowhere for me.

18   Q.  And you're saying --

19   A.  And I had to walk away and just end it.  You asked for more

20   money, and I couldn't do it.  I paid in full everything that

21   you asked for, and I went pro se.  I mean, I lost custody

22   ultimately.

23            MS. LASK:  Your Honor, may I approach?  Because I

24   really -- this is very important.  I'm trying to -- I need --

25   may we approach?  I need --

1              THE COURT:  Are you concerned about bringing up an

2    exhibit?

3              MS. LASK:  Yes.

4              THE COURT:  I just saw an exhibit on the screen.

5    That's not the one you were looking for?

6              MS. LASK:  No.

7              It's directly relevant to what she's saying.

8              THE COURT:  What aspect of what she's saying?

9    Regarding what?

10             MS. LASK:  She claims she terminated me.  I have an

11   email saying, I am withdrawing from you for these reasons, and

12   --

13             THE COURT:  Okay.

14             MS. LASK:  -- it's in the exhibits, but there were a

15   thousand of them on this computer and we're trying to find it.

16             THE COURT:  Okay.  Well, unfortunately, that is not

17   anyone's ultimate fault but the attorneys.  I gave you a strict

18   warning last night about preparing anything that might come up

19   today, and I am not going to try the jury's or my patience

20   anymore.

21             MS. LASK:  Okay.

22             THE COURT:  So I am not going to allow any more time.

23             MS. LASK:  Your Honor, if I may?

24             THE COURT:  If there's a question you want to ask

25   without the exhibit, that's fine.

O87DRhe2                          Rhee-Karn - Recross

1          MS. LASK:  I respectfully object, because we didn't

2     know she would say that today, there is no way, or how she

3     would repeat that today.

4          THE COURT:  I'm sorry.  You asked her a question about

5     termination.  You brought it up just now on cross.  She was

6     asked on direct about termination, I agree, and you're

7     following up on that, and that's fine.  You asked about an

8     email.  She told but it.  And you don't have any --

9          MS. LASK:  But the email --

10          THE COURT:  We don't have anything right now, and I'm

11     not going to take time to look for it anymore.

12          MS. LASK:  We'll find it on my direct.  Thank you,

13     your Honor.

14          THE COURT:  Okay.

15          MS. LASK:  By the time that happens, I'll be glad to

16     testify to that.

17          There was one more question.

18          THE COURT:  Okay.

19     BY MS. LASK:

20     Q.  And you say I was terminated by you I guess in June of

21     2014, but let me show you --

22          MS. LASK:  Is this working?

23     Q.  Let me show you this.  June, July, October 20th, 2014.  I'm

24     communicating to you -- subject, the form is due in 14 days.

25     See below.  Call clerk if you need to.  And that is N.Y.S.D.

O87DRhe2                          Rhee-Karn - Recross

1              Do you see that, Ms. Karn?  It's dated October 20,

2    2014, and we are --

3    A.   Right.

4    Q.   And we're still communicating, aren't we?

5    A.   We are, but this is the second action with regard to the

6    second --

7    Q.   Well, the second federal complaint was filed after June of

8    2014.

9              Isn't that correct?

10   A.   I may have gotten my dates wrong, but in the family court,

11   I withdrew.

12   Q.   You withdrew what?

13   A.   As far as continuing to fight.  I mean I went pro se.

14   Q.   Well, then you didn't withdraw.  You continued to represent

15   yourself.

16   A.   Right, because I couldn't -- I didn't have any more money

17   to be feeding into this.

18   Q.   When was the end of that trial in 2014, in the family

19   court, that you just testified to?  What was the end of the

20   trial?  Was it June of 2014?

21   A.   It was in 2014.

22   Q.   Was it June of 2014?

23   A.   You brought that order up, so it was okay I guess, that

24   order?

25   Q.   No, the order -- let me ask you about the order.  The last

O87DRhe2                          Rhee-Karn - Recross

1  | trial date of your case, your custody case, you said I was

2  | hired to handle your custody case, correct?

3  | A.  Correct.

4  | Q.  And I handled the second half of the trial after the other

5  | attorneys for two years started, correct?

6  | A.  Correct.

7  | Q.  And the trial ended on a particular date, didn't it?

8  | A.  I honestly cannot recall.  It was in 2014.

9  |       THE COURT:  That's fine.

10 | A.  It was ten years ago.  I don't recall.

11 |       THE COURT:  That's fine.  You don't need to add.

12 |       She doesn't recall.

13 | Q.  Okay.  So let me refresh your memory.

14 |       THE COURT:  By the way, the exhibit that was just

15 | being discussed is going to be Defendant's Cross 113.

16 | Q.  One second.

17 |       So we can be clear on the last date of the trial --

18 | oh, I found it.

19 |       Remember earlier I sent -- I put up the Referee

20 | Burnett --

21 | A.  Yes.

22 | Q.  -- order that you said was October 14 or 15, 2014, and you

23 | said that was the last date of the trial?  But I'm going to

24 | show you the judge showing the last date of trial where that

25 | document was May 30, 2014.

O87DRhe2                        Rhee-Karn - Recross

1    A.  Correct.

2    Q.  Does that refresh your recollection?  So was that the last

3    date of the trial?

4    A.  I assume that was the last date.

5    Q.  So I was hired to handle a custody case and trial, and the

6    trial date was over, is that correct, May 30?

7    A.  Correct.

8    Q.  So the job was complete?  The trial was over, correct, May

9    30, 2014?

10   A.  Correct.

11   Q.  Thank you.

12             THE COURT:  All right.  Ms. Karn, thank you so much.

13             (Witness left stand)

14             MR. DOLLINGER:  Judge?

15             MR. LONERGAN:  We're good.

16             MR. DOLLINGER:  All right.

17             THE COURT:  All right.  Is plaintiff done with your

18   affirmative case?

19             MR. DOLLINGER:  We are, your Honor.

20             THE COURT:  Okay.  Defense, please call your witness.

21             Will you raise your right hand, please?

22             (Witness sworn)

23             THE COURT:  Thank you.  You may proceed.

24             MR. FERRANTE:  Thank you, your Honor.

25             Just so it's easy to follow, your Honor, I'm going to

O87DRhe2                              Lask - Direct

1  be referring to Defense Exhibits One, Two, and Three, which are

2  the first federal action, the voluntary withdrawal of the first

3  federal action, and the second federal action; and then I'm

4  going to be referring to Defense Exhibits Four, Five and Six,

5  which are the billing for the periods of 10/24 to 1/24; no. 5

6  is the billing from 1/25 to 2/5, which encompasses the relevant

7  time period; and no. 6, which we were looking at earlier, which

8  is the detailed entries that we had -- I think your Honor took

9  your copy of it back, no. 6; and no. 19 will likely come up as

10  well.  That's the Article 78 that we've already seen.

11          And that's it for now, your Honor.

12          THE COURT:  All right.  Thank you.

13          Just make sure that when you put one up, that you

14  identify it --

15          MR. FERRANTE:  I will.

16          THE COURT:  -- by the exhibit number.

17  SUSAN CHANA LASK,

18      called as a witness by the Defendant,

19      having been duly sworn, testified as follows:

20  DIRECT EXAMINATION

21  BY MR. FERRANTE:

22  Q.  Good morning, Ms. Lask.

23  A.  Good morning.

24  Q.  How long have you been an attorney?

25  A.  To this date, 35 years.  As of the *Karn* case, 25.

O87DRhe2                              Lask - Direct

1   Q.  And what areas of practice -- what areas did you practice
2   in during all that time?
3   A.  At the time of the *Karn* case, for 25 years.  I'm a custody,
4   family court custody attorney, divorce and civil rights
5   attorney.
6   Q.  And at some point in time you were hired by Ms. Karn?
7   A.  Yes.  Sometime in about May, the end of May 2012, for a --
8   Q.  What issues were you working on for Ms. Karn?
9   A.  Custody case, her divorce case, which was in a different
10  court, and the custody case was in the other court, family
11  court case.  There were two judges on that, Referee Burnett,
12  Judge Sosa Lintner.
13          In the custody case, there was the Article 78 I was
14  preparing, particularly during the relevant time period here.
15  I was preparing an appeal during the relevant time period here.
16  I was preparing complaints, and when I say complaints, meaning
17  there was administrative judges that are the top judges that
18  oversee Referee Burnett, and Ms. Karn wanted me to complain to
19  them, because that is the procedure if you have a complaint
20  about the referee taking too long on a custody case.  And by
21  the time she came to me, it was already two years.  It took
22  another two years to get to the end of the trial.
23          At the relevant time, I was working on those
24  complaints with her.  She drafted some, said what do I think.
25  I would give her some ideas or sometimes -- so there were

1   different things within the custody case, the family court

2   case, relevant to this that I was doing all these different

3   things, and I was appearing at the family court many, many

4   times during this relevant period.  She wanted to recuse

5   Referee Burnett.  I argued that.  I argued all the

6   constitutional issues in the state case, because --

7             THE COURT:  Let's be careful about a narrative answer

8   here, please.

9             THE WITNESS:  Well, he asked me everything I was

10  doing, so I just wanted to be very clear.

11            THE COURT:  Well, I think at a general level --

12            THE WITNESS:  I was arguing the state constitutional

13  cases and federal cases in the state court, and it involved

14  many appearances, many -- it was trial.  And I must have

15  appeared in court about 12, 14 times easily, as well as

16  telephonic appearances.

17            There were transcripts in that case when I was hired

18  that were thousands of pages, because of her prior attorney,

19  David Scott.  She was in the middle of trial.  They take

20  transcripts, and I had to digest all of those to get up to

21  speed as to what was happening in a very complicated and

22  brutally fought between the husband and wife case.

23            I mean, there was a lot more, but --

24  Q.  Understood.

25  A.  There was a lot.

O87DRhe2                            Lask - Direct

1    Q.  Now, yesterday and today Ms. Karn testified, and you heard

2    all of her testimony, correct?

3    A.  Correct.

4    Q.  Okay.  And she was presented with invoices from you, right?

5    A.  Correct.

6    Q.  Okay.  And the relevant period for that was October 24 of

7    2012 to February 3rd, 2013, is the parameters that we've been

8    working with, correct?

9    A.  If I may correct you, it was February 5th, 2013 --

10   October 24 to February 5th.

11   Q.  Sorry.  We did do that today.

12            So it went a couple extra days to the 5th, not the

13   3rd?

14   A.  The parameters were February --

15   Q.  Right?

16   A.  The end was February 5th, 2013.  The short period between

17   October 24, 2012, to February 5th, 2013.

18   Q.  I'm showing you Defense Exhibit 14 --

19   A.  I see it.

20   Q.  -- which I believe was Plaintiff's Exhibit Two.

21            This is the billing period that we've just been

22   talking about, right?  It starts at 10/24?

23   A.  And it continues to February 5th of 2013.  Right.

24   Q.  And then there's a second exhibit, Five, which is the last

25   portion of the billing.  That's Defense Exhibit Five.

O87DRhe2                        Lask - Direct

1               You recognize that, right?

2   A.  Yes.  February 5th it ends.

3   Q.  Okay.  I want to show you what's marked as Defense Exhibit

4   Six.

5               You recognize that document, correct?

6   A.  Correct.

7   Q.  Now, you remember Ms. Karn putting up -- or, I'm sorry, the

8   plaintiff's attorneys putting up a synopsis sheet --

9   A.  Correct.

10  Q.  -- of billing hours that they claimed were towards the

11  first federal complaint?

12  A.  Correct.

13  Q.  And they encompass 10/24 through 2/4, to show it to you

14  again?

15  A.  Yes, I recall that.

16  Q.  You recall that.  And you recall Ms. Karn testifying that

17  each and every one of these hours, in her opinion, were hours

18  that you charged towards your work in the first federal action?

19              Do you remember that testimony?

20  A.  Yes.

21  Q.  Okay.  And this was the synopsis of those hours?

22  A.  Correct.

23  Q.  Okay.  When she testified that all of those hours were used

24  exclusively toward the first federal complaint, are those true

25  statements?

1    A.  Not true.  Those were not true statements.

2    Q.  And how do you know those were not true statements?

3    A.  Because looking at the bills themselves, the actual

4    billing, you know, that the client ultimately receives, which

5    is what she received, so many times it talks about Referee

6    Burnett, who has nothing to do with the federal case; it talks

7    about complaints about Referee Burnett.  That's state work.  It

8    talks about the Article 78.  I refer to it, and many lawyers

9    do, as a complaint, because it is a complaint.  It's in the

10    form of a complaint.  It's verified by the client.  So I refer

11    to it as a complaint.

12    Q.  So in the course of your normal business, you kept a

13    separate calendar with underlying billing for your practice; is

14    that correct?

15    A.  Of course.  Yes, of course.

16    Q.  Is that what we're looking at right here?

17    A.  That's the start of it for the relevant period.

18    Q.  And can you tell us how those entries were put into your

19    calendar?

20    A.  How they ended up -- oh, on this?

21    Q.  On that.

22    A.  Where are these entries from?  From my entire career and up

23    until even the time of this, when I do a case, I open up a

24    calendar on my computer, and as I'm working on the case, I'll

25    put in like, okay, I'm drafting a complaint, one hour.  Like

O87DRhe2                              Lask - Direct

1    1.0 is an hour.  I got a telephone call from a judge, it took

2    six minutes.  That translates to .10 of an hour.  So when I'm

3    doing -- I refer to this personally as my underlying bill, but

4    not everything from here goes to the final bill.

5              But that's what -- to answer your question, I open up

6    a calendar and it's pretty much simultaneous.  Sometimes at

7    best it's the end of the day, because I'm a lawyer, I'm doing

8    so many things.  As she even testified, there's a lot going on.

9    And she's not my only client, but at the time she basically

10   was, because it was every day working on her case.  So I had my

11   calender out simultaneously, and sometimes by the end of the

12   day --

13   Q.  So you're saying this is either contemporaneous or end of

14   the day type entries?

15   A.  Yes, because I can look on my computer and say, oh, these

16   emails from the court -- and sometimes, as a lawyer, you say,

17   well, I can't do it at the minute, because I was handling

18   multiple calls, so you put down .10 for the email, six minutes.

19   That's your minimum, reading the emails.  Sometimes you could

20   guesstimate, and after you do this for a while, you know, if

21   you do an order for show cause, it's going to take 40 hours.

22             Now, you could basically even estimate and tell a

23   client what something will take.

24   Q.  Now, this information then gets transposed onto invoices

25   like the invoices we've been looking at throughout the course

O87DRhe2                          Lask - Direct

1   of this trial, correct?

2   A.  Yes.  I have -- I call them bills, so if I haven't --

3   Q.  Okay.  So, bills, but you wouldn't in the normal course of

4   business or your experience you wouldn't take all of this and

5   write it in for that bill or invoice, right?

6   A.  You don't have to as an attorney.  You basically, you know,

7   if you're doing something like research, a lot of times you put

8   research for that day, and you put the amount of hours spent.

9   I mean, research could take seven hours, take eight.  It could

10  take five, depending -- it could take one hour.  But to put all

11  this in a bill to the client, it would be monstrous.

12          I mean, this document, I recall, was like 13 pages

13  just for a short period of time.  But, yes, and the client

14  basically knows what's happening, because they're working with

15  you, and they know, okay, that day we went to family court.

16  You look at the end result, bill, and you'll see, you know,

17  travel to attend court.  That's how I shorten it, one hour, two

18  hours.

19  Q.  So I would like to look at the first entry, which I'm going

20  to say is 10/24, the relevant time period.

21  A.  Sure.

22  Q.  And first I want to show you Exhibit Four.

23          And what does it say there under 10/24?

24  A.  R/R is a common abbreviation, receipt review C emails.  C

25  means client.  So receipt review client email.

O87DRhe2                         Lask - Direct

1          C-o-n-f is obviously conference, C, with client.

2     Begin drafting fed, complaint; T conferences with client.

3     Q.   Okay.   Looking at Exhibit Six again, can you look at the

4     entry for October 24 and explain to the jury what we're looking

5     at here?

6     A.   October 24 is more detailed, because a lot of times in a

7     detailed bill I'll write notes, what client is saying or doing,

8     so I can refer to this later, or even if the client has

9     questions to review.   But that's her emails.   That says, Karn

10    fam, that means family court, state court.   Receipt review long

11    emails at 4:00 a.m.   I worked non-stop with her.   And she was

12    basically calling the court a kangaroo court.

13         And then Ken is her husband.   He's a schmuck, she was

14    very upset.   T-C custody issue, state custody issue, review

15    family court file, forensics, 2011 forensics is very detailed,

16    reports in family court about the court will hire an expert to

17    go to Ms. Karn's home and her husband's home and give a report

18    and review about what is happening there.   So that took about

19    an hour.

20         Pull info from file to draft complaint.   That's an

21    hour and ten -- an hour and six minutes, 1.10.   .10 means six

22    minutes.

23         And just going on, it's all state, phone calls with

24    client regarding forensics, and begin drafting federal

25    complaint was .50.   It's just a bunch of state and federal work

O87DRhe2                          Lask - Direct

1    that were all inextricably interrelated.  So if I was working

2    with state court -- that's what it says.  If I was working with

3    state court, there's time I was -- you know, they're the same

4    exact issues that I was starting to draft the federal

5    complaint.

6    Q.  Can you point out to me which of those billing entries were

7    in fact for the first federal complaint on the October 24

8    billing?

9    A.  Sure.  It says pull info from file to draft complaint.

10   Meaning that's 1.10.  And then at the bottom, it's begin

11   drafting federal complaint .50.  So it was a total of 1.6.

12   Q.  Then switching back to Defense Exhibit Four.

13   A.  Which one would you like?

14   Q.  We're going right down the line.  Let's go to 10/25.

15   A.  And, you know, it translates it to researching civil rights

16   cases, fee cases, Rosemary Rivieccio, and sometimes you'll see

17   R.R.  She was the law guardian, and she filed a motion, an

18   order to show cause against -- which is an emergency motion

19   against Ms. Karn to pay her fee.  Ms. Karn refused to pay her

20   fee, so I was looking up fee cases, how to respond to cases.

21        I was continuing drafting a complaint, conference

22   calls with the client, receipt and review of the Rosemary

23   Rivieccio, that is R.R., email, and then I was drafting the

24   reply, as I said before, to Ms. Rivieccio.

25   Q.  Can you look at your October 25 calendar entries --

O87DRhe2                          Lask - Direct

1   A.  Yes.

2   Q.  -- and give us an understanding of how that time breaks

3   down, please?

4   A.  Well, it was -- it says Karn/family and it says R.R.

5   emails, R.R.'s order to show cause.

6           So that's an emergency motion that the law guardian

7   filed against Ms. Karn, and she's seeking fees that were due

8   from Ms. Karn.

9           I was researching civil rights cases regarding -- LG

10  means law guardian. Rosemary Rivieccio is the law guardian

11  appointed by the court.  And I'm researching civil rights cases

12  on that state issue, does the law guardian have a right to

13  represent the child as she did, because one of the issues in

14  the state case and one of Ms. Karn's complaints was how did the

15  Court just order me to pay this law guardian.

16          And in civil rights, sometimes there are cases where

17  state government actors which the family court is sometimes

18  cannot force a party to part with their money.  I mean, just

19  like that.

20          Like here you pay the law guardian.  You were ordered

21  to do it.  So I was looking up ways to reply to Rosemary

22  Rivieccio she shouldn't have to pay that fee.  It's a civil

23  rights issue.

24          We're on October 25?

25  Q.  Yeah.

O87DRhe2                        Lask - Direct

1    A.  Review trans. pages .30.  That's the state court I'm

2    reviewing.  I'm continuing.  And various notes about Karns are

3    in there about the state and then the Article 78, which I treat

4    as a complaint, because it has all the markings.  Some people

5    call it a petition.  I refer to it as a complaint.  So Article

6    78 --

7    Q.  Can you scan through October 25 and tell me which, if any,

8    billing was used towards work towards the first federal

9    complaint that we have been discussing?

10   A.  Zero.

11   Q.  So on Ms. Karn's invoice compilation, it says that four

12   hours were used for the federal complaint.  So that's not true,

13   right?

14   A.  That's not true.

15   Q.  Okay.  Can you look at 10/31?

16   A.  I see it.

17   Q.  Okay.

18   A.  It says -- oh, I apologize.  If you want me to say --

19   Q.  Yes.

20   A.  It says, continue draft fed. complaint, and if I was doing

21   something -- because at this time I wasn't sure if this first

22   federal that Ms. Karn said she filed should happen.  So I

23   was -- you know, because it was the state case, and the federal

24   case had the same civil rights issues.  I was researching civil

25   rights cases and arguing them before the family court judge.

1          So, you know, at times I would put -- well, whenever

2    it was relevant.  There wasn't that much federal complaint work

3    going on, because I didn't want to double bill her.

4          If I'm doing Article 78, a lot of the Article 78

5    dropped into this federal complaint, because I wasn't billing

6    her for this draft, so I was putting fed. before anything that

7    had to do with federal at this point.  I wasn't -- so that's

8    the explanation what October 31 is.

9    Q.  Can you look at the calendar entry for October 31 and tell

10   us what monies were used -- or I should say what hours were

11   used towards what work?

12   A.  Well, that -- my calendar shows four hours for the Article

13   78 that I was charging her for the Article 78, and when it says

14   transpose info, I basically was cutting and pasting the

15   information from the Article 78, which were facts, facts of her

16   long case of two years, and up until I was there, it was two

17   and a half years by that point, and transpose means basically

18   you cut and paste.  And I was looking to see what the draft

19   federal would look like, you know.

20         So I'm not going to charge her four hours for the

21   Article 78 and then four hours for drafting the federal

22   complaint, because I was working on the Article 78 and cutting

23   and pasting.

24   Q.  So for that date, they say that five hours were used.

25         Can you tell us what amount of time was used from that

O87DRhe2                              Lask - Direct

1   date towards the federal complaint?

2   A.   The transpose information was .30, or cut and paste.

3              (Continued on next page)

O873RHE2                          Lask - Direct

1   Q.  Do you see an entry for cross motion there?

2   A.  You mean November 1st, 2012?

3   Q.  No.  On October 31, it says cross motion simultaneously.

4   A.  Yes, it does.  I was working on other things, that's right.

5   It was the Article 78, the appeal, and I was drafting a cross

6   motion to Rosemary Rivieccio, the law guardian's emergency

7   motion for her fees that Ms. Karn refused to pay.

8   Q.  So the federal case is not filed at this point, right?

9   A.  No, not at all.

10  Q.  There is no way a cross motion could be attributed to the

11  federal complaint, right?

12  A.  No.  Nothing even --

13  Q.  Impossibility?

14  A.  Impossible.

15  Q.  The next entry that they point to is 11/2.

16  A.  It says research issues, 1.25, that's one hour and .25

17  means 15 minutes.  So I was researching for an hour and 15

18  minutes.

19  Q.  Can you look at November 2nd on your calendar billing.

20  Maybe that will help you explain a little better about what you

21  were researching.

22  A.  That bill that you just pulled up it says research.  It

23  doesn't say fed research.  It says research.  I was working

24  primarily and only really on the family court and trying to

25  figure out, as I testified before, we were talking about and

O873RHE2                          Lask - Direct

1    she had testified maybe doing a federal complaint.

2            So, on November 2, I was researching issues regarding

3    the change of custody that had happened to her.  I was pulling

4    and reviewing actually the case was *Rodger v. Samantha* I have

5    in there the First Department, and that literally translates,

6    that *Rodger v. Samantha* is in my Article 78 state filing.  That

7    state complaint that I referred to.  I was researching New

8    York -- NY JUD means New York Judiciary law.  That's state

9    cases.  Re Karns contempt.  There were contempt orders and

10   issues against her.  And none of that was to the federal.

11   Q.  Nothing at all?

12   A.  Nothing.

13   Q.  Zero for 11/02?

14   A.  *Rodger v. Samantha*, that is a First Department case.  From

15   what I recall, that had to do with civil rights cases in a

16   state case.  And that's what I was arguing to the state judge

17   Referee Burnett.

18   Q.  We're going to move to November 6.

19   A.  Okay.  I see it.

20   Q.  So for November 6, the plaintiff summary lists six hours of

21   work towards the federal complaint.

22   A.  Right.  And --

23   Q.  Now, I am going to show you the calendar entries so you

24   can --

25   A.  Well --

O873RHE2                          Lask - Direct

Q.  11/6 what does it say in the entry there on the invoice?

A.  It says draft fed complaint.  Fed -- the word fed in there,
so I was trying my best because they were so inextricably
intertwined, the state and the federal issues to separate, you
know, when I was doing the federal complaint, not the Article
78 state issue or the appeal also had the civil rights
constitutional issues.  And then after that, it just says
research/review cases.  Six hours.

Q.  Can you take a look at your calendar entry for November 6.

A.  So November 6 says Karns/fam, which is family law draft
federal complaint.  I put fed in there at that point even
though it says family, I was trying to put in whatever little
time that was in there with the Article 78 simultaneously.  So
that to me was a family, you know, a state issue.  .70 research
review cases for Article 78.  I add the research I was doing in
the First Department.  It says *Rodger v. Samantha*, that's First
Department is New York State appellate court.  And also another
case I found *Quinn v. Sherry*.  FCA means Family Court Act.
205.14.  It cites to a state statute.  About 90 days.

        And what that means is there was a Family Court Act
and there still is that directs, that's the section that I
found that a custody case in the state court must end in 90
days.  So when I found, that's a big problem when hers was
already 2 years that I'm fighting.  Now I'm hired and I'm
fighting for her and making the case that you're way past your

O873RHE2                          Lask - Direct

1   90 days, it violates her federal rights, her due process to the

2   state court.

3          And then I say re R-E means regarding and I'm

4   reviewing various orders of the state court to do that work.

5   Q.  So looking through the November 6 entry, how much time was

6   billed towards the federal complaint?

7   A.  None was filed towards the federal complaint.  Was I

8   drafting the federal complaint simultaneously with Article 78?

9   There's a .20.  I don't consider that.  If you want to add it,

10  go ahead.  But to me there was nothing directly attributed to

11  the federal complaint.

12  Q.  Next date is November 7.

13  A.  I see it.

14  Q.  And what does it say in the line in the invoice?

15  A.  It says continue federal complaint research.  Three hours.

16  Q.  Do you see your November 7 entry for your calendar entry?

17  A.  Yes, I do.

18  Q.  Can you explain the breakdown in that entry.

19  A.  It was family, I was attributing it to the family court.

20  I'm doing the federal complaint, I'm cutting and pasting, I was

21  doing research, cutting and pasting from the Article 78, so .40

22  was cutting and pasting for the federal complaint, and I was

23  researching more procedures in cases where the Article 78, 2.60

24  was going to the Article 78.

25  Q.  So, how much time was directly billed to the federal

O873RHE2                              Lask - Direct

1    complaint?

2    A.  I mean, for the cutting and pasting, .40.  If it says

3    federal complaint, I am going to say that was federal

4    complaint.

5    Q.  Go to the next entry date that the plaintiffs have listed

6    which is November 13.

7    A.  Okay.

8    Q.  You see that at the top there?

9    A.  Yes, I do.  It says, I'm sorry, conference C, that means

10   conference with the client.  Psych means there was a

11   psychologist ordered by the family court for Ms. Karn and the

12   child.  Ref stip, most likely means the Referee Burnett we made

13   a stipulation in the state court.  Receipt review transcripts

14   of August 10.  When I was counsel back then.  Research

15   constitutional cases, revise complaint.

16   Q.  November 13 has a pretty large entry.  Can you just read

17   that to yourself and then summarize it for us.

18   A.  Sure.

19   Q.  November 13 we just talked about.

20   A.  Sure.  It is basically family court stuff.  Ms. Karn is

21   sending me her own self-research about shame of New York

22   regarding New York divorce courts, she's writing me e-mails

23   about the psychiatrist.  Explanations of the forensics, there

24   was a Dr. Ravitz that was involved in the state court.  It is

25   all state courts, psychiatrist stuff, all state court.  There

O873RHE2                          Lask - Direct

was nothing, there was no federal issue or nothing like this

had anything to do with a federal matter.  I researched

constitutional cases.  It ends for appeal article petition.

That's the Article 78.  Sometimes I referred to it as a

petition.  It is complaint.  Mostly complaint.  Revises

complaint Article 78.

Q.  So, when Ms. Karn testified this was three-and-a-half hours

all paid towards federal work, that's actually not true, right?

A.  No, that's not correct.  I mean, that was, she knows what

she was sending me that day and the e-mail and she knows what

calls were with the forensics.  I'm having consultations with

her that this shows.

Q.  But again, work that you were doing for the Article 78 was

also helping you for the federal work, but you weren't charging

for both of them side by side; is that right?

A.  Well, yes, let me explain.  The work for the Article 78

ended up dropping into -- like I said, it was a cut and paste.

The whole entire case was a civil rights case basically from

the start.

        She, you know, when there is a custody case, family

court custody case, and a court takes away your child, there

are United States federal cases.  One of them is *Troxel*.  If

you are a family court lawyer, you know it.  And the first

thing you say is, holy crap, it's 90 days and they're keeping

this woman away from her child for 2 years already.

O873RHE2                          Lask - Direct

1          And then I come into the picture, you know with that,
2     that was my position.  Way too long.  There is a state statute
3     90 days, finish this custody, Referee Burnett.  It was 2 years
4     when Ms. Karn came to me.
5          So I was making the -- they were intertwined.  So if I
6     am doing an Article 78, and an Article 78, by the way, is a
7     petition or a complaint.  It says Article 78 petition, but it
8     is an actual complaint that the client verifies, which
9     yesterday she said that was her signature at the bottom, just
10    like a verified complaint.  It is an initial starting document
11    sent to a higher court which I think that went to the First
12    Appellate Court.  She testified it was filed, that the
13    appellate court has to say to the state court judge, enough
14    already.
15         You know, I'm fighting for her and I did the Article
16    78 with all the constitutional issues and what it was seeking
17    was for the higher court to tell Referee Burnett enough.  There
18    is a statute, there is a child, there is a statute of 90 days.
19    End it.  There's a child involved.  She can't see that child.
20    You are doing contempt order after contempt order and my
21    position was, and Ms. Karn said it too, the Court wasn't
22    letting her see her child.
23         So I'm fighting for her every which way.  And an
24    Article 78 had the civil rights issues.  I'm not going to
25    double charge her.

O873RHE2                          Lask - Direct

1          So when I was doing this work, I had like a lot of

2     times when I work, I have three screens open.  Okay.  And it's

3     not that I'm multitasking as much as I am being efficient, so I

4     have one screen open and maybe it's my research, I am looking

5     up I'm reading case law.  Like civil rights case law.  I have

6     another screen open, it was the Article 78, I'm drafting it.

7     And just so I don't double charge her, and I try to be as

8     efficient as possible, which is what I am, I look at -- I have

9     the third screen open, and as I'm writing it, I'm looking and

10    seeing what will this federal complaint look like.

11         She said she wanted it, she said from the beginning

12    she wanted to -- we were discussing it.  So, I was dropping it

13    into a federal complaint, same facts, same law, but, you know,

14    different courts.  Different, also different relief.  Article

15    78 says hey, state court, state higher court, appellate court,

16    tell the family court custody judge move.  Do something.

17    That's what an Article 78.

18         Federal complaint, when I say wanted to see what it

19    looks like, you're taking those facts, you are dropping it into

20    a federal complaint, but a whole different request.  Asking the

21    federal court will you get involved here because the state

22    court won't listen to her constitutional issues and we all have

23    due process rights.  And when something takes too long, at some

24    point, you have to go to a higher place.

25    Q.  Go back to Defense Exhibit 4.  The next date they list for

O873RHE2                         Lask - Direct

1   work for the federal complaint is November 19.  Can you look at

2   that line.

3   A.  Yes, revised complaint e-mailings to R.R.  It doesn't say

4   federal in there.  .25 means 15 minutes.

5   Q.  The 19th is at the very bottom there in your calendar

6   entry.  What does that say?

7   A.  Revising the Article 78 complaint.  E-mails to R.R.,

8   Rosemary Rivieccio, the attorney for the child regarding her

9   order to show cause, that's an emergency motion that I talked

10  about before in the state family court case.  That

11  Ms. Rivieccio was seeking her fees that Ms. Karn refused to

12  pay.

13  Q.  So in November 19, is there any billing that we should put

14  in for federal work?

15  A.  No, zero.

16  Q.  Their next entry is 11/28.  Can you read 11/28?

17  A.  Continue complaint which is the receipt review e-mails.

18  With Sarah pics.  Sarah was the child and Ms. Karn was

19  following Sarah and her husband during their visitations

20  against court orders and taking pictures of them crossing the

21  street and trying to make a case of, look, my ex-husband or

22  my -- he was still her husband at the time but they were in

23  divorce proceedings -- look, he has child and they're fare

24  beating.  They were jumping the turnstiles.  And that ended up

25  another motion that I had to file for her.  It was one of the

O873RHE2                           Lask - Direct

 1    issues.  So those are the pictures that I'm referring to.  She

 2    sent them to me.

 3    Q.  You see November 28 entry?

 4    A.  Yes, I do.

 5    Q.  On your detailed billing?

 6    A.  On the underlying I call it -- yes, detailed underlying

 7    billing, yes.

 8    Q.  Can you explain what's going on there?

 9    A.  November 28?

10    Q.  Correct.

11    A.  Oh.  Okay.  That's what I was talking about previously.

12    Article 78 appeal issue, I was working on the beginning to do

13    an appeal for her, one hour.

14          And then I'm talking about the numerous pictures

15    again.  New York City streets where see client stalks, is

16    stalking Ken and Sarah.  Because that was a big issue they

17    made, the husband made when he found she was doing it.  She was

18    following them during their private visitation period.

19          Conference with the client re issue.  This is all

20    custody.  E-mail from the client, you know, and I put details

21    so I remember, because when things are going real fast, I put

22    in her e-mail I got great footage, same deal including

23    sneaking -- the turnstile she's talking about.  Then I got

24    another e-mail from her later about a school party and she

25    complains Ken -- is her -- was her husband at the time, he

O873RHE2                             Lask - Direct

1    didn't attend.

2    Q.  So, for the 28th of November, is there any billing that we

3    need to add to our tally for the federal work?

4    A.  No.  It's all state.  State issues.

5    Q.  The next date on their list is November 29?

6    A.  Yes.

7    Q.  There are two entries for November 29, so please look at

8    both of them and tell us what is written there.

9    A.  I was continuing filing the complaint and actually now,

10   probably continuing with the Article 78.  It doesn't say fed in

11   here.  It was all about Sarah and Ms. Karn taking pictures of

12   her husband and Sarah during their private visitation time.

13   And then the second entry is receipt and review R.R. Rosemary

14   Rivieccio e-mail, she was complaining that Ms. Karn was

15   stalking them, the husband and the child, and Rosemary

16   Rivieccio has the child's interests that when the child is with

17   the husband, you, you know, it's his visitation time.  The

18   mother's not allowed to violate the order.

19            Then I am having conferences with Ms. Karn.  That's

20   TC.  Telling her, like, you need to stop it.  And we're talking

21   about adjourning a court date and I'm receiving e-mails from --

22   e-mails about Ken pictures.  She's sending me more pictures,

23   .25.  None of it has to do with the federal.

24   Q.  Just to be certain, can you look at your detailed

25   underlying for November 29.

O873RHE2                         Lask - Direct

1   A.  Oh.

2   Q.  You don't have to go into a long explanation.  Just give us

3   a general understanding, and if there is any federal billing in

4   there.  Take your time on that.  We don't want to get anything

5   wrong.

6   A.  Right.  You know, it's talking about all that.  And there I

7   was transposing, I was still working on the Article 78 and

8   doing a summons for the Article 78.  Like I said, in every

9   complaint has a summons.  So I referred to it as a complaint.

10  And I'm transposing federal docs for filing.  I'm not actually

11  sure but .10.  Federal is there so .10.

12  Q.  So 11/29 .10?

13  A.  Okay.

14  Q.  The next date they list in their compilation is 12/2?

15  A.  Okay.

16  Q.  You see a line for 12/2 there?

17  A.  Yes, I do.  I remember that one very well.  It says

18  continue complaint.  Again, I'm continuing probably the Article

19  78, but there were other complaints coming up at that time.  So

20  I might have just said continued complaint.  She had complaints

21  against Referee Burnett.

22          Review commission report.  Four hours.  the commission

23  report is the state matrimonial commission that the State of

24  New York organized I think it was around 2005.  I'm very

25  familiar with it because this is my field.  And that commission

O873RHE2                          Lask - Direct

1   was organized because the family court was found to be broken

2   by the state.  Everyone's complaining.  We can't see our

3   children.  It's more than 90 days, it is taking 2 years or

4   4 years.  I have a case that's 5 years.  And you fight and

5   fight.

6            So the state issued a commission and that family

7   report, the matrimonial commission that was organized gave a

8   report of everything that was wrong with the -- what do you

9   call it -- with the family court.  Same stuff I was complaining

10  about.  Trying to help Ms. Karn.  And the same stuff that ended

11  up in the Article 78 as well as what was transposed into the

12  federal complaint later.  It was very relevant.

13  Q.  Do you see your entry in your underlying for 12/2 of '12?

14  A.  Yes, I do.

15  Q.  That's --

16  A.  Yes.

17  Q.  Summarizes everything you just told us, it mentions review

18  digest the 70-page matrimonial report, correct?

19  A.  Yes.

20  Q.  Is any of that billing for 12/2 entered as work done for

21  the federal complaint?

22  A.  No.  There is nothing to do -- well, no.  It was a

23  matrimonial commission report and was argued in the Article 78.

24  Q.  The next date listed is 12/6.

25  A.  Okay.  So again --

O873RHE2                        Lask - Direct

Q.  Take a look at that and explain what's going on there.
There's two entries for 12/6.  I'm sorry.  Yes, there's two
entries for 12/6 so just take a quick look at that both of
them.
A.  So it's pretty clear these are telephone calls and receipt
and review e-mails from the client.  Receiving e-mails from the
attorneys on the state case.  Because there was no federal,
ever, you know, there is no attorneys no nothing -- the federal
wasn't even filed.  Receipt review CSW.  There was a certified
social worker Ms. Karn was ordered after all that stalking and
everything therapeutic visitation only with her child, meaning
a certified social worker would have to give a report and then
attend court via -- so there was a conference with Referee
Burnett, it was a court appearance by phone.  That was 1.5 or
an hour and a half.

        And then the second 12/6, what was happening is here
come the Referee Burnett complaints to the administrative -- I
called the administrative judge secretary and asked what the
procedure is, because Ms. Karn had complaints about Referee
Burnett taking forever and the procedure was to make a
complaint to the administrative judge.  The higher judge of the
family court.  You know, he's way above Burnett.

        I also appeared, let's see, appeared telephonically, I
guess we continued the appearance in the state case.  I was
talking to the client about strategy, you know, what do we do.

Lask - Direct

1    State court, federal court, what are we doing.

2            Fed case, it just says fed case.  We probably talked

3    about as we were talking about the state.  And we talked about

4    the complaint re Referee Burnett, could we get her removed.

5    And what about her annual review.  Ms. Karn was telling me they

6    get an annual review, you know, and I wanted to look into that

7    as well.

8    Q.  So the two entries for 12/6, how much, if any, time was

9    billed towards the federal complaint?

10   A.  Zero.  It was all state work.

11   Q.  You see 12/2 on the underlying?

12   A.  Yes, I do.

13   Q.  Is anything there different from what we just talked about?

14   A.  12/2/2012?

15   Q.  12/6 I apologize.

16   A.  Okay.

17   Q.  This is also very detailed, so you don't have to go through

18   all of it.  But, read it to yourself and give us a general

19   understanding of what's happening on those two December 6

20   entries.

21   A.  Well, because of the therapeutic and the certified social

22   worker court orders from Referee Burnett, against Ms. Karn,

23   they issued a report, Ms. Karn was washing her child's hair

24   during her therapeutic visitation, and they complained about

25   that, the social worker and the Court, they said she shouldn't

O873RHE2                          Lask - Direct

1  have been getting so involved with washing her hair.  And

2  frankly, I even thought that was crazy.  And I was, you know,

3  I'd said it's crazy, this is enough.  You know, now she can't

4  wash her own child's hair?  I see where they were coming from

5  but it was enough already.  And that's what this is about.  And

6  I was going back and forth and then it says receipt review

7  Ornstein report on the visit.  The therapeutic CSW, the

8  certified social worker will give a report, and that's what I

9  was reviewing.  So none of it is federal.

10 Q.  The next date they list is December 9.

11 A.  Okay.

12 Q.  Just generally tell us what that is.

13 A.  I'm revising a complaint.  It's not federal.  I'm

14 researching nationwide complaints regarding family court, how

15 do I complain about this family court Referee Burnett.

16 Q.  On the underlying --

17 A.  What date was it again?

18 Q.  12/9.

19 A.  Okay.  So, in summary, what's going on here is, yeah, I'm

20 talking about the child's constitutional rights in the state

21 court, like now what's happening, they are not letting the

22 child see the mother because she's washing her hair during

23 visit.  I'm researching and it says I sent her an e-mail.  I'm

24 researching law guardian rules which the law guardians,

25 Rosemary Rivieccio who is the law guardian appointed by the

## Lask - Direct

 1    court, there are rules, a huge set of laws that they have to

 2    follow.  And one of our other complaints was the law guardian

 3    was not following the rules.  She wasn't out for the best

 4    interests of the child, and that's what I was reading there, a

 5    rule book I'm talking about.

 6          I'm doing some constitutional issues.  It says

 7    research federal cases.  And then the client, you know,

 8    e-mailed, re draft long e-mail.  I'm sending her long e-mails

 9    about Dr. Michelle, that's state.  That's another psychiatrist

10    that was involved in the case.  And then I'm revising the

11    complaint for the administrative judge.  Earlier I had said I

12    called the secretary to find out what to do about Burnett.  And

13    researching issues regarding Burnett, to write that letter.

14    Q.  For this entry, the plaintiffs listed .25 hours.  Do you

15    see the .25 hours for federal work inside of that underlying

16    billing?

17    A.  No, I do not.

18    Q.  Maybe it is the .2 where it says Karn fam federal research.

19    Is that possible?

20    A.  Yes, it does say the word fed.  Karn fam fed.  So I am

21    working on the family and the federal simultaneously.  I'm

22    researching cases for family court constitutional issues, I put

23    fed.  Meaning I was -- constitutional issues are federal

24    issues.  There are also state, the state has a Constitution,

25    every state has one, too.

O873RHE2                          Lask - Direct

1   Q.  Would that be zero or .25?

2   A.  Zero.  Oh.  Are we looking -- I didn't look all the way

3   down.  December 9 it would be zero.  It was all intertwined.

4   Q.  The next entry on the Plaintiff's Exhibit is 12/10.

5   A.  Okay, I see it.

6   Q.  There are two 12/10s.  Quickly look at that and we'll

7   switch to the underlying and get a better understanding of

8   those two entries.

9   A.  I'm receiving e-mails from the client, there's pictures I

10  am reviewing.  She took some more pictures.  I'm reviewing the

11  file and revising the complaint, probably the Burnett complaint

12  at that point.  You know.  And then 12/10, receipt and review

13  client more e-mails.  And I'm continuing one of the complaints

14  in the state case.

15  Q.  You see the double entry in the underlying for December 10?

16  A.  Yes.

17  Q.  Give us a general understanding of what's going on there?

18  A.  It is family court stuff.  It says that the client Ms. Karn

19  sent me e-mails from December 9, with her own self-research for

20  federal cases in the family court.  She would do a lot of her

21  own research or dictating saying read this, read that.

22  Yesterday she testified that she did do research.

23          And just order to show cause custody family court

24  strategy.  Reviewing her pictures regarding the subway.

25  Because I had to file a motion in return.  And I'm continuing

O873RHE2                          Lask - Direct

1    the complaint now I am working on, you know, the Referee

2    Burnett complaint and the Article 78 simultaneously.

3          The second December 10 I'm continuing the Article 78

4    the Burnett complaint revisions, Referee Burnett, and I'm

5    working on an appeal now.  I'm trying to find every which way

6    legally and go through the process that we're supposed to, to

7    exhaust all remedies for this woman.

8    Q.  We'll look at it later.  Is that the appeal to the First

9    Department, do I have that?

10   A.  Correct.  That ultimately got filed I think some time in

11   January during the relevant period here, or at least I was

12   working on it during that whole relevant period.  I recall it

13   was January or February that appeal was filed.

14   Q.  So in, that listing for the December 10 dates, do we have

15   any hours for the federal to add to the tally?

16   A.  I don't see any, no.

17   Q.  The next date listed in the plaintiff's tally is 12/15.

18   Can you look at that line, take a quick look at it and we'll go

19   to the underlying so we can discuss it deeper.

20   A.  12/15 research cases on civil rights.  1983 and 1985.  1983

21   is a civil rights case that, meaning due process, 1983 means

22   everyone has due process and substantive rights in our court

23   system to have a fair trial, quickly, immediately, and not, you

24   know, going on for two-and-a-half years.  Ultimately hers was

25   four.  And that's what I was researching.  1985 is part of 1983

Lask - Direct

1    statute, federal statutes.

2    Q.  So again, they're federal statutes, but that doesn't

3    necessarily mean it's going towards the federal complaint.  It

4    could at some point, but for this research you're trying to

5    understand?

6    A.  I am arguing it in front of Referee Burnett in the state

7    court.  I'm not going to charge the client as I am -- I could

8    have taken that and double billed her and said let's say it is

9    the federal complaint too.  I was focusing on a state court

10   case.

11   Q.  So for December 15, zero?

12   A.  December 15?  Yes.  Zero.  Yes.  I see it, yes.  Zero.

13   Q.  The next date is 12/17.

14   A.  I see it.

15   Q.  Again, these are all dates and billing that Ms. Karn

16   testified to and she attributed essentially every hour of all

17   of these entries to the work on the federal complaint.  Do you

18   remember that testimony?

19   A.  Yes, I do.

20   Q.  So, take a look at 12/17 see what you wrote in there and

21   then we'll go to the underlying and we'll dig a little deeper

22   on that as well.

23   A.  So looking at 12/17, it is impossible to say all that was a

24   federal complaint because I'm researching the psych issues.

25   I'm having conferences with the client re the clerk that I

O873RHE2                          Lask - Direct

 1  called for the family court.  And the client wants the custody

 2  transferred now to another judge.  And Judge Drager is that

 3  other case I was working on her as well.  Judge Drager is a New

 4  York Supreme Court judge, totally different court, and that

 5  divorce case which was before Judge Drager was going on

 6  simultaneous.

 7  Q.  So, now I'm showing you the underlying billing for that

 8  date.  12/17.

 9  A.  Yeah.

10  Q.  Again, we don't need to go in great detail, but it is a

11  long entry so maybe just summarize for us.

12  A.  I will say there are many times I didn't charge her for all

13  the time.  You'll see long entries for this.  I don't hit them

14  with every .10, .25.  It doesn't end up in the final bill.  So

15  this entry is receiving her self-research, here she's saying I

16  copied -- sorry for sending you more stuff.  These are two

17  articles which completely outline that Dr. B -- that's

18  Dr. Brandt the psychiatrist in her case -- is liable.  So she's

19  telling me how to file a case against one of the people in one

20  of the parties in the state court case and she's saying very

21  complicated words but she understood it.  No immunity, it's

22  changed, Dr. B needs to be sued for tort.  Okay, she knows what

23  tort is.  But also she should lose her license, no person like

24  this should be evaluating and treating others.  That's what she

25  wrote.

O873RHE2                              Lask - Direct

1                  MR. LONERGAN:  I really have to object.  This

2      document, I understand has been admitted to evidence and it is

3      being brought in for it truth.  However, the witness is

4      embellishing now what this document says and saying what the

5      plaintiff meant, and what she was really saying.  And so that's

6      not what this document says.

7                  If we are going to bring in this complaint, a

8      self-serving hearsay document, let's adhere to it and let's not

9      go much beyond what is just on absolutely uncorroborated

10     statements.

11                 So I am going to have to object.  I've been sitting

12     here listening to it, but enough is enough.  This document, as

13     self-serving as it is, we need to reel that in a little bit.  I

14     am going to object to any statements by this witness that go

15     beyond the content of this document.

16                 THE COURT:  That's overruled to the extent you've said

17     it that broadly.

18                 The witness clearly is adding things to explain what's

19     going on from her perspective in and around the entries in the

20     document.  If there are individual objections because certain

21     things are speculative or whatever, you can make those

22     objections.  But, as long as it's clear that much of what she's

23     saying isn't specifically in the document, which the jury can

24     see for themselves, and she is allowed to testify about what

25     she recalls she was doing.

O873RHE2                              Lask - Direct

1              MR. FERRANTE:  I'm more than halfway done.  These are

2        just the entries they did on their case.  And I just want to

3        make sure we get through all of them.

4              THE COURT:  I would ask you to tailor your answers a

5        little more.

6              THE WITNESS:  I'll try and expedite it.  You get

7        passionate.

8        Q.  So, for 12/17, just scan it real quick and tell me, is

9        there any billing, any of those numbers that go directly to

10       work for the filing, which I will point your attention to

11       towards the bottom, it does say transpose to S.D.N.Y. filing

12       documents?

13       A.  Yes, I saw that.

14       Q.  Would that be work for the federal complaint?

15       A.  Yes, the S.D.N.Y. I was transposing information from the

16       summons of the Article 78 into the potential -- S.D.N.Y. means

17       Southern District of New York where we are all sitting right

18       now, and it is a federal court, and I was -- you know, a

19       complaint in the federal court would need a summons, so I was

20       taking the parties from the Article 78 as well and transposing

21       issues into the Southern District summons.  The summons is just

22       a one-page document.

23       Q.  That would be the --

24       A.  You could --

25       Q.  The .20 we are looking at there on the screen?

O873RHE2                      Lask - Direct

1    A.  Yeah, that was a .20.

2    Q.  Okay.  The next date is the 12/20.  Should be right there

3    in the middle of the page.

4    A.  I see it.

5    Q.  You see that line?

6    A.  Yes.

7    Q.  So it says revise and research cases?

8    A.  Yes.  It could have been anything in general.  I mean,

9    again, I'm -- yes, it says that a general statement.

10   Q.  So looking at your December 20 entry on the underlying just

11   quickly, what is it you're working on there?

12   A.  Now I'm working on the order to show cause that Ms. Karn

13   wanted to bring against the husband and I think Rosemary

14   Rivieccio, the law guardian, from what I recall.  Because she

15   was trying to get Rosemary Rivieccio off the case.  That's the

16   order to show, Article 78 transcript, that's obviously state.

17   Nothing ever happened in that first federal filing.  It was

18   immediately withdrawn.  Oh it says I am reviewing family court

19   transcript.

20   Q.  December 20?

21   A.  Zero.

22   Q.  Next entry they listed on their running tally was 12/21.

23   Do you see that there?

24   A.  Yes, I do.

25   Q.  So it's finish complaint, civil cover sheets, and summons,

O873RHE2                          Lask - Direct

1    right?

2    A.   Hmm-hmm.

3    Q.   Can you look at 12/20 on the underlying.

4    A.   Yes, I see it.   To be expeditious, it was just state court

5    transcripts I'm talking about, family court transcripts.   I'm

6    revising the state court Article 78.   I'm researching cases for

7    the order to show cause.

8              It is all state, zero to federal.

9    Q.   The next entry is 12/22.

10   A.   I see it.

11   Q.   You see that there?

12   A.   Hmm-hmm, yes.

13   Q.   And it says draft service docs e-mails see R.R. see e-mail

14   re file docs.   We'll take you to the itemized, to the

15   underlying.

16   A.   I mean, I was only charging for -- I'm sorry.

17   Q.   Can you see December 22 there at the bottom?

18   A.   Yes, I do.

19   Q.   Just very, very briefly, what do we have going on, on that

20   date?

21   A.   It's around Christmas, I'm -- there's e-mails between her

22   and Ken, they're fighting over custody, you know, visitation

23   during Christmas.   And I'm drafting service docs for the order

24   to show cause.   You have to have proof of service when you do a

25   motion for a state court case.   It's just family court stuff,

O873RHE2                         Lask - Direct

1    I'm, that's all I'm charging for is family court.  OTSC is the

2    order to show cause and I'm preparing for a January 15

3    appearance that was scheduled in the state family court.

4    Q.  Do you see anything there in the underlying that would be

5    billing for the federal complaint?

6    A.  I didn't charge for anything for the federal in that.

7           MR. FERRANTE:  Your Honor, I know we are in the 12

8    something range.  Would you like me to stop?  Would you like me

9    to continue?

10          THE COURT:  I'd like you to continue a bit.  It is

11   12:15.  I'll tell you when.  Within a half hour.  Let's see if

12   we can get through these entries.  Maybe do them in streamline

13   fashion.

14   Q.  The next date they list is 12/23.

15   A.  I see it.  And do you have a question?

16   Q.  Yeah.  Just read it real quick and we'll go to the

17   underlying so we can speed it up as best as possible.

18   A.  Right.  Receiving e-mails from her about Christmas, and

19   talking about the federal complaint for the past three days.

20   And I'm drafting the response, obviously to the state court on

21   whatever motions were available because there was nothing to

22   draft a response to, there was no federal, .25, that's it,

23   which is 15 minutes of time.

24   Q.  Again, just quickly look at the December 23 entry.  Just

25   give us a real brief description of what's happening there.

O873RHE2                        Lask - Direct

1   A.   Just she's complaining about the state court -- I'm sorry,

2   I mean the Christmas holidays just as the underlying bill said.

3   She's talking about the turnstiles again.  She's saying that

4   the child's under negligent care and then she's talking about

5   her contacting CPS.  So just everyone understands, CPS is child

6   protective services.  You know, Ms. Karn wanted to get involved

7   with them.  That's according to this.  And she's saying that

8   she should be held in contempt and there is nothing in here

9   that I see is federal.

10          THE COURT:  Then why in the billing entry for 12/23

11  does it refer to the federal complaint if there is nothing your

12  more detailed notes about it?

13          MR. FERRANTE:  It said you were speaking with your

14  client about the federal complaint.

15          THE WITNESS:  You mean in the regular bill?  12/23.

16          THE COURT:  12/23 refers to the fed complaint.

17          THE WITNESS:  Those were e-mails had.  We were talking

18  about the federal complaint but I wasn't necessarily charging

19  her for a federal complaint.  We were talking about what was

20  happening.

21          THE COURT:  Okay.

22  Q.   The next date is 12/24.

23  A.   I see it.

24  Q.   Quickly read that and we'll go over to the itemized

25  billing.

1   A.  It says federal in front of it.  And I'm talking to her, I

2   guess I got an e-mail about federal.  But it also, yeah it's

3   federal.  .25.

4   Q.  You see December 24 there?

5   A.  Yeah, and it is a little under .25.  Yes.

6   Q.  So that would be around .20?

7   A.  It would be .20.  But again, not everything translates here

8   at the end of the day.  It took a little longer, it took a

9   little less.  But if you want to do .25, go ahead.  If you want

10  to do .20, go ahead.

11  Q.  Next date listed is January 8.

12  A.  I see it.  There's two.

13  Q.  There are two entries for January 8.  They do make

14  reference to S.D.N.Y.?

15  A.  Right.

16  Q.  So, we'll go to the underlying and take a look at that?

17          MR. LONERGAN:  I'm also going to object to reference

18  of these calendar entries as "underlying."  That word is

19  nowhere used anywhere in this document.  That is another

20  embellishment.

21          THE COURT:  The objection is overruled.  You can cross

22  about that.

23          MR. FERRANTE:  I can use "detailed" if you prefer.  I

24  don't even know what underlying means, so I apologize.

25          THE WITNESS:  I called it underlying.  You can call it

O873RHE2                              Lask - Direct

1   detailed, you can call it underlying.  I refer to it as

2   underlying.

3   Q.  Take a look at January 8 and tell us how much time we are

4   putting towards the federal work.

5   A.  .05 and .10.  That's .15 which is basically receiving some

6   filing, an e-mail, that's what S.D.N.Y. means.

7   Q.  There are actually two 08s.  Take a look at it.  Looks to

8   me like a 3 but I'm going to guess that's maybe worn out and

9   they're both January 8, but I'm not sure?

10  A.  No, it is a January 8.  They're both January 8 because I'm

11  looking at the hard copy.  I don't know why this copy --

12  Q.  It listed January 8 twice on theirs.

13  A.  In any event, it's --

14  Q.  I'll show it to you.  There are two January 8s there?

15  A.  Correct.

16  Q.  So using this maybe go back and see how much between the

17  two of them you put .15 on one, maybe there is more there.  It

18  does say S.D.N.Y. filing, etc.?

19  A.  If you go back so I can see the underlying.  So it says

20  S.D.N.Y. filing notice, .05, and it says what I was working on

21  a number of things including the order to show cause the state

22  and another S.D.N.Y. filing notice.  .10.  The federal

23  complaint was filed December 21 and she testified nothing

24  happened.  Except January 8, I got a notice from the court that

25  said the complaint was there.  That's it.  Which is basically

O873RHE2                          Lask - Direct

1    an e-mail.

2    Q.  The next date on their list is January 16.

3    A.  I see it.  It says quick review of last four transcripts.

4    Transcripts are state.  There was nothing happening, a

5    conference with C.  I need the last transcripts.

6    Q.  This is 1/16 now?

7    A.  1/6?

8    Q.  There's two 16s.

9    A.  I'm sorry.  The first one is federal.  I was receiving some

10   notices, then I had an e-mail with the client.  It says .25.

11   Q.  So .25 is correct?

12   A.  Correct.

13           THE COURT:  Mr. Ferrante, I don't think you asked with

14   respect to January 8 what Ms. Lask attributes to the federal

15   action of the 2.25.

16           MR. FERRANTE:  For January it is .15.

17           THE COURT:  Okay.

18   Q.  The next entry is January 24.

19   A.  I see it.  There's two --

20   Q.  There are two of them so please take a look at both.

21   A.  As I said before, Drager is a state court judge for the

22   divorce.  I am talking to her clerk, can we consolidate the

23   cases.  There was a 9:30 appearance before Judge Drager.  I'm

24   talking to the client and I'm reviewing, and receiving C.S. is

25   Cheryl Solomon, her e-mail, she is the state court, the

O873RHE2                          Lask - Direct

1    attorney for the husband in the family court.  And also I think
2    she was on the divorce case, too.
3           The next one is conference with client.  I'm talking
4    about the federal strategy, what do you want to do.  We have a
5    strategy or not.  You filed it, what do you want to do with
6    this.
7           She also wanted libel research.  I was researching
8    libel because I recall that, I definitely recall that whole
9    libel incident where she wanted to sue her husband and the law
10   guardian for libel.  So the client said something to me, I go
11   and do research.  She asked me --
12           THE COURT:  There is -- enough.
13   Q.  I want to show you January 24 now.
14           And your Honor, we're almost done.  Only a few more
15   entries.
16           January 24?
17   A.  I'm looking at it.
18   Q.  I am going to put -- I'm sorry.  We are going down to
19   February 1 now.  We did January 24.
20           THE COURT:  You didn't ask her the question though.
21   Q.  For January 24, right.  What amount of billing from looking
22   at the details would be attributable to the federal?
23   A.  It says conference re fed strategy we must withdraw.  So
24   we're talking the strategy.  The Burnett complaints were
25   happening, so we were talking about withdrawing --

O873RHE2                          Lask - Direct

```
 1              THE COURT:  Just give the answer, please.

 2              THE WITNESS:  .05.  But that's what it says and I'm

 3    explaining exactly what happened.  That's the sentence.  Then

 4    it goes on and talks about the libel again.  And then I was

 5    researching issues with the family court.  So, .05 which is six

 6    minutes.

 7              THE COURT:  Are you including the libel research as

 8    part of the federal strategy or no?

 9              THE WITNESS:  No.  Libel is a state court action.

10    Q.  The next date listed is 2/1.

11    A.  Okay, I see it, and I'm researching regarding the federal

12    complaint.

13    Q.  I was going to go to the detailed for you.

14    A.  I'm researching.  1.5 hours.  I'm organizing files.

15    Q.  Do you see February 1 there.

16              How much of that time is attributable to the federal

17    tally?

18    A.  .30.  We are having a discussion regarding what to do with

19    the federal complaint.

20    Q.  Next entry is February 3.

21    A.  I see it.  And February 3 is talking about pre-argument

22    statement.  That is not a federal draft.

23    Q.  I apologize.  There are two February 3rds, so look at both

24    of them.

25    A.  The first one is just state.  4.5.  The second one,
```

O873RHE2                         Lask - Direct

1    researching amending the federal complaint outline issues re

2    amend.  .25.  That's all federal.  I mean, you don't have to go

3    into the underlying, it's federal.

4    Q.  So .25.

5    A.  Yes.  I mean, you have -- okay.

6    Q.  Last one they list on their tally is 2/4four.

7    A.  Yes, there's two 2/4s.

8    Q.  Two entries.

9    A.  No, none of that is -- none of that is federal.  I think

10   what they, they missed was 2/5 which is the last date within

11   this damage period.

12   Q.  The section where it says discuss cases with Kaufman

13   attorney re fed appeal Article 78 media.  Going to the

14   underlying so we can take a look.

15   A.  No.  Kaufman, I can't --

16   Q.  2/4 is a large entry.  Quickly scan and tell us what we can

17   attribute towards federal work.

18   A.  Zero.  This is all about a judge in state court.  The

19   family court drafting the appeal.  I'm working on -- that's

20   February 4.  I see nothing there that has anything to do with

21   federal.  Discuss case with Kaufman, attorney re fed.  I mean,

22   that could -- you know, appeal Article 78.  You know, there

23   were several things happening in that one hour, I mean, the

24   only time something fed, but again, I was arguing federal in

25   the state court.

O873RHE2                          Lask - Direct

1              I can't remember who Kaufman is.  He is an attorney
2     obviously, because I have attorney after it.  I might have been
3     conferencing with another attorney, I don't remember exactly.
4     But, there's that one hour encompasses the Article 78, the
5     appeal, and talking about federal issues.
6     Q.  And last entry in our time frame is the February 5 entry
7     that lists the FRCP 41 voluntary dismissal that we discussed.
8     A.  That --
9     Q.  That's when the federal complaint was voluntarily pulled
10    back; is that right?
11    A.  Yes, it is a one-page simple form, you just put in some
12    names, it is a draft form.  I showed it earlier.  One page.
13    You put in their names and I filed it electronically to
14    withdraw that first filing that she filed and that ended that.
15    That filing ended anything -- yes, okay.
16    Q.  Showing you what is Defense Exhibit 2.  Is that the
17    voluntary dismissal that we're talking about?
18    A.  Yes, it is a form.  Same language, you use it, you know,
19    attorneys use it whenever something happens, like if the
20    complaint is mistakenly filed, you go and file this.  As long
21    as no litigation, no defendants answered, nothing happened, you
22    get to voluntarily withdraw it.  Mistakes happen.  You
23    withdraw.
24    Q.  You discussed this with the client far before she said on
25    her cross-examination, right?

Lask - Direct

1    A.  Oh, definitely.  Yes.

2    Q.  I don't remember exactly, but she said she didn't hear

3    about this for a while.  That's not true, is it?

4    A.  No, it's not true.  She also said we were in constant

5    communication all the time.  And as we can all see, I'm a

6    talker.  I love to talk.  I love to explain.  And no.

7    Q.  And also filed on the ECF system, you see there at the top?

8    A.  It was filed on the ECF.

9    Q.  The ECF system is the system that attorneys use so we can

10   file things to federal court from our computers?

11   A.  Correct.  All I did was get the form, put in the names,

12   sign it with my signature, there it is and --

13   Q.  This is all public information as well, right?

14   A.  Yes.  And I just hit a button and it's filed.  If I want

15   something filed, I am going to file it on PACER, and that's

16   what this was.

17            MR. FERRANTE:  Your Honor, I'm done with this section.

18   Maybe now would be the right time to break before we start the

19   next section.

20            THE COURT:  Sure.  Let's take lunch break.  We will

21   resume at 1:30.  And I remind the jury not to discuss the case

22   amongst yourselves.

23            Enjoy lunch and we'll see you later.

24            (Jury excused)

25            THE COURT:  Are there any issues we need to talk

1   about?

2            MS. LASK:  I have one, your Honor.

3            THE COURT:  Why don't you take a seat.  And actually

4   before you bring it up, let me ask Mr. Ferrante, maybe you'll

5   be answering this too.  How much you have left time-wise for

6   Ms. Lask?

7            MR. FERRANTE:  Do you have any estimate in your mind

8   how long that was?  I lost track of time.  I'm thinking maybe

9   that was two hours.  Is that about right?  Maybe an hour and a

10  half.

11           THE COURT:  Maybe.

12           MR. FERRANTE:  I would say about the same, probably a

13  little bit more, because now is when we are going to compare

14  the complaints for the jury instruction about which parts were

15  used and which parts were not used.

16           THE COURT:  I ask you to do it as efficiently as we

17  can.  I would like to finish testimony today.

18           MR. FERRANTE:  I started thinking I was going to do a

19  whole lot of reading and we are going to streamline that

20  dramatically.

21           THE COURT:  Then we'll have cross-examination.

22           MR. FERRANTE:  Yes, yes.

23           THE COURT:  What was your issue?

24           MS. LASK:  My issue is your rules and you had stated

25  to us objection, why.  Objection why.  And when he's giving a

O873RHE2                                   Lask - Direct

1    soliloquy, it's wrong.  They are hearing something come from an

2    attorney's mouth and they are doing it again on purpose.  We

3    have stuck to the rules.  Objection relevance.  And they're not

4    coming -- yes, it is the judge's rules.

5             THE COURT:  You've made your point.  Is there any

6    response to that?

7             I sustain that and I will ask counsel state objection.

8    And if I want more, I'll ask you for more.  Okay?  Thank you.

9    Anything else?

10            MS. LASK:  One hour, your Honor?

11            THE COURT:  1:30.  Thank you.

12            (Recess)

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O873RHE2                          Lask - Direct

```
 1                         AFTERNOON SESSION

 2                              2:00 p.m.

 3               (In open court; jury present)

 4               THE DEPUTY CLERK:  All rise.  Jury entering the

 5    courtroom.

 6               THE COURT:  All right.  Welcome back from lunch.

 7               Everyone can be seated.

 8               Let's resume with the examination, please.

 9               Ms. Lask, you can come to the bench.  I remind you

10    that you are still under oath.

11               Thank you.

12               Counsel, you may proceed.

13               MR. FERRANTE:  Thank you, your Honor.

14    BY MR. FERRANTE:

15    Q.  Ms. Lask, when we left off, we had just finished reviewing

16    the billing entries that were attributed on this document that

17    the plaintiffs had used to describe what their belief of the

18    hours used towards federal were.

19               Do you remember that document?

20    A.  Yes, I do.

21               THE COURT:  For the record, it's Plaintiff's Exhibit

22    Three.

23               MR. FERRANTE:  I believe that was Plaintiff's Exhibit

24    Three, if I'm not mistaken.

25               THE COURT:  Correct.
```

O873RHE2                          Lask - Direct

```
1    Q.  So you see there, on the right-hand side, there's the hours
2    that they listed, and then there's the hours that we went
3    through together, right?  You see those?
4    A.  Correct.
5    Q.  Everybody please excuse my chicken scratch on that, but
6    when added up, we land on 5.1 hours.
7            Do you see that at the bottom there?
8    A.  Yes.
9    Q.  And the rate was 650, and the amount of monies put towards
10   the federal complaint are $3,315?
11   A.  Correct.
12   Q.  You see that, right?
13   A.  Yes.
14   Q.  Now, when we were talking, a couple of different actions
15   came up.  One of them being an order to show cause.
16           Do you remember that?  The OTSC that you had described
17   to us?
18   A.  Correct.
19           MR. FERRANTE:  Your Honor, this is in the defense book
20   listed as Exhibit 20.
21           THE COURT:  All right.
22   Q.  Is this the order to show cause that we were discussing?
23   A.  Yes.  Filed by Rosemary Rivieccio, the attorney for the law
24   guardian.
25           THE COURT:  Actually, we're looking at the affirmation
```

O873RHE2                         Lask - Direct

1    in support of the order to show cause.

2              MR. FERRANTE:  Yes.  I just have it as a complete

3    document.

4    A.  There's the first page.

5              THE COURT:  It's all right.  I just wanted to be clear

6    what we were talking about.

7              MR. FERRANTE:  Yes.

8    Q.  Just briefly, without getting into it, because we talked

9    about it earlier, but this was the document that was being

10   referred to that was filed by Rosemary Rivieccio.  And just

11   tell us briefly again what it involves.

12   A.  That is -- put that one up.  That is the order to show

13   cause I was talking about.  It was filed during the damages

14   period that we're here for.  November 2 are the dates -- oh,

15   I'm sorry, sworn to October 24, and then it's filled in -- the

16   handwriting is for us to come back on November 2 of 2012 to the

17   state court.  And it's basically supporting an affirmation.

18   This is a -- well, that's the first page.  The rest will tell

19   me --

20   Q.  And then comes the affirmation?

21   A.  Right.  So that's Rosemary Rivieccio again, and if you go

22   through it, it's basically her asking for -- keep going.  I see

23   it.  As you go through the next --

24             THE COURT:  What's the question?

25   A.  I'm trying to describe what this is, but I have to look at

O873RHE2                              Lask - Direct

1    it and remember it.  Oh, this is -- therapeutic, so in

2    paragraph five, this was all about the therapeutic visitation,

3    where they wanted a qualified social worker, or I referred to

4    it in my billing as CSW, certified social worker.

5              THE COURT:  Okay.

6    A.  And they were asking for a social worker for a therapeutic

7    visit for Ms. Karn and the child.

8    Q.  Okay.

9    A.  That's what that is.  So that is a document.

10   Q.  And we're also talking about an Article 78.

11             THE COURT:  Correct.

12   Q.  Do you remember that?

13   A.  Yes.  That I referred to as the Article 78 complaint.

14             MR. FERRANTE:  Your Honor, this is Defense Exhibit 19

15   in the binder.

16   A.  Yes, that's -- it says up top, "verified petition."  And

17   it's about -- it's very long.  It's about -- if you have a

18   question, I'll be glad to answer.

19   Q.  Does the complaint -- does this complaint contain several

20   federal civil rights issues that needed to be researched and

21   addressed?

22   A.  Yes, it does.

23             Would you like me to show you?

24   Q.  Yeah.  Just pick a page, and just give us a brief

25   description so we can move along.

O873RHE2                         Lask - Direct

```
 1              THE COURT:  Just give an example or two.
 2     Q.  Yes.
 3     A.  So it's a 12-page document, and the entire petition is
 4     about -- or the complaint is about the Court's interference
 5     with the child and the mother, the mother's -- not giving the
 6     mother access to the child.  It's showing therapeutics, giving
 7     examples such as on pages one and two, the detail in paragraph
 8     three from -- that's continuing from page two.  But I'm
 9     detailing all of the orders at that time that were in place
10     interfering with her access, and I'm making the argument on
11     page -- the arguments for her civil rights access or
12     constitutional right to affiliation with her child.
13              In paragraph four, I say it right there, that there's
14     decisions by this court for this same misconduct, denying a
15     parent's substantive and procedural due process, and I cite
16     some of the cases I was researching.  I don't site all of them,
17     but In re Rodger, which was in the billing, and Patricia C. v.
18     Bruce L.  And they so held, meaning Referee Burnett cannot
19     automatically grant petitions when no evidence supports a
20     change in custody.  Again, it's all civil rights.
21     Q.  And the parties are listed as --
22     A.  It gives the parties, just like any other complaint.
23              So next it says who are the parties, which is
24     Ms. Karn, against Judge Burnett.  And this is -- that's on page
25     two.  And then on page three it gives, if you go to the top,
```

O873RHE2                                    Lask - Direct

1      the jurisdiction and venue, which is typical of any complaint.

2      And then I go into the detailed facts, which is everything that

3      we went over in the beginning, when I was taking all that time,

4      you know, researching and transcribing transcripts of the state

5      custody.  I couldn't have done all this without having gone

6      through the entire custody before I came, which was two years

7      and thousands of documents.  And while I was there, as -- you

8      know, I'm talking about the November 2017 order.  That was way

9      before she hired me in June of -- or the end of May, June 2012.

10          And then it goes into -- so that's in the facts part,

11     page ten, and it continues to facts.  If you turn the next page

12     real quick --

13          THE COURT:  Ms. Lask, focus on the question.  Don't go

14     through the whole document.  Just show us one or two examples

15     where the complaint contains federal civil rights issues that

16     needed to be researched and addressed.

17     A.  The one or two examples were in the beginning, and then the

18     whole rest of the complaint is me reviewing all those excessive

19     transcripts that we went over in the billing.  You see trans --

20     we just went through four pages where it says that.

21          In those transcripts -- let's see, December 3rd, 2012,

22     things like that, I was arguing -- those transcripts.

23          Slow down.

24          So you have the number 39, but all these citations to

25     transcripts, that's me like around December 3rd or those times

O873RHE2                          Lask - Direct

1    where I'm in front of the state court judge, Referee Burnett,

2    and I'm arguing for due process, her federal civil rights to

3    see the child --

4    Q.  That's citing back to older arguments you're having and

5    citing them here?  That's what those transcripts were, right?

6              MR. LONERGAN:  Objection, leading, Judge.

7              THE COURT:  Sustained.

8              THE WITNESS:  It's just all the work.

9              THE COURT:  There's not a question pending.

10             THE WITNESS:  Well, he is going --

11   Q.  Another case at the bottom of nine, is that one of the

12   cases as well?

13   A.  Yes, it is.  Thank you.

14             There's another case that I was researching.  It says

15   Sixth Circuit, because I go out -- before I said research

16   nationwide, family cases, and that is the Sixth Circuit, which

17   is a Federal Court in another state.  We are the Second

18   Circuit.

19   Q.  Okay.

20   A.  So, you know, when you're researching, you're allowed to go

21   out of court -- out of the district -- jurisdiction.  Those are

22   the causes of action.

23   Q.  You're talking about FCA 205, 90-day complete custody

24   rules, all that --

25   A.  No.  Paragraph 72, 74 are state statutes and rules where I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O873RHE2                          Lask - Direct

1    was talking about that the state has to finish these cases in

2    90 days, and that's what those are saying.  You have to

3    complete the custody, in paragraph 72.  And then I'm making my

4    arguments that it violates her due process under the

5    Constitution.

6           And then the last, you know, two pages that you were

7    showing was first cause of action, second cause of action.  A

8    cause of action is in a complaint where you say, this is what's

9    wrong.  You know, for instance, number 84, there's more

10   research, the equal access to justice.  These are case laws and

11   various rules and laws.  And, correct, number 84 I'm citing

12   federal law in this state document.  In 28, U.S.C., section

13   2412(d), that's in paragraph 84, I'm making the federal

14   argument before the state courts before any federal complaint

15   was filed.

16          And hold on.  The prayer for relief.  And that's the

17   end of the complaint.  Every complaint has a prayer for relief.

18   And what you do is you ask -- the plaintiff, which she was, or

19   petitioner they call them, asking, you know, the Court for

20   certain relief.  And we were asking for them to annul an order

21   that happened at a certain time, and to enforce certain laws.

22   Q.  And just the last page for the verification.

23          Do you see --

24   A.  Every complaint -- well, nine times out of ten every

25   complaint should be verified by a client.  I make sure the

O873RHE2                          Lask - Direct

1   client verifies it, because they know what's going on.

2   Attorneys can, in state court, sign and verify for the client.

3   I tried not to, for exactly the reasons that happened today, so

4   someone can't say they didn't see it or don't know what it's

5   about.  That's signed by Margaret Rhee-Karn.

6   Q.  And the date on that is?

7   A.  It's dated February 12, the date this was completed.

8   Q.  And this is slightly outside of the window of time we're

9   discussing in this case; is that right?

10  A.  Just by a couple of days, but all the work that we're

11  referring to in there is in there or in the time period.

12  Q.  Thank you.

13  A.  You're welcome.

14  Q.  That's just the back page.  That's done for organization

15  purposes?

16  A.  Yeah.  We used to call it a blue back back in the day.

17  It's just for the court purposes.

18  Q.  Okay.  The last thing that had popped up during our

19  discussion was a notice of motion for an appeal to the

20  appellate division of the First Department?

21  A.  Correct.

22          MR. FERRANTE:  And, your Honor, before I put this on

23  the screen, this was Exhibit E of the second action, which is

24  the Defense Exhibit Three.  So it's a portion of Defense

25  Exhibit Three.  It's the exhibit attached to Defense Exhibit

Lask - Direct

```
 1   Three.
 2            THE COURT:  All right.
 3   Q.  You see there Exhibit E?
 4   A.  Yes.  So can you bring that down a bit?
 5            THE COURT:  What's the question?
 6   Q.  The question is this that appeal that we were discussing?
 7   A.  That's the notice of motion, but stop moving it for a
 8   second, because my sight -- that's the notice of motion.
 9            Can you bring it down so I can see the caption so I'm
10   sure we're looking at -- yes.  And that's Ms. Karn against
11   Kenneth Karn, and that's the first page of -- it's called a
12   notice of motion, to file an appeal for a family court case.
13   Q.  And the date on that one on the receipt is what?
14   A.  Well, it's dated February 14, 2013.
15   Q.  And would I be correct in saying that you were working on
16   this in the relevant time period, as shown in your calendar
17   entries?  Right?
18   A.  Yes.
19   Q.  That we discussed earlier?
20   A.  Yes.  It just ended up being completed February 14.
21   Q.  Of course.  It doesn't complete itself on the same day,
22   right?
23   A.  No.  You can't do that kind of work in the same day.
24   Q.  And this includes an affirmation in support, right?
25   A.  Yes.  I had to prepare that.  That's me doing an
```

O873RHE2                        Lask - Direct

1  affirmation supporting this appeal.  So that's two pages.

2  Q.  After the affirmation, we turn to an attachment that you

3  put in, right?

4  A.  Oh, that's a court order, January 15, 2013, which is within

5  the time period.  That's the state court referee Burnett's

6  signature at the bottom, and it basically is an order that had

7  to do with the state court and talking about supervised

8  visitation for the mother.

9          So this appeal was trying to attack that, as well as

10  everything else if you --

11  Q.  And then you have what's called a memorandum of law?

12  A.  Yes.  That's law, research, everything I was doing during

13  the period that we discussed earlier for this appeal.  That's

14  the first page of the memorandum.  Those are the facts in the

15  memorandum, where I'm talking about the various orders in the

16  case, just like in the Article 78.  This is almost -- this is

17  literally almost duplicated from the Article 78.  It actually

18  is.

19  Q.  All right.

20  A.  That whole listing from November 18, January 15, remember,

21  when I said I was working on two statements and then the

22  federal complaint was the third screen.

23  Q.  And it also has -- I mean, you're talking about petitions

24  that date all the way back to 2010 here, right?

25  A.  Yes.  It's the same list we went over in the Article 78.

O873RHE2                           Lask - Direct

1   Q.   Okay.  This again, just continuing, it's mentioning

2   Rosemary Rivieccio again.

3          Do you see that?

4   A.   Yeah.  It's all the memorandum of law, an almost duplicate

5   of Article 78.  The Article 78 was my main -- it's talking

6   about transcripts, exhibits.  The page you're showing now is

7   October 11, 2012.  You know, during when I was representing

8   her, various ex parte orders suspending her visitation, and of

9   course it's a memorandum of law, making arguments --

10  Q.   And this is continuing on in those arguments?

11  A.   Yes.  It's the whole memorandum, yes.

12  Q.   Okay.

13  A.   There is more to that memorandum, but apparently you

14  stopped the page -- oh, there it is.  Yeah.  It's going on.

15  Q.   Continuing on?

16          THE COURT:  You don't need to show every page.  How

17  many pages is it?

18  A.   I'm sorry.  Right there is the constitutional law.  That's

19  page -- I can't see it.

20  Q.   Page ten?

21  A.   But that's all the constitutional law that I'm arguing to

22  the state appellate court now.

23          THE COURT:  Okay.

24  A.   Long before the actual filing of the federal complaint --

25  Q.   Thank you.

O873RHE2                          Lask - Direct

 1              Now, there came a point in time where the first

 2     federal action that we've been discussing was in fact filed,

 3     right?

 4     A.  Yes.  Ms. Karn said she filed it, correct, December 21.

 5     Q.  And this is a copy of that action?

 6     A.  That's the first page of a verified complaint.  Yes.

 7     Q.  So later on, we went over earlier that on February 5th I

 8     believe it was that the voluntary dismissal of this complaint

 9     went out.  Right?

10     A.  Yes.  Correct.  I filed it from my -- the February 5th,

11     2012, dismissal of this complaint.

12     Q.  Eventually the second federal action was filed, right?

13     A.  Correct.

14     Q.  Put those side by side, so we see the December 21, '12,

15     filing on the left, and the August 30, 2013, on the right,

16     right?

17     A.  Yes, I see it.

18     Q.  So let's look at -- do you see what's called the heading

19     there, the description of the case?

20     A.  Correct.

21              THE COURT:  You're back to the first federal action,

22     right?

23              MR. FERRANTE:  Correct.

24              THE COURT:  Exhibit One?  Okay.

25     Q.  I'm going to put these side by side.

O873RHE2                           Lask - Direct

```
 1          Is there a lot -- I should say, is the heading
 2   substantially the same from the first one to the second one?
 3          MR. LONERGAN:  Your Honor, I'm going to object.  The
 4   documents both speak for themselves, and they're in evidence.
 5          THE COURT:  Well, they do speak for themselves, but I
 6   think do bear some explanation I think from the person who
 7   prepared them, so I'll allow it.  Overruled.
 8   A.  So on the left side is 2012, and that has certain parties'
 9   names, and the same exact parties are named in the 2013 filing,
10   but I added to that Judge Edwina Richardson Mendelson as a
11   party, because she was one of the administrative judges that I
12   talked about earlier.  And you have to give them notice before
13   filing a complaint is what we started.  And I added -- hold on.
14   Rosemary -- I think that's the only additional party.
15   Q.  Okay.  And the nature of the action, I just want you to
16   read this in your head as quick as you can, and let me know the
17   similarities between the two.
18   A.  I'm making the same argument, the plaintiff -- that the
19   state was interfering, the family court was interfering with
20   Ms. Karn's federal rights.
21   Q.  I'm going to turn -- can you see the parties there?
22   A.  Yeah.  Then, you're right, both the same exact thing, same
23   parties, except in the one to the right I added the judge in
24   the caption we just talked about.
25   Q.  And no. 11 and no. 17 -- can you see no. 11 on the left?
```

O873RHE2                              Lask - Direct

1    A.  Yes.

2    Q.  And then no. 17 on the right?

3    A.  Yes.

4    Q.  Is it word for word almost?

5    A.  Yes.  All of this is word for word from the left to the

6    right, except a few little changes.

7    Q.  Okay.  And 12 to 15 on this one here, on the left?

8              THE COURT:  You need to be more precise when you are

9    talking about what you are referring to, so that the record is

10   clear.

11   Q.  Twelve to 15 -- paragraph 12 through 15 on the first

12   action, which is on the left of the screen.

13   A.  They're the same as paragraphs 19 to 21 and 23 on the right

14   side of the screen.  Same exact paragraphs.

15   Q.  And 16 and 17 on the first complaint on the left-hand side.

16             Could you look at that and compare it to 25 and 26 in

17   the second?

18   A.  The same exact paragraphs, defendant, City of New York,

19   defendant city is responsible.  Same exact paragraphs,

20   duplicates.

21   Q.  Do you see at the bottom of the first complaint where it

22   says "jurisdiction and venue" on the left-hand side?

23   A.  Yes.  Same heading in the right side.  It's a duplicate.

24   The right side duplicates the left.

25   Q.  Okay.  On the left-hand side is the heading "facts."

Lask - Direct

```
 1   That's on the first complaint.  That's on the first complaint

 2   on the right-hand side, is facts, state statutes?

 3   A.  Yes.  Now it goes into the facts section.

 4   Q.  And just no. 23 on the first complaint, the left-hand side?

 5   A.  Is a duplicate of the second complaint's paragraph 53.

 6   That paragraph was put in -- yes, in January 2004, same exact

 7   thing, ends with "report to the chief judge."  Both of them are

 8   the exact duplicates, like the other paragraphs.

 9   Q.  Okay.  I want you to look at on the left-hand side, first

10   complaint, the paragraphs 24 and -- 24 to 26 on the left-hand

11   side.

12   A.  Are the exact duplicates on the right-hand side, the exact

13   duplicate paragraph.

14   Q.  Of 55 and 57?

15   A.  Yes, they are.  You see it in February 2006, paragraph 25

16   -- sorry, 55 on the right, and paragraph 24 in February 2006.

17   Then if you keep going on down, you see there are a decline of

18   the public -- could you go to the next page of both of them?

19   They're literally -- they're duplicates, yes.

20            And if you go to the next page, to the right.  All of

21   that is duplicate.  That's literally the first complaint inside

22   the second complaint.

23   Q.  You're talking about those top two paragraphs, right?

24   A.  Yes.  I'm talking about the matrimonial commission I talked

25   about earlier.  Duplicates.
```

O873RHE2                         Lask - Direct

1   Q.  All right.  And 27 through 36 are removed from the second

2   complaint; is that right?

3   A.  Correct.  It was just redundant.  I didn't need it in the

4   second, so those are out.

5   Q.  I just want to go back one second to paragraph 29 in the

6   first one, as compared to --

7   A.  Yeah.  In the -- so in the left side, 29 is talking about

8   the same information in 170 and one -- 170 to 181 on the right

9   side.  So in 29, it's a pretty long paragraph.

10          Could you raise it up on the left side?

11  Q.  Yes.

12  A.  And it keeps going.

13          Okay.  So raise it up on the right side.

14  Q.  Yes.

15  A.  And go to the next page, on the right side, is page 19,

16  because it continues.

17  Q.  This is page 19.  So it's on the top --

18  A.  So it's the next page, page 19.

19          Go to page 20.

20          Could you lower it?

21          Okay.  Yes.  It's talking about the defendant Burnett,

22  what she did, the amount of money that they're making in the

23  case.  Like paragraph 174, it's saying that what they billed

24  Ms. Karn, like defendant Brandt billed 21 to 50,000.  And on

25  the left side it's talking about the amounts, 44 to 20 -- I'm

O873RHE2                          Lask - Direct

1    sorry, about 22.  But the left-hand side is back in 2000 -- you

2    know, nine months before, so the numbers this is discussing,

3    how much Ms. Karn has to pay all these people that wanted to

4    get paid from the social work, but -- the numbers changed from

5    the right side, because five months later the facts change and

6    their bills went up.  So that's what this is arguing and

7    showing.

8    Q.  I'm going to look at paragraph 37 on the first complaint,

9    on the left-hand side.

10   A.  Thirty-seven to what on the left?  Okay.

11   Q.  It's 37 through 42 on the left-hand side.

12   A.  Okay.

13   Q.  And I want you to look at --

14   A.  Okay.  On the right?

15   Q.  -- 45 through 50.

16   A.  Those are exact duplicate complaints.

17            Could you move the left a little bit?  You'll see it

18   starts -- bring it down, the left.  245 -- exact duplicate

19   complaints, and they end with -- you know, even 50, 0it ends

20   with the same word "family court."  Maybe I added a word

21   "system," which you see on the right side.

22            So in 2013, these are exact duplicate complaints.  In

23   2014, they were moved over to paragraphs 45, 50.

24   Q.  And in paragraph --

25            THE COURT:  Just to be fair, you're saying

O873RHE2                         Lask - Direct

1    "complaints."

2              Do you mean allegations?

3    A.  I'm sorry?  What?

4              THE COURT:  You used the term "complaints," but I

5    think you're referring to the individual paragraph numbers,

6    which would be the allegations of the complaint.

7              Is that right?

8    A.  Yes.  I'm referring to paragraphs in a complaint.

9              On the left side is a complaint from December 21st.

10   On the right is a complaint from --

11             THE COURT:  I'm just clarifying that you're saying

12   those portions are the same.  You're not saying they're

13   identical, are you?

14   A.  What I'm showing is, yes, the paragraphs in the left are

15   the same paragraphs in the right, but different numbers.  They

16   were moved around.

17   Q.  Can I draw your attention to paragraph 37 on the first

18   complaint and paragraph 45 on the second complaint?

19   A.  Okay.

20   Q.  They both make reference to a case called *Troxel*?

21   A.  This, *Troxel*, mentioned earlier, yes.

22   Q.  Tell us the significance.

23   A.  *Troxel* is the case I talked about at the beginning where

24   from the start any good family court lawyer should be arguing

25   civil rights, constitutional law when a family court takes a

O873RHE2                         Lask - Direct

1    parent's rights away from their child, alienates them or -- you

2    know, *Troxel* is a United States Supreme Court, Federal Court

3    action case that basically, in summary, says parents have a

4    right to familial -- to access to their child, that's it, which

5    of course they do, unless someone is found unfit or there's

6    some kind of exception.  But we all have a right to our

7    children, to access.  So that's what *Troxel* is about.

8    Q.  Can we look at 44 and 45 on the left?

9           I'm going to turn to 82 and 83 on the second

10   complaint.

11   A.  Exact duplicates from the left side.  The first federal,

12   that was withdrawn, right, 82 and 83.  So 44 and 45, those

13   paragraphs are duplicates.  They ended up in the second.  And

14   you can see the wording.  82 starts with "on April 23, 2010."

15   So does 43 on the left -- I'm sorry, 44 on the left side.  They

16   end with, you know, talking about the custody petition.

17   Q.  So they appear in both?

18   A.  Yeah.  They're duplicates.

19           THE COURT:  I think you've given a number of examples.

20           Mr. Ferrante, can you move it along?

21           MR. FERRANTE:  Yes, your Honor.

22   Q.  Can you look at 49 through 56, and 84 through 90?  Again,

23   substantially the same?

24   A.  They're duplicates.  Yeah.  Exact duplicates.

25           On August 19, 2011, in 85.  August 15, 2011.  Same

O873RHE2                    Lask - Direct

1    words, OSCs, and, yes, duplicates.  If you want to --

2           THE COURT:  No.  As I said, I think we should move on

3    to broader questions perhaps.  You've shown examples which show

4    that parts were reused in the other.  That's been established,

5    so you don't have to show every example.

6           THE WITNESS:  Your Honor, I'm sorry.  I'm sitting here

7    and I'd like to --

8           THE COURT:  In the interest of time, we are not going

9    to go through every example.  I think an appropriate question

10   would be, to what extent did you use the first complaint in

11   drafting the second complaint; and another appropriate question

12   would be what differences were there.  But that's up to your

13   counsel to ask.

14   Q.  So do you know how many paragraphs were in the first

15   complaint?

16   A.  About 200 and -- can you show me the last paragraph of the

17   first complaint?  I think it was 235.  Yes.  That's it.  235

18   paragraphs, numbered 1 through 235.

19   Q.  Okay.  And in the second complaint?

20   A.  398.  So one of 300 -- 398.  So the left side has less and

21   the right side has additional, more.

22   Q.  All right.  So from my math, the total first paragraphs

23   that appear in the second are 218?

24           THE COURT:  What's the question?

25           MR. LONERGAN:  Your Honor, I object.

```
 1            THE COURT:  No.  Sustained.  Ask her a question.
 2   Q.  Are there 218 paragraphs from complaint number one that
 3   appear in complaint number two?
 4            MR. LONERGAN:  Your Honor, how about how many --
 5            THE COURT:  Well, I'm going to overrule the objection
 6   there.
 7            MR. FERRANTE:  I'm moving as fast as I can, your
 8   Honor.
 9            THE COURT:  Well, I'm taking counsel's representation
10   that there are approximately 218, and whether his client agrees
11   with it, I don't know.
12   A.  I went through this.  I drafted the first.  I drafted the
13   second.  218 of the 235 paragraphs in the first are in the
14   second.  And I yellowed it and outlined it.
15            So, correct, the first and the second are duplicates.
16   Q.  So a substantial number -- would you agree that a
17   substantial number of the paragraphs that were used in action
18   number one were reused in action number two?
19   A.  Basically, all of number one is in number two.  I only took
20   out those few paragraphs that we talked about, because they
21   were just redundant.
22   Q.  And there was much -- there was added material to part --
23   to action number two.  Was that because of the passage of time?
24   A.  Correct.  There were nine months in between the filing of
25   the first one on the left, and a lot was going on in that
```

O873RHE2                          Lask - Direct

1    thing.  There were more orders.  They were -- you know, that

2    was filed on the left, December 21st.  Then the January 18,

3    2013, order came out, you know, taking away more of her time

4    with her child.  And a bunch of things happened between

5    December 21 -- yes, it was nine months worth of additional

6    facts in the right side.  So that's why the right side is about

7    ten more pages in addition to the left side.

8              MR. FERRANTE:  Your Honor, I have a demonstrative

9    exhibit on this, and if you're asking me to save time, I can

10   quickly flip through it, and then we'll be done with this

11   portion of the questioning.

12             THE COURT:  Okay.  Have you shown it to your

13   adversary?

14             MR. FERRANTE:  I will.

15             THE COURT:  My question was, have you already.

16             MR. FERRANTE:  No, I have not.

17             THE COURT:  It should be done in advance to save time,

18   but go ahead, show it.

19             What are you representing the demonstrative to be?

20             MR. FERRANTE:  I'm representing the demonstrative to

21   show highlighted areas of things that were removed, and the

22   yellow -- the white parts are the part of the first complaint

23   that's retained.

24             THE COURT:  Okay.  You can ask her questions about

25   that.

O873RHE2                          Lask - Direct

```
 1              MR. LONERGAN:  So the highlighted are the new
 2      sections?
 3      Q.  Ms. Lask, correct me if I'm wrong on that -- tell us the
 4      yellow and the white on that, please.
 5              THE COURT:  Stop.  Stop.  Hold it.  Hold it.
 6              So in the demonstrative that you have without the
 7      highlighting, is that a copy of the first federal complaint?
 8              MR. FERRANTE:  No.  This is a copy of the second
 9      amended complaint.
10              THE COURT:  Okay.  This is a copy of the second
11      amended complaint.
12              MR. FERRANTE:  Yes.
13              THE COURT:  And who did the highlighting?
14              THE WITNESS:  I did.
15              MR. DOLLINGER:  There are two colors, your Honor.
16              THE COURT:  Okay.  You can use it.  Go ahead.
17      Q.  Ms. Lask, can you tell us what the highlighted portions of
18      this demonstrative exhibit are as opposed to the white
19      versions?
20      A.  This exhibit is the second complaint that was filed nine
21      months later than the -- after I withdrew the first complaint,
22      and everything in yellow highlighting is what was added to the
23      first -- I mean to the second.  I'm sorry.  So everything
24      that's not highlighted is everything that's in the first.
25      Q.  Right.  So the white part is the first?
```

O873RHE2                            Lask - Direct

1    A.  Yes, it is.

2    Q.  The yellow part is the additions to the first?

3    A.  Correct.

4            MR. FERRANTE:  Okay.  I'm just going to quickly flip

5    through it, your Honor.

6    A.  So that's the first page, and that's all the yellow.

7            Slow down.

8            If you can bring it down, so I can see?  And then

9    bring it up.

10           So all that yellow is additional.  And the reason why

11   this one -- as I said, I added, if you look at paragraph 15,

12   defendant Richardson Mendelson.  These are additions.  You

13   know, I'm adding more defendants.

14           Go ahead.

15           So that's page two.

16           Page three, could you bring it down and then up?

17           That's all additions, you know, as I was doing more

18   research, 32, all additions in yellow.

19           THE COURT:  We do not need to go through every page.

20   I will allow this exhibit to be provided to the jury, and we

21   are designating it Defendant's Exhibit 21.

22           MR. FERRANTE:  Thank you, your Honor.

23           THE COURT:  If there are a couple of things you wanted

24   to go through, that's fine.  I'm just saying we don't need to

25   go through every page.

O873RHE2                          Lask - Direct

```
 1              THE WITNESS:  It's my entire case.

 2              THE COURT:  We just don't need to go through every

 3    page.  In other words, the yellow highlights are the things you

 4    added.  The white parts are the things you --

 5              THE WITNESS:  If I can go through it and show how many

 6    highlights --

 7    Q.  It will just take a few minutes.

 8              THE COURT:  Okay.  Go through a little more.

 9    A.  Just go a little faster then, Joe.

10              All the white is the first.

11              All the white is the first.

12              All the yellow is added.

13              That whole page is the first.  That whole page is the

14    first.

15              What page are we on?  Eight, of this complaint.

16              Go a little faster, please, because --

17              That paragraph 76 was added.  Everything else is the

18    first, all of that procedural history.  The yellow was added.

19              That paragraph 97 was added.

20              Paragraph 105 was added.  It's in yellow.

21              And here's a whole bunch of additional, because there

22    was additional -- slow down.

23              That's about defendant Richardson Mendelson, so of

24    course I had to add all those facts.  It was a new defendant.

25              Page 13.  Thirteen.  Keep going.  And that is
```

O873RHE2                                    Lask - Direct

1  continuing.

2         Now we're -- there are facts about a whole new

3  defendant that was added, so of course I'm going to have to

4  add.

5         All of that is the first.  The yellow is the second

6  additionals.

7         Page 16, all of the first.  Keep going.

8         Page 17.  Could I -- defendant's custom and policy --

9  that's added.  Okay.  So we see the yellow.  Okay.  The yellow

10  was added.

11         Here's some more on paragraph 20.

12         THE COURT:  Page 20.

13  A.  I'm sorry.  Page 20.  Thank you.

14         I see it.  Yes.  Paragraph 187 was added, and it's all

15  yellow.

16         And, by the way, the -- well, yeah, you see the same

17  exact headers were in the second as in the first.  Basically,

18  the first was used as the basis to, you know, file the second

19  that was found not negligent by the Court.

20         All of that is the first.

21         And July 24, 2013, obviously is after the -- you know,

22  I'm adding facts after the first was removed on February 5th of

23  2013.  I'm changing words around here and there, and this is --

24  all that yellow is additional.  All that is additional.

25         Same exact duplicates of the first, and then

O873RHE2                          Lask - Direct

```
 1    additional information on 28.  We see the yellow.  Same thing.
 2    All the first, some of the yellow, some additional, 30.
 3              It looks like we're almost done.
 4              Now I get into the counts of -- as I told you before,
 5    a complaint has certain counts, and this is going on Count Two.
 6    Same as the first.  Maybe some additions or revisions.  Keep
 7    going.  They were the additions.  But Count Three was added.
 8    It's a completely new count.  It's about the 14th Amendment,
 9    because I wanted to make it as close to perfect as I can.
10              Count Five was added.  It's a First Amendment
11    violation.  Freedom of religion, the reason that was added, all
12    of that is because after -- you know, when certain orders were
13    coming -- Joseph, please -- we were on freedom of religion.
14              Just very quickly, because that was after the Federal
15    of February 5th was withdrawn.  Ms. Karn wanted to make a
16    religious argument, because her husband was Jewish, she was
17    Asian, and it had to do with Christmas and holidays.  And they
18    violated her religious holiday -- or interference with her
19    religious holiday.  She couldn't see her child during that
20    holiday.
21              Paragraph 316, that's another count.  I'm sorry.  Yes,
22    that was added, same exact Count Six as the first one.
23              (Continued on next page)
24
25
```

O873RHE5                              Lask - Direct

1   A.  (Continuing) All of that yellow is added.  That's all the

2   first as well.

3           Count Seven, same causes of action, Count Seven.  I'm

4   sorry.  In the first cause of action.  Here just the counts

5   were changed because I added the other counts.  The yellow is

6   just extra facts, things that happened.

7           Count Nine, all the same exact stuff as the first.

8           Count 10 was added constructive fraud, that was not a

9   claim that was in the first.  Again, certain things happened in

10  the nine months so we add a count to say fraud happened.

11  Certain things happened.

12          Count 11, yes, okay, keep going.  All the same that is

13  not in yellow, it's all from the first.  And then again, as

14  you're continuing, all the yellow is from the second.  And all

15  of that is from the first.

16          And I'm adding there on Count 14, because this is a

17  federal action, declaratory relief and injunctive.  I am asking

18  the federal court for certain declaratory relief.  There are

19  certain federal laws you can ask for that under certain

20  situations.  And that's what I was doing.

21  Q.  That's the end of the 398 paragraphs, right?

22  A.  Yes, it is.

23  Q.  Again, after the quick review that we did, do you agree

24  with me that essentially the whole first complaint is in the

25  second complaint, other than the yellow delineations?

1           MR. LONERGAN:  Objection.

2           THE COURT:  The objection sustained.  That's a leading

3    question.

4    Q.  Do you think the first and second complaint are essentially

5    the same except for some added --

6           THE COURT:  Objection sustained.

7           Why don't you ask her to what extent the first amended

8    complaint was -- I'm sorry, the first federal complaint was

9    incorporated into the second without your characterizing it.

10   Q.  In your estimation, how much of the first is incorporated

11   into the second?

12   A.  It's not an estimation.  The entire first complaint is the

13   second complaint.  I took the first complaint because it was

14   all relevant and I added all of that yellow to do the second

15   complaint.  Because nine months later, when that second

16   complaint was filed, I was working on it and amending the first

17   complaint.  So, like we said, there were 235 paragraphs in the

18   first, 218 end up in the second.  The second had about 10 more

19   pages in addition to the first, that's it.  So, everything in

20   the first was used to do the second.

21          MR. FERRANTE:  I have no further questions, your

22   Honor.

23          THE COURT:  Thank you.  Cross-examination.

24          MR. DOLLINGER:  May I have two minutes?

25          THE COURT:  You may have two minutes.

O873RHE5                              Lask - Cross

1          (Pause).

2          THE COURT:  You want to use the restroom?  Don't

3    discuss the case.  Whoever needs to go.

4          (Jury excused)

5          (Jury present)

6          THE COURT:  Ms. Lask.

7    CROSS-EXAMINATION

8    BY MR. LONERGAN:

9    Q.  Good afternoon, Ms. Lask.  My name is Larry Lonergan.  I'm

10   co-counsel today for the plaintiff in this matter.  I have

11   questions for you.  Basically start with your background.  You

12   mentioned on direct your education.

13         Where did you attend undergraduate school?

14   A.  I did not mention education and that was objected to

15   earlier, but the judge ruled that that's not within here.  I

16   never talked about my education.

17   Q.  Do you have a J.D.?

18   A.  Excuse me?

19   Q.  Do you have a juris doctorate degree?

20         THE WITNESS:  Your Honor, this was objected and this

21   is irrelevant.  We went over this in June 24.  My education is

22   from over 45 years ago and you specifically, 45.  So,

23   unfortunately.

24   Q.  You don't have a juris doctorate?

25         THE COURT:  Hold on.

O873RHE5                         Lask - Cross

1              THE WITNESS:  You made the order.

2              THE COURT:  Was this a ruling that was the subject of

3    an in limine ruling?

4              THE WITNESS:  It was in limine, it was July 24, '23,

5    and you had specifically --

6              THE COURT:  Okay.

7              THE WITNESS:  It was on their --

8              THE COURT:  I don't need anything at the moment,

9    Ms. Lask.  I'll ask you when I do.

10             Jury, I am going to apologize.  I do need to go back

11   with the lawyers and the court reporter.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O873RHE5                          Lask - Cross

 1              (At the sidebar)

 2              THE COURT:  Okay, Ms. Lask.

 3              MS. LASK:  Your Honor, unbelievable but everything

 4     that you have told them not to do, they find a way to weasel it

 5     in.  And this was specifically, thanks to my, you know,

 6     Invisalign inside my mouth.  But, you told them not to.

 7              THE COURT:  Be specific about what I told them.

 8              MS. LASK:  I think they had it on their witness list

 9     around July 20, '23.

10              THE COURT:  Witness or exhibit?

11              MS. LASK:  Witness list.

12              THE COURT:  I know what you are talking about.

13              MS. LASK:  We had a huge discussion.  What in the

14     world does that have to do with anything.  I am a lawyer, and

15     that's what I'm here as.  I'm not here as a grad.  My B.A., my

16     PhD.

17              MR. FERRANTE:  I never asked about education.  I asked

18     how long she's been a lawyer.

19              THE COURT:  Whoa.  One at a time.

20              MS. LASK:  I'll handle it.

21              THE COURT:  I understand why the plaintiffs want to

22     ask in this area, presumably for credibility.

23              MS. LASK:  We --

24              THE COURT:  This is from yeah, I don't remember which

25     day, I'm looking at my notes from when we discussed the witness

O873RHE5                         Lask - Cross

1    sheet.  I do not have the transcript in front of me.  I do not

2    know exactly what the ruling was.

3              MS. LASK:  There was a hands down ruling.  Even then

4    he did it again.  And in November of 2023, we wrote letters and

5    said stop it.  With the --

6              THE COURT:  With what specifically?

7              MS. LASK:  With the education.  It's irrelevant.  And

8    not only is it irrelevant, you said in contempt, contempt,

9    contempt.

10              THE COURT:  Right now I want to determine exactly what

11    was ruled before.  So Mr. Dollinger, what's your recollection?

12              MR. DOLLINGER:  Your Honor, I actually took very

13    copious notes on this, because it's a sensitive area for

14    Ms. Lask.

15              MS. LASK:  It's not a sensitive area.

16              MR. DOLLINGER:  No, we're here because --

17              THE COURT:  Stop.

18              MS. LASK:  We're here because --

19              THE COURT:  Stop.

20              MR. DOLLINGER:  Your Honor, the ruling was very clear.

21    I can bring it up on cross.  There is no question about it.

22    Who ever heard of not being able to bring up someone's

23    education?

24              THE COURT:  Did anyone order the transcript from that?

25              MR. DOLLINGER:  No.

O873RHE5                           Lask - Cross

1              MS. LASK:  He's lying.  I am going to say it.

2              MR. DOLLINGER:  One more time and I am going to ask

3       for a contempt order.  I'm tired of the lying.

4              THE COURT:  Hey.  Everyone, quiet.  I don't want to

5       hear anything until I'm ready to have you speak.  Don't get

6       personal with each other.  I know this is all very personal.  I

7       don't need to -- I know you are getting upset.  I do know that

8       I definitely struck out some things regarding her background.

9              MS. LASK:  Education was right out and Mr. Dollinger

10      wrote in his letter he suspect they were going to do just what

11      they did and you said no.  Three times he keeps doing this.

12      It's stupid.

13             THE COURT:  Hold on.

14             MR. DOLLINGER:  The rule is I can inquire into any

15      topic of educational background.  And in addition, okay, the

16      issue in this case is whether or not she was competent.  That's

17      already been determined she wasn't.

18             MS. LASK:  I remember.  That was the argument you said

19      is useless.

20             THE COURT:  That's exactly right.  Competent has

21      nothing to do with this.

22             MR. LONERGAN:  How about the standing to charge these

23      bills at all.  If it says on the New York State website, the

24      attorney search website that the attorney is Whittier Law

25      School.

O873RHE5                          Lask - Cross

　　　　　MS. LASK:  It has nothing to do with this case.

　　　　　MR. LONERGAN:  And this is a public document.  It says

right on the website that says that the New York State attorney

listing website says Whittier.  I'm not able to ask whether

that's true or false?

　　　　　MR. DOLLINGER:  That's what occurred.

　　　　　THE COURT:  What did I say about not speaking.  No

speaking.

　　　　　This was an issue that was discussed previously in

terms of whether it would be permissible.  There are cases

where certain subject, even for impeachment purposes, are not

permissible depending on the extent to which they can be

prejudicial because they don't pertain enough to the relevant

issues in the case.

　　　　　But just let me read through what I'm reading through.

　　　　　I'm going to read this into the record.  This is my

order of November 15, 2023 at docket no. 424.

　　　　　This order addresses the subject parties'

correspondence at docket 419 and 423.  The extent to which

plaintiff may introduce evidence and cross-examine concerning

defendant's credentials, marketing, and related matters the

plaintiff contends go to defendant's credibility.

　　　　　Plaintiff once again ignores the scope of trial.  The

trial will resolve a narrow issue.  Compensatory damages for

time expended in connection with the first federal action, and

O873RHE5                        Lask - Cross

1    the extent to which the work performed during that time was

2    reused and saved time in the second federal action.

3            Plaintiff may of course impeach defendant with prior

4    inconsistent statements, i.e. inconsistent with the testimony

5    she presents at trial, and cross-examine defendant about her

6    time entries and the work she did or did not perform.

7            The collateral matters on which plaintiff focuses,

8    e.g. bases for plaintiff's reliance on defendant retaining her

9    in the first place, however, are off limits as their limited

10   relevance is outweighed by the prejudice that will be incurred

11   inter alia confusing jury about the issues they are to resolve.

12           However, to the extent defendant opens the door to the

13   purported credibility issues raised by plaintiff, plaintiff

14   will be permitted to cross-examine commensurately.

15           And that 419 specifically raised the issue about

16   education.  That's why it was addressed in my order.  And so

17   that is one of the collateral matters to which I referred.

18           MS. LASK:  Thank you, your Honor.

19           THE COURT:  We are not going to go there.

20           MR. LONERGAN:  I want to ask a question.  On direct

21   he's asking about experience.

22           THE COURT:  You can ask her about her experience.

23           MR. LONERGAN:  How does experience --

24           THE COURT:  We're not going to get into an issue of

25   where she does or does not have her law degree.  This was an

O873RHE5                        Lask - Cross

1    issue that was brought up previously.  That has been ruled.  If

2    you want to ask her about some of her experience, fine.

3                MR. LONERGAN:  How about the fact whether or not she

4    has a law degree.

5                MS. LASK:  He just said --

6                THE COURT:  We're not going there.  This is not the

7    subject of this trial which is about the damages and about the

8    time.  And you can impeach her on things about the time that

9    are relevant.  I've already ruled that the prejudicial weight

10   of this aspect is not going to be gone into.  And it was not

11   elicited on direct.

12               MS. LASK:  Thank you.  Why they're even --

13               THE COURT:  This was all the subject of this letter.

14               MR. DOLLINGER:  If I can just put something on the

15   record.

16               MS. LASK:  No.

17               THE COURT:  Go ahead.

18               MR. DOLLINGER:  You allowed the defendant sitting here

19   for three hours to testify to her competency.

20               THE COURT:  This isn't about competency.  It is about

21   what she did or did not do.

22               MR. DOLLINGER:  I'm suggesting to you that we can

23   prove on the cross-examination what she didn't do and did do

24   and how it affected whether or not she had a J.D. or not and

25   what she was hiding.

O873RHE5                           Lask - Cross

1              MS. LASK:  How does a J.D. --

2              THE COURT:  I've given my ruling.

3              MR. DOLLINGER:  Just --

4              THE COURT:  I am sticking to my order and she did not

5     open it up on direct.  If you take your exception, that's fine.

6     We are going to go back there and move on.

7              MS. LASK:  I would like to say something because

8     earlier you said stop violating the rules, contempt, contempt.

9              THE COURT:  We're not -- we're not going to go there

10    right now.  I haven't dealt with Mr. Lonergan before.  I have

11    not had to repeatedly admonish him not to do what he is doing.

12    I had to repeatedly admonish you.

13             We're going back in and we are going to continue and

14    move on.  If there is reason for contempt going forward, I will

15    certainly make that determination.

16             MS. LASK:  I make my objection because they are

17    together these two and he stood here before you and lied and

18    said education can come in.

19             MR. DOLLINGER:  I believe that the --

20             THE COURT:  We're done within this issue.

21             (Continued on next page)

22

23

24

25

O873RHE5                           Lask - Cross

1         (In open court)

2         THE COURT:  My apologies again to the jury but we did

3    resolve the issue that we had to address.  Thank you for your

4    patience.

5    BY MR. LONERGAN:

6    Q.  To continue.

7    A.  I'm sorry.  You were going to read the order?

8         THE COURT:  No, I just read it into the record.  Go

9    on.  The subject of the last few questions is stricken.

10   Q.  You talked about your experience earlier.  Have you had

11   disputes with other clients besides our client?

12        THE WITNESS:  Objection.  Irrelevant.

13        THE COURT:  I think it's for Mr. Ferrante --

14        MR. FERRANTE:  I do make that objection.

15        THE COURT:  -- to raise.

16        Sustained.

17        THE WITNESS:  Hard to be a lawyer and a witness at the

18   same time.

19        MR. LONERGAN:  I am going to come back on this because

20   it's relevant.

21   Q.  You've had a lot of experience dealing with clients over

22   your decades of practice, correct?

23   A.  I've worked with clients.

24   Q.  And you've submitted time sheets to those clients

25   throughout your career, correct?

O873RHE5                                Lask - Cross

1   A.  Yes.

2   Q.  Have at times there been disputes about those time sheets?

3              MR. FERRANTE:  Objection, your Honor.

4              THE COURT:  Overruled.

5   Q.  In the past, have you had disputes with clients, other than

6   my client, about time sheets?

7   A.  Not that I recall while I'm sitting here.  Maybe somebody

8   asked me a question, so we fix it.  We discuss it and we do it.

9   Q.  You are an admitted attorney, correct?

10  A.  Of course.  For 35 years I testified in New York State.

11  Q.  You're a legal expert?

12  A.  I never said I was a legal expert.

13  Q.  If you look at your LinkedIn page.

14             MR. FERRANTE:  Objection.

15  Q.  You call yourself an expert.

16             THE COURT:  The objection is overruled.

17  A.  I don't know what you're talking about a LinkedIn.

18  Q.  You don't know what a LinkedIn profile is?

19  A.  The way you are talking to me, I don't --

20  Q.  Do you have a LinkedIn profile?

21  A.  Yes, there is a LinkedIn.

22  Q.  Do you call yourself a high-profile lawyer on that page?

23  A.  I'm waiting for the objection.

24             MR. FERRANTE:  Your Honor, again.

25             THE COURT:  Overruled.

O873RHE5                          Lask - Cross

1          MR. FERRANTE:  It was specifically the social media.

2     The ruling was specifically to social media and websites.

3          THE COURT:  I'll allow very little rope here.  But go

4     ahead.

5     Q.  You know the system, correct?  You know the legal system,

6     correct?

7     A.  That's a very general term.  I don't know what you mean.

8     Q.  Okay.  You don't know what the legal system means?

9     A.  The legal system.

10         THE COURT:  I don't know what you mean by it either so

11    let's be more particular.

12    Q.  As an attorney, are you bound by the disciplinary rules in

13    the State of New York?

14         THE WITNESS:  Objection, relevant.

15         THE COURT:  Overruled.

16         I will take judicial notice that there are

17    disciplinary rules for attorneys in New York that govern

18    lawyers.

19    Q.  We are supposed to avoid the appearance of impropriety,

20    correct?

21    A.  I'm not answering that.  I don't know why this is even --

22         THE COURT:  Hey, let Mr. Ferrante deal with

23    objections.  You are a witness.  The objection is overruled.

24    Go ahead.

25    Q.  So then let's cut to it.  We have your bills which are

O873RHE5                          Lask - Cross

1   Plaintiff's Exhibit 2, correct, that are at issue and I am

2   going to throw down the first page.  I want to read the very

3   top line.

4            TC re case organize file.  Cell $2.

5   A.  I'm sorry, I don't know where you are.

6   Q.  I'm 5/17 at the very top?

7   A.  That's not within the period.

8            THE COURT:  He is asking a question though.

9   Q.  I am asking a question, ma'am.

10  A.  It's right in front of my face.

11  Q.  Talk to this counsel.  I read that very first line, right?

12  TC re case organize file Cell 2.

13           That's not a sentence, is it?  Is that a grammatical

14  sentence, counsel?

15           MR. FERRANTE:  Your Honor, it speaks for itself.  It

16  says what it says.  What does it matter if it is a sentence.

17           THE COURT:  The objection you are making is overruled.

18  The objection to tone of voice and argumentative is sustained.

19  Q.  That is not a sentence, is it?

20  A.  It is to me.

21  Q.  To you?

22  A.  It is a sentence I use in my bills and that all lawyers use

23  the same thing.

24  Q.  All lawyers.  How do you know that?

25  A.  Because I actually review lawyer bills all the time.  In

O873RHE5                              Lask - Cross

```
1    the custody case Ms. Rivieccio gave her bills, if you remember.
2    I testified that Ms. Rivieccio brought an order to show cause
3    because Ms. Karn refused to pay her bills and Ms. Rivieccio's
4    bills were very similar.
5    Q.  Are you sending this bill to Ms. Rivieccio?
6    A.  Sir, tone of voice.
7         MR. FERRANTE:  Your Honor, objection, again
8    argumentative.
9         THE COURT:  Sustained.
10   Q.  Come on.  You're sending this bill to Maggie Karn, right,
11   right?  Isn't that what you did with this bill?  You sent it to
12   Maggie Karn?
13   A.  That's the bill, yes.
14   Q.  Okay.  And the next line below that R/R C e-mail re David
15   atty, T-C re W/DRL.
16        My question to you, how does a layperson know what
17   that possibly means without some sort of legend on these bills?
18   How is Maggie Karn supposed to divine what you mean?
19   A.  I can't speak for Maggie Karn.  All my clients get a legend
20   and I explained before.  R/R is receipt review.  We all know
21   it.
22        MR. LONERGAN:  Objection.
23        THE WITNESS:  You asked me a question.  I answered it.
24        THE COURT:  Hey.
25        THE WITNESS:  He's laughing.
```

O873RHE5                          Lask - Cross

```
 1              THE COURT:  This is how I have to deal with my kids
 2     sometimes.  The admonishment about arguing goes just as much
 3     for the witness as it does for counsel.
 4     Q.  And then looking down through the rest of these entries,
 5     and on these bills that you sent, I don't see a legend, I don't
 6     see anything to help decipher these hieroglyphics that you
 7     include in this bill.
 8              How is a layperson supposed to divine --
 9              MR. FERRANTE:  I'm going to object to hieroglyphics.
10              THE COURT:  Overruled.
11     A.  I just told you, she got the -- all my clients get what R/R
12     means.  When I say T to C and we know.  If she has any
13     questions, she can always ask if she didn't understand.
14     Q.  Is the legend in evidence?
15     A.  There was no reason to.  You didn't put it in evidence and
16     neither did we.
17     Q.  I am asking the question.  Does this document contain any
18     kind of a legend or any help to define what this shorthand
19     means?
20     A.  It doesn't have to.  The client's gets the legend when they
21     sign up with me.
22     Q.  Where is that?
23     A.  I don't know where she put it.
24     Q.  It's your duty to prove what you're saying here.  So where
25     is it?  Have you put that into evidence or not?
```

O873RHE5                          Lask - Cross

1            MR. FERRANTE:  Your Honor, there is no duty to prove

2       anything.  This is a damages trial.

3            THE COURT:  I know you didn't mean it when you said

4       that, but obviously the plaintiff has the burden of proof to

5       prove her damages.  Defendant has the burden of proof, as I

6       have said, to show to what extent the work you used in the

7       first federal action was used in the second federal action.

8            The Court will take judicial notice that the legend to

9       which the witness is speaking is not in evidence.

10  Q.   So why is it Maggie Karn's job to decipher these bills?

11  A.   I never said it was her job to decipher anything.  I gave

12      her a legend.

13  Q.   When you were on direct, when you were cross-examining

14      Maggie Karn earlier today, you took issue with the fact that

15      she never complained about any of these bills.  Do you remember

16      that?

17  A.   I asked her if she complained about the bills, correct.

18  Q.   Right.  And she said no?

19  A.   She said no and she paid them.

20  Q.   Did you ever go through any of the entries with her?

21  A.   If she ever had a question, I think this was 10 years ago,

22      little more.  She said we were talking constantly, we had

23      communications, phone calls all the time and e-mails.  So if

24      she ever had a question, I was ready, willing, and able.  I was

25      there 24 hours for her.  Obviously, according to the bills.

O873RHE5                        Lask - Cross

1   Q.  Let's go down to the item that says 7/13:  RR C e-mails T/C

2   cell $2.

3              What's cell $2 mean?

4   A.  I don't know.  That was 10 years ago.  Cell calls $2, I

5   don't know.  Well, obviously it wasn't charged.  It's not in

6   the other side.  So, I don't know what that was.

7   Q.  Are you saying it was 10 years ago yet you were able to

8   recall on direct precisely every entry?  Yes?

9   A.  You are asking for, yeah, the entries that had to do with

10  the scope of this trial.  You're way out of it and I never

11  looked at this in the longest time.  You are talking about

12  things that we're not even here for.

13  Q.  7/13 is an item that is being challenged and sought for

14  recovery.

15  A.  I'm sorry.  But that's outside the scope of the damage.

16  Q.  So --

17             THE COURT:  Counsel, I'm sorry.  I understand from my

18  deputy that one of the jurors needs a quick bio break and I

19  think we all want that so they can pay attention and be

20  focused.  So if there is a juror that needs to do so, please do

21  so.

22             (Pause)

23             THE COURT:  All righty, we are now all back.  Please

24  continue.

25  Q.  I'd ask you to take a look at item 10/24, the lower the

O873RHE5                              Lask - Cross

1    page that's on the screen.

2    A.  I see it.

3    Q.  RR C e-mails, conf-C begin drafting fed compl; T confs with

4    client.  And then a five at the end for five hours.  This is

5    you encapsulating you did five hours on the 24th of October in

6    2012?

7    A.  Encapsulating some of the work I did that day.  The

8    underlying that I testified to goes into more detail about what

9    each one is.

10   Q.  How much time of this five hours from -- can you tell from

11   this document of those five hours were spent begin drafting

12   federal complaint?

13   A.  This document adds all that time together, because -- I'm

14   sorry, 10/24?

15   Q.  Yes.

16   A.  Begin drafting federal complaint?

17   Q.  Yes.

18   A.  There is conferences so obviously not all five hours is

19   regarding the drafting of the complaint.  That's why we have, I

20   testified that's why I keep my underlying.  If there is ever a

21   question, we want to go down point by point, if a client has a

22   question, we review.

23   Q.  When did you send those entries, those calendar entries,

24   when did you send those to Maggie Karn?

25   A.  If you can show me the top, I can see the date of the bill.

O873RHE5                          Lask - Cross

1   Q.  I'm asking you, counsel, when did you send the calendar

2   entries, our Exhibit 6, when did you send those to Maggie Karn?

3   A.  Sir, I'm sorry, but it is heard for me to answer you when

4   you're combating me like that in that tone of voice.  But I

5   would be glad to answer but please, just keep it a little

6   calmer.

7            THE COURT:  Okay.  Enough.

8   Q.  I'm going to speak clearly and I'm going to ask my

9   questions and I hope you answer them.

10           THE COURT:  Both of you cool it.  He is asking about

11  the calendar entries that you said you keep.  For clarity, why

12  don't you put out Defendant's Exhibit 6.

13           THE WITNESS:  Okay.  I didn't understand what he was

14  asking because it's hard for me to understand with that --

15  Q.  Here is an example.

16  A.  Oh, my underlying calendar?  You're talking about -- yes.

17  When were these sent to Maggie Karn?  We don't send these to

18  clients unless they have a question.  I can pull it out and say

19  we were talking about this on this date, I keep detailed notes,

20  this, this, and that.  You know, clients know what's happening

21  on a daily basis.

22           MR. LONERGAN:  Judge, this is so far afield.

23           THE COURT:  She's answered the question enough.

24  Please go forward.

25           THE WITNESS:  Clients know what's happening on a daily

1    basis.

2              THE COURT:  Ms. Lask, first of all, you're

3    speculating.  Secondly, you are going beyond the scope of the

4    question.  Please continue with your questions.

5    Q.  When you said "we keep these," who do you mean by we?  You

6    said we keep these.  Who is we?  Is that just you?

7    A.  This is an underlying calendar that attorneys, most

8    attorneys I know keep it.  I have kept it.  I've taken CLE

9    courses about it.  I have read -- it's my calendar.

10   Q.  It's your calendar.  So do you share this with anybody?  Do

11   you share it with a paralegal or these are just your entries

12   you make by yourself?

13   A.  I testified before this comes from my calendar.  When I do

14   a case, I have my calendar open and either simultaneous or by

15   the end of the day I'm looking at all the work and I'm adding

16   the time.  It is a little obvious opening an e-mail sometimes

17   which is six minutes.  Every attorney does charges a minimum.

18   Most attorneys charge a minimum .25.  I literally go down to

19   six minutes.

20   Q.  So again you are not answering the question.  This is even

21   more shorthand than your own shorthand, correct?

22   A.  I don't understand that question.

23   Q.  Well, these are not complete sentences and they're not

24   complete words.  So they're shorthand, yes?

25   A.  What on this document?

1   Q.  Let's take a look at what's up right now.  Okay.  Karn/fam

2   this is 8/14/12 R/R C e-mails quickly from past week, file

3   review, .25.

4   A.  It follows the legend I give every client.  R slash fam we

5   are working on the family court case.  CT is court, fam is

6   family.  These are my own personal underlying calendars.

7   Q.  You can write whatever you want on this, right?  You can

8   write whatever you want.  No one looking at this at the time

9   you write it.  You don't have a partner, you don't have an

10  associate, you don't have a paralegal?

11  A.  I never said --

12  Q.  This is whatever you want on these calendar entries, right?

13          MR. FERRANTE:  Objection.

14          THE COURT:  Overruled.

15  A.  First of all, you said I don't have a partner or a

16  paralegal.  So I don't know why you're assuming that.  And then

17  second, at the time I did have paralegals.  And third, your

18  question is you are accusing me of something.  I'm an attorney.

19          THE COURT:  Ms. Lask, last time.  You're on

20  cross-examination.  You answer the question that is asked.  You

21  and your counsel will have an opportunity to follow up.  I know

22  it is hard to resist when you are an attorney yourself, but

23  this is cross-examination.

24          THE WITNESS:  I was answering the question.  Literally

25  my process is to write what I am doing simultaneously or within

O873RHE5                              Lask - Cross

1   the same day.  That's what I testified to.

2   Q.  Is there anything that can corroborate your testimony that

3   you didn't write this 5 years after the fact?

4            MR. FERRANTE:  Your Honor, I object.

5            THE COURT:  Overruled.

6   A.  This is my calendar.  This is what I kept.  I testified to

7   that.

8            MR. LONERGAN:  Could you read the question back,

9   please.

10           THE COURT:  "Is there anything that can corroborate

11  your testimony that you did not write this 5 years after the

12  fact."

13  A.  And I said, I testified, yeah, the corroboration is me.  I

14  am sitting here.  You called me as your witness.  I'm sitting

15  here.

16  Q.  And can anything or anybody corroborate that fact that you

17  just said, beyond you in your own little world, making this

18  entries, is there anything that?

19           MR. FERRANTE:  Your Honor, objection.  Your own little

20  world.

21  Q.  You didn't concoct this from whole cloth?

22           MR. FERRANTE:  Objection.

23           THE COURT:  Counsel, he asked a question.  He finishes

24  his question.  You object.  And then I rule.  The objection is

25  overruled.  Go ahead.

O873RHE5                          Lask - Cross

1   A.  I don't know what you mean by my own little world.

2   Q.  Please answer the question.  Is there anything to

3   corroborate the fact that you wrote these contemporaneously?

4   A.  I answered that before and I said you called me up here,

5   you asked me questions, and I testified these are my bills.

6   I'm corroborating it.

7   Q.  No.  How about beyond you, beside you, you can say anything

8   you want.  You can write anything you want.  I want external

9   evidence to show that you didn't just concoct these out of

10  whole cloth.  And there is nothing, right?

11  A.  You know, yeah, there would have been much more, in fact

12  when this was raised, the judge ordered --

13          THE COURT:  Hey.  We're not getting into what the

14  judge ruled or didn't.  The question is, are you aware of any

15  other evidence, beyond your own testimony and the document

16  itself, that it was made contemporaneously, the day of, and not

17  at some point in the future?

18          THE WITNESS:  I have answered this three times.  These

19  are my calendars we make and transfer them over to the final

20  bill.  I'm corroborating it.

21  Q.  How about besides you?

22  A.  Who else would be doing my billing?

23  Q.  You tell me.

24          THE COURT:  Let her finish.  One at a time.

25  A.  I'm sorry.  What?

O873RHE5                          Lask - Cross

```
 1   Q.  Tell me who could have corroborated this?

 2           THE COURT:  Let's not talk about who could.  Let's

 3   talk about who did or who was there to do so.  Let's not

 4   speculate about who could.

 5   A.  What's the question?

 6   Q.  Did anybody besides you know anything about these calendar

 7   entries that were allegedly made back in 2012 or 2013?

 8   A.  Not allegedly.  I testified that they were made and

 9   simultaneous, and it's me.  They're my calendar.  Why would

10   anybody else be going over my calendar with me?

11   Q.  Because you could fudge them.  Because you could

12   conceivably have written these 5 years ago and not at the time

13   in anticipation that maybe there would be some questions in

14   this litigation about it.  That's why.  And I am asking you

15   again, besides -- let me ask you something else --

16   A.  No, I want to answer.

17           THE COURT:  Whoa, whoa, whoa.  You did make a little

18   speech there.  She wants to answer that.  I am going to allow

19   her to answer that.

20           Please make sure your questions are questions and not

21   narratives.

22           Ms. Lask, you may answer.

23   A.  Yes.  Thank you for reminding me.  Because, wow, you just

24   remind me exactly what happened.  Which was these were

25   presented and ready for the plaintiff to come to my office,
```

O873RHE5                        Lask - Cross

```
 1    over 5 years ago, when this case started, and get all the

 2    documents, and they refused and that was a ruling in this

 3    court.  This was already gone over.

 4              MR. DOLLINGER:  Note the objection.

 5    A.  They did not show up and get these documents.  So I can't

 6    help, you know, you coming the day of trial and saying -- they

 7    also had a right to depose me about it.

 8              THE COURT:  Hey.  Yeah, again, Ms. Lask, I am going to

 9    warn you for the last time.  Answer the question.  Do not go

10    into lawyer mode and start making arguments.

11              And counsel, please ask questions without the long

12    narratives.  We have had the same question asked five times,

13    and each time the witness has not identified anything or

14    anybody other than herself and her document.

15    Q.  There is no time stamp on any of these calendar entries,

16    right?

17    A.  There doesn't have to be a time stamp.  These are the

18    calendars.  Of course there isn't a time stamp.  I'm answering

19    the question.

20              THE COURT:  Yes or no, there is no time stamp.  No.

21              THE WITNESS:  But, your Honor, actually I don't

22    understand what time stamp he's talking about on a calendar.

23    Other than --

24              THE COURT:  Hey.  Stop.  I will duly note and I will

25    take that as an objection.  And I will sustain it to the extent
```

O873RHE5                          Lask - Cross

1    it suggests that it is required to have a time stamp.

2              THE WITNESS:  Correct.  Thank you.

3    Q.  Let's just continue, all right.  Just what's been put up so

4    we looked at 10/24.  Let's look at 10/25.  Again we have

5    shorthand.  Looks like research civil rights cases, fee cases,

6    continued drafting complaint.  Continue TC.  RR.  RR e-mails

7    draft reply.  Four hours.

8              Question.  What of those four hours from reading this

9    document can you say was speaking about the drafting of the

10   complaint?  Can you tell?

11   A.  Again it is a total of the work that day.  So I would have

12   to go to my underlying to, like we did before, and go down

13   point by point.

14   Q.  So if Maggie Karn's looking at this, drafting federal

15   complaint, what are you communicating to her?

16   A.  Exactly what she knew was happening in her own case that

17   she was very involved in.  She testified earlier she was.  If

18   she didn't understand, she could have asked me if she didn't

19   understand the communication.

20   Q.  Certainly, you have mashed together a lot of work in about

21   a line and a half.  Correct?

22   A.  What line and a half?

23   Q.  I am looking at 10/25.

24   A.  And what's the other half?

25   Q.  So that's 10/25 has a line and a half of research civil

O873RHE5                          Lask - Cross

1   rights down to --

2   A.  In the same block.

3   Q.  Yes.

4   A.  Yeah, it says I'm having conferences with her.  Telephone

5   conferences.  I'm talking about I'm drafting the complaint, I'm

6   receiving e-mails from Rosemary Rivieccio, I'm drafting a reply

7   to the state motions.

8   Q.  It doesn't say that.  It doesn't say draft reply to the

9   state motions, right?  You could have if you wanted to have

10  spelled all of this out, correct?

11  A.  No.  We don't do that.  Like I said, this is what I learned

12  how to do my bills.  For 35 years I've been doing this and

13  never had a problem.  And I've been in civil rights cases and

14  I've sent the same bills to federal judges and they have

15  determined my legal fees, when we ask for legal fees, receipt

16  review, draft complaints, five hours here, research.  If an

17  attorney would start putting everything in the underlying, I

18  showed, as I explained before, it would be 25 pages.  If anyone

19  had a question, we bring out our underlying.

20  Q.  It is a lot easier then later if things are vague and

21  indecipherable for you to say whatever you think it might mean?

22  A.  No, that's not true.

23  Q.  That's what you've been doing so far today isn't it?

24          THE WITNESS:  Objection.

25          THE COURT:  Sustained.

O873RHE5                          Lask - Cross

1    Q.  So why not just make them clearer though and avoid having

2    these self-serving calendar entries?

3    A.  Okay.

4          THE COURT:  Leave it to your attorney.

5          MR. FERRANTE:  Objection, your Honor.

6    Q.  No.  Why not just have --

7          MR. FERRANTE:  Objection.  Why not just have?

8          THE COURT:  I need to hear the whole question.

9    Q.  Why not just spell out what you have written in these

10   calendar entries?  Why the secrecy, the subterfuge?  Why not

11   put them in your bill so you wouldn't be sitting here and

12   having taken up these people's days.

13         Why?  Why is that?

14         MR. FERRANTE:  Objection, your Honor.

15         THE COURT:  The objection is overruled.  Answer the

16   question.

17   A.  I'm sorry.  You said we're wasting people's --

18   Q.  Yes, we are.  Absolutely wasting people's time.

19   A.  This is your case, you brought it.

20         THE COURT:  Ms. Lask and counsel, let's not comment

21   upon people's time.  Let's focus on the issue in the case,

22   please.

23   Q.  Why not just spell it out?

24   A.  You asked me that three time.  Clients get a legend.  They

25   know what's happening.  And they can always, they are in their

O873RHE5                        Lask - Cross

1    own case, they know what's happening each day when I'm -- what

2    do you call it -- putting in the billing.  If they have any

3    question, call me up, I'll pull out the underlying, we'll go

4    over it.  No client -- most clients don't have a question

5    because they know their own case.  And I'm answering the

6    question.

7    Q.  This says draft federal complaint.  Did you submit any of

8    the drafts?

9    A.  I don't think I was finished answering when you

10   interrupted.

11           THE COURT:  No, I think that was enough of an answer,

12   go ahead.

13   Q.  Did you submit any of the drafts of the federal complaint

14   in this action?

15   A.  What?

16   Q.  Did you submit any of the drafts that you speak right there

17   drafting the complaint.  Did you submit any of your work

18   drafting complaint that you referred to right there?

19           THE COURT:  When you say submit, though, what do you

20   mean?  Do you mean filing with the court or do you mean

21   something else?

22   Q.  Include as evidence.  Include in discovery.

23   A.  What?  Right where, where were you pointing, where do you

24   want me to look?

25   Q.  You said right here you're drafting the federal complaint.

1    Right?

2    A.  Where?  Where?  Which one?

3    Q.  10/25 continue drafting complaint.

4    A.  And I'm drafting.

5    Q.  Okay.  Did you submit any drafts of the federal complaint

6    that you referred to there in this action?

7    A.  Drafts where?

8            MR. LONERGAN:  Judge, I've been going at this for a

9    half hour.  I haven't gotten a single straight answer.

10            THE COURT:  Well, this refers to drafting federal

11   complaint.  Were there drafts that preceded the final version?

12            THE WITNESS:  Your Honor --

13            THE COURT:  I am asking a simple question.  Were there

14   drafts that preceded the final version?

15            THE WITNESS:  I want it corrected because it refers to

16   drafting complaint.  I think I was drafting other complaints on

17   10/25 and I testified to that.

18            THE COURT:  Right now I'm seeing words that say draft

19   fed complaint.  Well compl.  Pretty much says fed complaint to

20   me.

21            THE WITNESS:  Intentionally.

22            THE COURT:  But the question is, did you have drafts

23   that preceded the final version?

24            THE WITNESS:  As I testified before, your Honor --

25            THE COURT:  Let's put it a different way.  Sometimes

O873RHE5                          Lask - Cross

1    people keep drafts of their document that they are working on.

2    Sometimes they just work on a document continuously and don't

3    keep drafts.  So I think the first question that needs to be

4    asked before whether she provided drafts is whether she had

5    any.

6              THE WITNESS:  Thank you, your Honor.  That helps.  I

7    use Word document.  And everyone knows you -- you have

8    something up on your Word document, drafting means I am

9    drafting.  Revising, whatever I am doing, it's one document.

10   The Court just explained, and that's what -- that's exactly

11   what I do.  So Word doc, I'm not doing drafts like 30 years ago

12   where you do a draft and then you print it out and we put in a

13   box.  It's all electronic.  So I was using one document,

14   drafting and revising.

15   Q.  But if you had submitted drafts, wouldn't that help clarify

16   what complaint you were referring to throughout these bills?

17   A.  Submitted drafts.

18   Q.  Drafts of any documents that you are a talking about to

19   corroborate what complaint you're referring to.  You said there

20   were multiple complaints.

21             MR. FERRANTE:  Your Honor, it's asked and answered.

22   She said she works off of one document in electronic updates.

23             THE COURT:  Sustained.

24   Q.  So let's look at 10/31.  Continued draft fed complaint.  I

25   guess continued drafting federal complaint 10/31, correct?

1    A.  Yes.

2    Q.  That is the first federal complaint we're talking about

3    there, right?

4    A.  I'm drafting a federal complaint.

5    Q.  And is that the first federal complaint?

6    A.  There was only -- yes.  The first as we're here for is

7    10/24 to February 5.

8    Q.  Then 10/11 research issues.  How is the client supposed to

9    know what issues you are researching there?

10   A.  Again, she knows what's happening.  As she testified, there

11   were many e-mails and I was sending her e-mails, she was

12   sending me e-mails back.  I would send her, hey, look at this

13   research.  I testified and told you how she was telling me

14   about research that she would find.  So she knows what we're

15   researching.  If she had a question, she could have asked.  She

16   know what her own case is, every client does.  She's not

17   unsophisticated.

18             THE COURT:  Ms. Lask.

19   Q.  I know you like to talk but please just answer my

20   questions.

21   A.  I answered it, but she yeah --

22             THE COURT:  Ms. Lask, keep it short and to the point,

23   please.

24   Q.  So you were researching several different issues at the

25   time.  Correct?

O873RHE5                        Lask - Cross

1   A.  11/2, you were doing a lot of different work.  You

2   ultimately charged $345,000 for all the work you did.

3           THE WITNESS:  Objection.  That is not the number in

4   this case.

5           THE COURT:  Ms. Lask, let him finish.

6   Q.  Research issues, how is my client supposed to know what

7   case or what matter you're researching issues about.

8   A.  Because we're talking almost every day we're talking and

9   we're e-mailing and we're discussing.  So she knows what we are

10  doing every day.

11          When I'm doing things and also, if I'm putting down

12  research issues, she knows I am doing her custody case.  And

13  I'm doing -- if I'm researching issues, she knows I'm

14  researching civil rights.  In fact she testified Ms. Lask was

15  researching about the civil rights.

16  Q.  Isn't it very useful now it's so vague that you can say,

17  well, it's really pertaining to this, pertaining to that, even

18  though it says compl T, well it was really complaint to the

19  Article 78 which is really a petition.  Doesn't that give you

20  all kinds of leeway now to tell this court and tell this jury

21  what you really meant at the time and, oh, you have these

22  alleged contemporaneous records, how easy does this make it

23  it's so vague, it makes it easy for you to say what it pertains

24  to correct?

25  A.  Wrong.  You are accusing me of being a liar and --

O873RHE5                          Lask - Cross

1            THE COURT:  "Wrong" is fine as an answer.

2            (Continued on next page)

O873RHE5                              Lask - Cross

 1                   (In open court; jury present)

 2      BY MR. LONERGAN:

 3      Q.  Okay.  11/13, let's look at that.  11/13 reads, psyche rep.

 4      STP cash R/R trans 810: research constitutional cases it looks

 5      like, revise complaint.

 6                   Question:  What complaint are you referring to there?

 7      A.  I testified earlier I'd have to look at my underlying, but

 8      at that time, I was doing various complaints, the Article 78

 9      complaint that we showed the --

10      Q.  Which one was this?

11      A.  I'd have to look at my underlying, like I did before.

12      Q.  Why can't you tell from this timeline, from this time

13      sheet?

14      A.  That's the purpose of this timeline.

15      Q.  Well, that's nice and vague.

16      A.  I'm sorry.

17                   THE COURT:  Let each other finish, please, counsel.

18                   Were you done answering the question?

19      A.  I forgot after what he just did.

20                   THE COURT:  All right.  Let him ask.

21                   Go on.

22      Q.  So you're asking the jury today to decipher what you mean

23      by revised CLMPL, right?

24                   MR. FERRANTE:  Objection, your Honor.

25      Q.  Just like you asked Maggie Karn, I used shorthand, you're

O873RHE5                              Lask - Cross

1    asking the jury to do the same thing.  Is that their job?

2    A.  No.  We're not here to decipher anything.  You're here to

3    prove that case.  I told you I gave her the legend.  You

4    decided not to bring it.  That's not my fault.

5    Q.  Where is the legend?

6    A.  You tell me where it is.  You didn't enter it into

7    evidence.

8    Q.  I'm asking, is there any legend?

9              THE COURT:  Enough.

10   Q.  You're saying you gave it to my client and you didn't keep

11   a copy of it?

12             THE COURT:  Enough.  You've already established that

13   the witness testified that there is a legend that she has

14   testified to and it is not in evidence.  That's all we need to

15   know.

16   Q.  Okay.  Let's go to 11/28.  I mean, I can barely make this

17   out.  CNT' CMPL, R/R emails with slash Sarah pics across the

18   street, 1.5 hours.

19             What is CNT -- I don't know if it's an E or C.  CNT,

20   what is that?

21   A.  Continue complaint.

22   Q.  Which one?

23   A.  I told you I'd have to look at the underlying.  That's the

24   purpose of it.

25   Q.  Do you know sitting here looking at that entry?  Do you

O873RHE5                          Lask - Cross

1   know --

2   A.   I'm not going to make a guess.

3          THE COURT:   Let him finish his question.

4   Q.   You don't, right?   You have no idea?

5          MR. FERRANTE:   Your Honor, objection.   It's been asked

6   and answered.   If he'd like to show her Exhibit Six to look at

7   it, that's --

8          THE COURT:   Overruled.

9          I think the point has been established well enough for

10  everyone here that there is more detailed information and

11  underlying information that Ms. Lask had but Ms. Karn did not,

12  and that even Ms. Lask needs to look at her notes to determine

13  what certain things in here refer to.

14  Q.   But doesn't it make it easier for you to assign different

15  meanings to different words when you're not precise?   Doesn't

16  it?

17  A.   You asked me that before and I told you that this is the

18  bill.   If anyone has a question, the client knows what's

19  happening on a daily basis, she's in court with me, she's

20  writing me emails, we're actually talking about -- she could

21  have had conversations with me about this, and maybe we did

22  have them.   I don't remember it now.   But she knows.   You know,

23  right now sitting here, she never had an issue.   She never

24  asked about the complaint.   She testified to it -- I'm sorry,

25  not the complaint.   I apologize.   The billing.

O873RHE5                              Lask - Cross

```
 1   Q.  So --
 2   A.  She personally understood everything that was happening.
 3   Q.  She did?  She perfectly understood it?
 4   A.  I just said that.
 5   Q.  How do you know that?
 6   A.  Because I was with her every day in this case, in the
 7   trenches, and she knew what was happening on November 28, she
 8   knew what was happening on November 29.
 9   Q.  And you went through this with her --
10   A.  If I had to, I would have.  I don't remember sitting here
11   this day.  Honestly, she never -- I couldn't even recall to
12   this day.  I know there was never any issue of what was
13   happening, because she was in it day by day with me.  She knew
14   I was drafting these complaints.  She was sending me emails.
15   We established the other day about the Judge Hoffman complaint
16   she was doing.  She knew what was going on.  So many different
17   things --
18   Q.  Which complaint you said?
19   A.  The complaint to administrative judges I spoke about.
20   Q.  A petition or a complaint?
21   A.  I'm sorry?
22   Q.  A petition or a complaint?
23   A.  I just said a complaint.
24              MR. DOLLINGER:  A letter?
25   Q.  How many different complaints did you work on for Maggie
```

O873RHE5                          Lask - Cross

1   Karn?

2   A.   In the -- there was the complaint to Judge Hoffman, and the

3   administrative judges that I talked about.  I mean, it's going

4   to take me a little time to remember.  There was about Referee

5   Burnett.  Maggie Karn wrote her own complaint and had me review

6   it.  I wrote mine for her as her attorney.  So that's the

7   complaint -- I testified about that earlier.

8          I was doing the Article 78 complaint during this time.

9   I was doing -- I have to look at my underlying notes a little

10  bit, because, again, I'm not right there in 2012 like me and

11  Maggie were as this was happening realtime, but there were --

12  Q.   Maggie didn't have the underlying notes, did she?  She had

13  this document?

14  A.   You asked me three times.

15          MS. LASK:  Objection, your Honor.  It's over and over

16  again, and I answered.

17          THE COURT:  Again, let's be economical in what we're

18  doing.  You have asked that question repeatedly.  I understand

19  the witness is giving speeches repeatedly.  Let's move it

20  along.

21  Q.   All right.  How about 12/2, COMT' CMPL and review

22  commission report?  Which complaint are you referring to in

23  12/2?

24  A.   As we went over before, if my underlying was in front of

25  me, I'd have to go look at it.  I'm not here in realtime --

O873RHE5                              Lask - Cross

1   Q.  You can't support your own bill right now?

2   A.  Yes, I would if you would show me the underlying.

3   Q.  Why do I need the underlying bill?  This is what you sent

4   to my client.  I'm asking you to explain it.  You made it so

5   vague it's impossible to tell what you're referring to.

6           I'm asking, which complaint is referred to on 12/2?

7   A.  If you show me the underlying --

8           MR. FERRANTE:  Your Honor, it's the same question over

9   and over again.

10          THE COURT:  Sustained.  She says she needs the

11  underlying to identify which complaint it is.  Let's move on.

12  Q.  Then it says, review commission report.  That's the marital

13  commission report you mentioned on direct?

14  A.  It's the matrimonial committee.

15  Q.  And you billed Maggie Karn to read that report?

16  A.  It's called research.  Yes.

17  Q.  Okay.  Did you bill any other clients for that?

18  A.  I'm sorry?  What?

19  Q.  Did you bill any other clients for that work?

20  A.  What other -- she was my only client here.

21  Q.  The only client you had at the time?

22  A.  You know what?  To tell you the truth, yes, basically.

23  Yes, because if you look, I was working for her every day.

24  This was a huge case.  There was a libel -- so, yes, I was a

25  solo at the time.

O873RHE5                          Lask - Cross

1    Q.   You only had one client?

2    A.   Look at that case.  That was three different cases.  But

3    my -- go ahead.

4    Q.   That commission report, is that not general lawyer

5    information that you need to know for your profession and to be

6    a good lawyer?

7    A.   No, not -- no.  The answer is no, not at all.  You have to

8    do your research.  To be a good lawyer, you'd have to read that

9    76-page detailed report.  There's no requirement for what I was

10   doing for her to make the argument in the complaints and the

11   Article 78 and the appeal, and they specifically have the

12   matrimonial commission -- no, we don't sit there and read the

13   report.

14          The last thing I want to do is sit and read the

15   article -- the matrimonial report, unless I have to, and in

16   this case, I did.

17   Q.   Okay.

18   A.   It's not required reading for anybody.

19   Q.   The substance of the report had absolutely no bearing on

20   any other work you were doing at the time?

21   A.   No.  It -- I read it for her.  What other work?

22   Q.   So the commission report that you billed Maggie, how

23   much -- four hours on 12/2, how much of that time did you spend

24   reviewing the commission report?

25   A.   We'd have to look at the underlying.

O873RHE5                        Lask - Cross

1   Q.  You can't tell me sitting here right now?

2              MR. FERRANTE:  Your Honor, again, if he wants to use

3   the underlying detailed billing --

4              THE COURT:  No.  Overruled.  He's establishing a

5   point, but I think we've made clear he's established the point.

6   There are certain things that she would need her underlying

7   information to give you the answers you're looking for.

8   Q.  Okay.  Let's jump down -- I don't want to lose my -- 12/20,

9   revise research cases.

10             What is this about?

11  A.  I testified to -- same thing we've been talking about over

12  and over again.  If you show me my underlying -- you know, just

13  as you're asking, if a client had said, oh, what were you

14  revising, although they would know, because it's realtime and

15  we know what we're doing, and we're sending emails even -- I

16  would send her my research in realtime, and she said it, she

17  knew I was researching.  She would send me her research.  So on

18  that day, there could have been an email, and I'm like, Maggie,

19  look at this.  She's sending me emails.  Susan, look at this

20  research I found.  Will you check it out?

21             We were both back and forth realtime.  She knows what

22  was happening.  She was absolutely confused and didn't know

23  what was happening in her case day by day.  These are 10, 11,

24  12, 13, 14, almost every day I'm working for her.

25             THE COURT:  Ms. Lask, keep it --

1    A.   Okay.

2    Q.   12/17, I don't want to read that all into the record, but

3    that is five hours, and within there we have, revise complaint

4    summons S.D.N.Y. file docs.

5         You testified that you didn't bill any of that time to

6    the federal action?

7    A.   12/17?

8    Q.   On 12/17.

9    A.   I don't recall.  I don't know if I said that, but it says

10   S.D.N.Y. filing doc.

11   Q.   So, again, if I ask you about the five hours, you have no

12   idea you would need this document that you wrote to help your

13   memory, right?

14   A.   Over ten years later, I need my document, yeah.  If it was

15   realtime and we were there that day I'd be able to say, Maggie,

16   no, remember, we did this and that, but if you want to see the

17   underlying calendar, here it is.

18   Q.   Okay.  Or you could have just made this clear?

19   A.   No.  I didn't have to make it any more clear than this,

20   because these are the kind of bills that we all submit.  I've

21   submitted this to federal judges in civil rights cases.

22   Q.   Okay.  How about 12/23, R.R. multiple emails re Xmas,

23   federal complaint for last three days, draft response, .25.

24         That's like 15 minutes, right?  You on direct said

25   that you didn't bill for everything.  Is that true that you

O873RHE5                            Lask - Cross

1    didn't bill for everything?

2    A.  Absolutely.

3    Q.  How do you know what you billed and didn't bill for?

4    A.  Here's my bill.  This is the purpose of the bill and the

5    underlying.

6    Q.  What didn't you bill for?

7    A.  I'm sitting there one day -- I'll explain.  What date are

8    we on?

9    Q.  I have 12/23.

10   A.  Okay.  So say it's 12/23 and I could have done actually

11   more work, I generally err to charging the client less,

12   especially a client like Maggie Rhee that had about five cases

13   going on at the same time.  And if you look at my further

14   bills, it says "good client discount," meaning -- and it says

15   also, "I do not charge for everything I did."  So --

16   Q.  But now you say that you didn't charge for the federal

17   complaint, so we don't owe a refund for it; isn't that correct?

18   A.  I'm sorry?  Say that again.

19   Q.  Could you read it back?  That's a clear question.

20   A.  But it's your tone that's throwing me off.

21         THE COURT:  Okay.  Ms. Lask, no need to comment on

22   tone.  If there's an objection to tone, that can be made.

23         Counsel, please just ask straight forward, without

24   unnecessary intimation.

25   Q.  Please answer the question as posed.

MR. LONERGAN: Could the reporter read the last question back?

THE COURT: Yes.

"But now you say you didn't charge for the federal complaint, so we don't owe a refund for it; isn't that correct?

Q. You don't owe a refund?

A. What do you mean, I don't owe a refund?

Q. So you don't owe my client a refund for anything that wasn't billed, right?

A. Oh.

Q. It wasn't billed; you're not going to refund --

A. Wasn't billed -- you're right. I was giving her a discount left and right.

Q. So why are you saying now all discounts on the first federal complaint, and you didn't bill, you didn't charge for it, although really I can't tell from this document -- you're saying "I didn't bill you for it," even though it's right there?

A. Right. Some was billed. I gave her -- I billed some. It's substantially less than would take to produce a complaint like that. If you remember, I explained the Article 78, the appeal, and towards the end, the federal complaint started. Starting around October 24, I was working on all three at the same time. Everything in that Article 78 is in the first federal complaint.

O873RHE5                        Lask - Cross

1   Q.  How much time --

2   A.  About all of the work --

3   Q.  About how much time did you spend rewriting the first

4   federal complaint, research, writing the first federal

5   complaint?

6   A.  Well, it was all time I charged for the Article 78.  I'm

7   not going to charge a -- double charge a client for -- meaning

8   the work in the federal -- I'm sorry.  You were huffing.

9           THE COURT:  Just answer the question.

10           THE WITNESS:  Your Honor, he's making faces to the

11   jury.

12           THE COURT:  Just answer the question, please.

13   A.  All of the work in the Article 78 involved, and we went

14   over it, the transcripts, the many thousands of pages of

15   transcript from her trial before I came to the case, so I take

16   those transcripts, and I have to read them and digest them.

17   You will see that those transcripts of -- citations in the

18   Article 78 are right in the first federal.  So I'm not going to

19   charge her $20,000 for putting together a first federal

20   complaint when I'm charging her for the work in the Article 78.

21           I'm not necessarily saying it was $20,000, but I'm

22   giving it a number.  So if I'm working on the Article 78 and

23   I'm digesting documents to get the Article 78, and then I bring

24   it over to an appeal, you will see that the charges for the

25   appeal are less.  The Article 78 was more substantial, and

O873RHE5                          Lask - Cross

1   everything from there was transposed into the federal.

2              Why would I double charge her for --

3              THE COURT:  Ms. Lask, you're repeating yourself.

4   A.  I'm trying to answer.

5              THE COURT:  You're repeating yourself, though.

6   Q.  Okay.  When is the first time the word Article 78 appears

7   on your time sheets?

8   A.  Well, I don't know.  Nothing's in front of me.  I don't

9   have a photographic memory from --

10  Q.  You have no recollection of when you first charged my

11  client for the Article 78 proceeding?

12  A.  If you put something in front of me, I can show you.  Or

13  you should show me.

14  Q.  So it's highlighted, 2/4 research Article 78.

15  A.  Well, no, but that's not.  I called the Article 78 -- it

16  was a complaint.  It is a complaint.  I showed you how it is a

17  complaint, and it's verified.

18  Q.  Okay.

19  A.  And I call it a complaint so much longer before that

20  Article 78.

21  Q.  I haven't asked you anything yet.

22  A.  Excuse me?

23  Q.  I haven't asked you anything yet.

24  A.  Your last question was when was the first time you charged

25  for the Article 78, and it was long before 2/4.

O873RHE5                              Lask - Cross

1    Q.  Okay.  When is the first time the words Art 78 appear in

2    your billing?

3    A.  You'd have to show me the whole bill.

4    Q.  Okay. Let's look.  This is what I have.  So this is 1457.

5    A.  It's upside down.

6    Q.  Sorry.

7             It's 1457, 517 through 817.

8             Is there any mention of Article 78 on that page?

9    A.  No.  It started around October, if you want to go directly

10   --

11   Q.  One time, a straight answer.

12   A.  I just said no.

13            THE COURT:  But you did add information that on the

14   other hand -- the information was not answering the question,

15   but overruled.

16            If you can answer yes or no, answer yes or no.

17   Q.  Bates stamp 1458.  I'll just show you the Bates stamp at

18   the bottom.

19            Tell me if the words "Article 78" appear anywhere on

20   this time sheet.

21   A.  I don't see those words.

22   Q.  I'll show you the rest of it.

23            Okay.  Let's go to 59.  Tell me if the words "Article

24   78" or any shorthand of Article 78 appears on 59.

25   A.  No.

O873RHE5                                    Lask - Cross

1    Q.  Okay.  I'll show you the rest of it, so you can see it.

2              And then we have document 60.  I'll just show you that

3    it's 1460.

4              Okay.  Do we see the words "Article 78" anywhere

5    there?

6    A.  I don't, no.

7    Q.  And, lastly, this is 1461.

8              And we see "Article 78" for the first time

9    February 4th, correct?

10   A.  Correct.

11   Q.  Why have you not included the words "Article 78"

12   previously?

13   A.  Because I was drafting it, and then it was ready around

14   February 4th to be filed, so I called it an Article 78.  I was

15   drafting the complaint.

16   Q.  Did you not know it would be an Article 78?

17   A.  I was drafting -- I was considering the Article 78.  It was

18   concluded at around that time definitely.  I wanted to file the

19   Article 78, so I called it an Article 78.

20   Q.  Okay.  How about before that?  Did you bill time for it?

21   A.  Before when?

22   Q.  Before February 4th.

23   A.  Yes.

24   Q.  And why didn't you call it an Article 78 then?

25   A.  Because I called it a complaint.  When it was ready to be

1  filed, I called it an Article 78 petition.

2  Q.  Why?  Why so vague?  Why so -- why prevaricate like that?

3  I don't get that.  Why call it one thing, call it another, and

4  now here we are trying to divine your intent from this

5  document, which we just cannot do, because you are all over the

6  place with the word "complaint?"  Isn't that right?

7            MR. FERRANTE:  Your Honor, I object to that question.

8  It's been asked 100 times.  It's the same answer.  If he wants

9  to --

10            THE COURT:  Yes, it's argumentative.

11            Move on.

12  Q.  All right.  Did you bill my client for the second federal

13  complaint?

14  A.  The second complaint that was filed nine months later, yes,

15  I billed her.

16  Q.  You billed her for that as well as for the first complaint,

17  right?

18  A.  The first complaint -- I don't understand your question.

19  Q.  You billed -- isn't it true that you billed Maggie Karn

20  tens of thousands of dollars for the first complaint and then

21  tens of thousands of dollars for the second complaint?

22  A.  No.

23  Q.  How is that not true?

24  A.  We just established it was 3,000 something dollars, because

25  I didn't want to double charge her because the Article 78 and

O873RHE5                          Lask - Cross

1   the appeal and the first federal were all mainly the Article

2   78.  And the issues in the Article 78 are literally the same

3   facts that were in the first federal.  The work to get -- I'm

4   answering the question.  I want to give you a very -- you know,

5   a good response, so you understand.

6           I said, the first federal, I am not going to charge

7   her tens of thousands of dollars when I'm already working on

8   the Article 78 and the appeal, and the work, the same work that

9   was done in the Article 78 that she was charged for, I said it

10  before.  All those transcripts I had to research, the same

11  state law cases I had to research was charged for the Article

12  78 in the appeal.  The appeal was less money than the Article

13  78 for the very reason if you go down the line, the appeal's a

14  duplicate of the Article 78.  Nearly the same issues, same

15  things.

16          And then when you get to the first federal, you'll see

17  it's the Article 78, plus, you know, some more.  I'm not going

18  to charge her for reviewing transcripts and then go to the

19  federal case and say -- and double charge her for the same

20  transcript.  I already reviewed them.

21  Q.  Do you have your time sheets in evidence for what time you

22  spent on the second federal complaint?

23  A.  I was a -- that's a question for Mr. -- I'm not sure --

24  evidence where?  Here?  When?

25          MR. LONERGAN:  Judge, I don't really know how to

O873RHE5                              Lask - Cross

1    handle this.  I asked a very straight forward question.

2               THE COURT:  Well, you asked whether it's in evidence.

3    That's a question for the Court.

4               THE WITNESS:  Yeah.

5    Q.  Do we have your -- are you able to show this jury what you

6    charged for the second complaint, so you can show the

7    difference between what you charged for the first and charged

8    for the second?

9               MR. FERRANTE:  Judge, I object to the form of the

10   question.  Show the jury --

11              THE COURT:  Overruled.

12              MR. FERRANTE:  -- about evidence that's not here --

13              THE COURT:  Overruled.  Go ahead.

14   A.  Am I -- could you ask it again?

15   Q.  Pulling teeth.

16   A.  I'm sorry.  What was your comment?

17   Q.  I said pulling teeth, it's like getting --

18              MR. FERRANTE:  Your Honor, objection.

19              THE COURT:  Counsel, keep your comments to yourself.

20   No need to mutter under your breath.  Be professional, please.

21   Q.  You charged Maggie Karn money for the second federal

22   complaint, right?

23   A.  Because I was working, yes.

24   Q.  How much did you charge her for the second federal

25   complaint?

1   A.  I don't have that in front of me.

2   Q.  Well, I'm asking you now, do you recollect how much you

3   charged?

4   A.  I couldn't possibly tell you.

5        THE COURT:  The answer is yes or no.  You do or you do

6   not.

7   A.  No, I can't recollect.

8   Q.  But you did charge Maggie Karn for working on that second

9   complaint, right?

10  A.  You asked me three times, and I answered it three times.

11  Q.  So the answer is yes?

12  A.  Of course I worked --

13  Q.  After charging her tens of thousands of dollars for the

14  first federal complaint, you then charged money additional for

15  the second federal complaint, right?

16  A.  I never said I charged her tens of thousands of dollars.

17  Q.  So do you have Exhibit Two?

18  A.  I don't have anything in front of me.

19  Q.  Okay.  I went through that with you.  And, again, I don't

20  want to go and beat a dead horse here, but I'm really trying to

21  divine from your document that you wrote --

22  A.  I can't see that.  I wish I could.

23  Q.  This is Exhibit Two.

24        THE COURT:  Ms. Lask, wait for a question.

25  Q.  This is Exhibit Two, and I'm just of trying to divine what

1   you charged my client for the first federal complaint.  And

2   it's impossible, isn't it?

3   A.  No.

4   Q.  Because you wrote very vague entries on your time sheet,

5   and I see now it's deliberate, because now you have all kinds

6   of wiggle room, don't you?

7           MR. FERRANTE:  Your Honor.

8           THE COURT:  Okay.  Counsel, enough with the

9   argumentative questions.  Your point has been made about 15

10  times.  Let's move on.

11          MR. LONERGAN:  All right.  You know, I'll finish up,

12  Judge.

13          Excuse me one minute, Judge.

14  Q.  The research that you refer to in your time sheets, have

15  you produced that research in this action in discovery?

16  A.  Yes.  Actually, I re-- yes.  It was in emails.  There was

17  research.  It was in my long color sheet of exhibits of the

18  entire file.  And it shows all the research in the folders and

19  everything I did.

20          And I also invited you and your counsel -- your

21  plaintiff's counsel to come to my office and look at

22  everything, which is what is done, and nobody showed up.

23          MR. DOLLINGER:  Objection, your Honor.

24          THE COURT:  Overruled.

25  Q.  Again, I want to make this clear, you said there was a

O873RHE5                          Lask - Cross

1  legend provided, but I don't see there was ever a Bates Stamp

2  legend submitted in discovery?  Is this true?

3  A.  I'm waiting for my counsel.

4          MR. FERRANTE:  Your Honor, it's been asked and

5  answered several different times.

6          MR. DOLLINGER:  Your Honor, this goes to clarity --

7          MR. FERRANTE:  Several different --

8          THE COURT:  One at a time.

9          MS. LASK:  Your Honor --

10          THE COURT:  Hold on.  Ms. Lask, you said you produced

11  your file in this action.  Did that include your communications

12  with Ms. Karn?

13          THE WITNESS:  She produced a lot of my communications.

14          THE COURT:  I'm asking --

15          THE WITNESS:  Yes.  Yes.

16          THE COURT:  What you produced, did it include your

17  entire file with Ms. Karn?

18          THE WITNESS:  I produced an index of the entire file,

19  which was about 30 pages, and they were invited to come and

20  take copies of anything they wanted.  And they didn't come and

21  get it.

22          THE COURT:  All right.

23          MR. DOLLINGER:  May I clarify, your Honor?  Because I

24  think it confuses the jury.

25          THE WITNESS:  We're not supposed to argue.

O873RHE5                         Lask - Cross

1              THE COURT:  One at a time.

2              MR. DOLLINGER:  Is this a sidebar situation, your

3    Honor?

4              THE COURT:  Yes.  Right now move on.  We'll come to

5    that later.  Move on.

6              MR. DOLLINGER:  Yes, sir.

7    Q.  How about the calendar entries?  Did you include the

8    calendar entries on the motions that you included in this case?

9    A.  I don't understand.

10             THE COURT:  I don't either.

11   Q.  Okay.  There were prior motions in this matter, correct?

12             THE COURT:  This case that we're litigating now?

13   Q.  This case that we're litigating right now, correct, there

14   were underlying motions that went to -- there was an appeal,

15   correct?

16             THE WITNESS:  Your Honor, my counsel is not rising.

17             MR. FERRANTE:  I don't understand what the question

18   was.

19             THE COURT:  Overruled, but you did say motions and

20   then you referred to an appeal, so just be clear.

21   Q.  Okay.  There were motions filed in this action, right?

22   A.  That were here, of course.  It was litigated.  It's called

23   motions.

24   Q.  Did you include calendar entries as exhibits in those

25   motions?

O873RHE5                         Lask - Cross

```
 1              MR. FERRANTE:  Your Honor, I have an order from you
 2    regarding this.  If you want to go to sidebar, we can --
 3              THE COURT:  Sustained.  Sustained.
 4              MR. LONERGAN:  Your Honor, I'm not understanding why
 5    that is sustained.
 6              What I'm trying to get, just as an offer of proof --
 7              MR. FERRANTE:  I would ask we have a sidebar on this,
 8    your Honor.
 9              THE COURT:  Look, we're not going to go into what
10    happened in this litigation in terms of the history of this
11    document.
12              MR. LONERGAN:  Your Honor, it goes to --
13              THE COURT:  I have made rulings about that.  Let's
14    move on.
15              MR. DOLLINGER:  Judge, we will have an opportunity --
16              THE COURT:  We can discuss it at the end of the day.
17              MR. DOLLINGER:  Yes, sir.  Thank you.
18    Q.  All right.  And, again, you were ultimately paid about
19    $345,000 in this case, correct?
20              MR. FERRANTE:  Objection, your Honor.  It's
21    prejudicial.  It's irrelevant.
22              THE COURT:  Overruled, but it is duplicative of what's
23    been asked many times.
24    Q.  Okay.  But that's true?
25              MR. LONERGAN:  A lot of questions I have now --
```

O873RHE5                          Lask - Cross

```
1                THE COURT:  Go ahead.
2    A.  That's not true.
3    Q.  Okay.  About how much money did you receive from Maggie
4    Karn?
5    A.  I don't know.  I'm sitting here -- I told you she had five
6    different things going on and libel and everything.  We're here
7    for the specific time periods, and I know I testified to what
8    was received.
9    Q.  All right.  And its been determined already that you
10   committed malpractice in the first action, correct?
11               THE COURT:  We don't need to go there.
12               MR. FERRANTE:  Objection, your Honor.
13   Q.  I'm just asking --
14               THE COURT:  We don't need to go there.
15   A.  Maggie Karn is seeking reimbursement today of about 45,
16   $50,000, correct?
17               MR. FERRANTE:  Judge, objection.
18               THE COURT:  Overruled.
19               MR. FERRANTE:  I have a sheet here with the exact copy
20   --
21               THE COURT:  Overruled.
22               Go ahead.
23               THE WITNESS:  I don't know what she's seeking.  She
24   gave different numbers.  At the opening they said 60.  Another
25   time they said another number.
```

O873RHE5                        Lask - Cross

```
 1          Whatever she's seeking now, the numbers --
 2   Q.  Or about 15 or 20 percent of what you ultimately charged
 3   her in this action, right?
 4   A.  I don't know.  It was never established what I ultimately
 5   charged her, and it was not even --
 6   Q.  And you refused to provide her that discount even though
 7   you committed malpractice, right?
 8          MR. FERRANTE:  Objection, your Honor.
 9          THE WITNESS:  No --
10          THE COURT:  Sustained.
11   Q.  We're now having a two-day Federal Court trial over this
12   issue, a $50,000 issue --
13          MR. FERRANTE:  Judge, objection.  He's arguing again,
14   the same exact words.
15          THE COURT:  Sustained.
16          THE WITNESS:  I will answer it.
17          THE COURT:  No.
18          THE WITNESS:  Okay.
19          MR. LONERGAN:  All right.  I have nothing further
20   right now, Judge.
21          THE COURT:  Okay.  I'm going to give the jury a break,
22   and I'll meet with counsel and the court reporter outside in
23   the hallway.
24          Let's be back in ten minutes.  We'll continue for a
25   little more.
```

O873RHE5                         Lask - Cross

1              THE DEPUTY CLERK:  All rise.  Jury exiting the

2    courtroom.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O873RHE5                          Lask - Cross

```
 1              (In open court; jury not present)
 2              THE COURT:  All right.  Let's go over --
 3              THE WITNESS:  Can I go?
 4              THE COURT:  Yes, you can go.  Yes, you can go back to
 5      the table if you want, but you don't need to.
 6              THE COURT:  Okay.  So there was an issue about certain
 7      topics, so what do you want to tell me, Mr. Dollinger?
 8              MR. DOLLINGER:  Your Honor, it appears to me that the
 9      language used by counsel was not full enough.  All I really
10      wanted the jury to understand and be able to ask is -- I have
11      some questions, just as they used two counsel, I have some
12      further questions on rebuttal and other pieces the Court is
13      well aware of and has ruled on relevant to the impeachment.
14      Questions related to documents used in the Court of Appeals,
15      documents used in this court.  That's clearly established, that
16      there was, in fact, work done, and that, in fact, it shows that
17      there is an ambiguity, and it creates some questions of doubt.
18              There are -- I agree with you, the horse has been out
19      and beaten a few times.  There is no question about it.  We
20      don't need to know anymore about the specifics other than the
21      jury should be able to hear that there were 1,295 -- 94
22      documents first provided, and that according to Ms. Lask, and
23      we have no reason or no way of doubting or, pardon, proving
24      that we doubt it other than to create the inference, which is
25      not correct -- but the bottom line is the additional documents,
```

O873RHE5                         Lask - Cross

```
 1    295 I believe to -- 1,295, rather, to 1,351 or 2, those
 2    documents establish her calendar.  Okay?
 3              But that's what the jury needs to understand, is that
 4    we have a claim that those documents, the original documents,
 5    the first 1,295 were not -- they do not include any proof of --
 6    pardon me, of any research.  And all they are is a compilation
 7    of what the other attorneys provided to her.  Not what she did
 8    on her own.
 9              I want to ask those questions, but I don't want to be
10    -- I don't want to, again, beat it to death.
11              THE COURT:  Well, not only has it been ruled on, and
12    we're not going into the discovery and the number of documents
13    produced, that's already all been --
14              MR. DOLLINGER:  The content, Judge, not the number,
15    among the 1,295 documents, where's the research?
16              THE COURT:  Oh, the research itself.
17              MR. DOLLINGER:  Yes, sir.
18              I agree with you, I don't want to go into what did
19    this mean, what does that mean.  Where is the research?  What
20    did you produce?  The research --
21              THE COURT:  She said she did.
22              MR. DOLLINGER:  Where is it?
23              MS. LASK:  That's for you to do it.
24              THE COURT:  All I know is she said, yes.  If you want
25    to cross her on it, that's fine.
```

O873RHE5                              Lask - Cross

1          MR. DOLLINGER:  Judge, that's my point, the narrow

2    window.  Then there are other issues here related to the

3    ambiguities created by the Court of Appeals and the motion in

4    reconsideration.

5          THE COURT:  Well, let's take these separately first.

6    Okay?

7          MR. DOLLINGER:  Yes, sir.

8          THE COURT:  So in terms of what was or was not within

9    the 1,295, we don't need to get into the numbers, she said she

10   produced with emails or other things research, and there may be

11   questions -- well, there are questions that were asked about

12   that, but we're not going to get into the discovery in this

13   case.  If you can establish that it never was produced, fine,

14   but I think you have to go through all your files.

15         Maybe there are other questions you could ask.  I

16   don't know.  But we're not going into what was or was not among

17   the first 1,295 unless you have a way to show that.

18         MR. DOLLINGER:  Well, Judge --

19         MS. LASK:  Judge, if I may, you told us to come here

20   prepared with exhibits, and when I couldn't find one, you gave

21   me a minute and then -- and they have the same burden.

22         MR. DOLLINGER:  A missing evidence charge should be

23   done, because that was a document that should have been

24   preserved electronically and wasn't.  Those documents --

25         MR. FERRANTE:  What are you talking about?

1          THE COURT:  Okay.  Objection is overruled.  You

2    mentioned the Second Circuit Court of Appeals.

3          MR. DOLLINGER:  And I don't really want to mention the

4    Court that much.

5          THE COURT:  Right.  But I had previously ruled that

6    you could cross-examine using her statements as admissions.

7          MR. DOLLINGER:  Right.  And the second part of that,

8    Judge, is that there was a motion for this Court relative to

9    Mr. -- I can't remember his name.  The prior attorney for

10   Ms. Lask.  And he reargued -- or he moved for reconsideration,

11   rather, and in the reconsideration it's almost identical but

12   it's to what was before the Court of Appeals.

13         So the question is, can we use those two sets, because

14   it would be redundant.  But I don't want to do that.

15         MS. LASK:  Again, your Honor, that goes to the

16   exhibits that you held us to a standard --

17         THE COURT:  Well, hold on.

18         MR. DOLLINGER:  The exhibit there --

19         THE COURT:  Is it --

20         MR. DOLLINGER:  -- it's impeachment.

21         THE COURT:  Hold on.  I had said that the Second

22   Circuit Court of Appeals could be used.  I don't remember

23   offhand the reconsideration issue.

24         MR. DOLLINGER:  Judge, you know what?  It's easier to

25   say it one time.  All right.

O873RHE5                              Lask - Cross

 1                THE COURT:  Okay.

 2                MR. DOLLINGER:  And I'm going to ask --

 3                MS. LASK:  Your Honor, first of all, he asked me --

 4      we're continuing this?

 5                MR. FERRANTE:  I thought I heard "no further cross."

 6                THE COURT:  So did I.

 7                MS. LASK:  Yes, so it's done of course.

 8                MR. DOLLINGER:  Excuse me.  You're going to --

 9                THE COURT:  Whoa.

10                MS. LASK:  Wow.

11                MR. DOLLINGER:  You're right.  You're right, Judge.  I

12      apologize.

13                THE COURT:  What were you going to say?

14                MR. DOLLINGER:  Your Honor, I made those specific

15      exceptions or asked for those specific exceptions before

16      Mr. Lonergan rested.

17                THE COURT:  Yes, and, regardless, we're here.  I've

18      given you permission previously to use it if you want.  If you

19      want to use it now, you can do that.

20                MR. DOLLINGER:  Judge, I'm going to have Mr. Lonergan

21      limit it to the two pages you had previously ordered that that

22      exhibit be reduced to, pages 19 and 20.

23                THE COURT:  Okay.

24                MR. DOLLINGER:  I'm sure you recall.

25                THE COURT:  Right.  I wanted to make it narrow and not

O873RHE5                          Lask - Cross

1   the whole thing.

2              MR. DOLLINGER:  I'm just looking for them now, Judge.

3              THE COURT:  Okay.

4              MR. DOLLINGER:  And I --

5              MS. LASK:  May I say again, they rested and said "no

6   more questions."  Now they're coming back and putting me on --

7              THE COURT:  But Mr. Dollinger did raise the issue

8   before Mr. Lonergan had finished, and I had said we will get to

9   that.  That's what I am --

10             MS. LASK:  Oh.  Oh.

11             THE COURT:  That's what I'm doing now.  I just didn't

12  want to waste the jury's time.

13             MS. LASK:  Okay.  So they never provided me it, when

14  you told them to correct the exhibit.  Could I get a copy of

15  what they're going to provide?

16             THE COURT:  They should provide you with a copy.

17             MS. LASK:  They didn't.  It's not in their exhibit

18  list.

19             THE COURT:  On the other hand -- well, I'm not sure --

20  I don't think either side has come with copies for their

21  adversary for exhibits certainly, which is poor form.  That

22  should be done by everyone.  But let's see what they have

23  first.

24             MR. DOLLINGER:  Your Honor, may I ask you, tomorrow

25  morning is -- we should be starting at about 9:30 tomorrow

O873RHE5                          Lask - Cross

1   morning, correct?

2             THE COURT:  Yes, but we're finishing this right now.

3             MS. LASK:  Your Honor, I also would like to say, I

4   want to make it very clear, because sometimes I feel like I'm

5   getting a little beat up, and this is my feeling, because when

6   the Court said before "contempt, don't do it again," they have

7   done it four times.  Unless you want me to do a motion and say

8   they have done it.  You can't give them leeway that just

9   because Mr. -- I forgot his name, this other attorney came in

10  the day before, obviously he is responsible for knowing the

11  file, knowing the Court order.  Mr. Dollinger knew it.

12            And we're spending so much time wasting, going over

13  what this Court has ruled every time, and they find every other

14  way to try and bring this in.  I'm so prejudiced.  When he

15  started saying, aren't you a JD, I saw one of the jurors look

16  like, she's not a lawyer?  I saw the look on her face.  And

17  they did it on purpose.

18            And these are -- well, why did you say it when there's

19  an order saying not to?  And you're an attorney --

20            THE COURT:  Hey.  You're not directing your comments

21  to counsel.  You're directing them to the Court.

22            MS. LASK:  I see him shaking his head.

23            THE COURT:  I shut down that questioning, and I'm not

24  holding anyone in contempt at the moment.  Both sides have

25  plenty of conduct they could be held in contempt for.  I've

O873RHE5                              Lask - Cross

1   been very I would say generous given how much people repeat

2   doing what I tell them not to do, including witnesses and

3   lawyers.

4           So we're just going to keep moving along here.

5           MS. LASK:  At some point I need to say it, but I'd

6   love to see the list of what I -- because I have been following

7   every --

8           THE COURT:  Ms. Lask, I know you love to talk.

9           MS. LASK:  Yes.

10          THE COURT:  A lawyer often does.  But you've spent a

11  lot of time talking on the stand repeating the same speeches

12  over and over --

13          MS. LASK:  It's hard.

14          THE COURT:  -- when it's not necessary.  I'm just

15  saying we're going forward.

16          MR. FERRANTE:  So I'm not understanding.  Are we going

17  back to cross with this?

18          THE COURT:  With this one document.

19          MR. FERRANTE:  Oh, okay.

20          May we use the restroom?

21          THE COURT:  Go ahead.

22          MR. FERRANTE:  Thank you, your Honor.

23          (Recess taken.)

24          THE COURT:  Let's go on the record.

25          MR. DOLLINGER:  Just on the list of the exhibits that

O873RHE5                         Lask - Cross

 1  have been introduced --

 2           MS. LASK:  I didn't even hear.

 3           THE COURT:  He just started speaking.  He's just

 4  asking about exhibits.

 5           Go ahead.

 6           MR. DOLLINGER:  What I wanted to do is figure out

 7  which one -- if there's any objection, in advance of what we

 8  have or don't have, because I think there are a couple, your

 9  know, add water so to speak, so could we somehow before the

10  closing is done maybe, you know, marshal them and perhaps, you

11  know, make sure --

12           THE COURT:  Well, I think counsel should do that at

13  the end of today.  Confer about what the exhibits are and, if

14  any housekeeping needs to be done, we'll discuss that first

15  thing in the morning.

16           MR. DOLLINGER:  I just wanted to --

17           THE COURT:  Because I had a little bit of that, too.

18           MR. DOLLINGER:  Thank you, Judge.

19           (Recess taken.)

20           THE DEPUTY CLERK:  Court officer, we're ready for the

21  jurors.

22           Thank you.

23           (Continued on next page)

24

25

O873RHE5                              Lask - Cross

```
 1              (In open court; jury present)
 2              THE DEPUTY CLERK:  All rise.  Jury entering the
 3    courtroom.
 4              THE COURT:  All right.  Welcome back.
 5              So there was one matter that came up before the end of
 6    that cross-examination and we've resolved it, so the plaintiffs
 7    are going to continue with cross-examination on one document.
 8              MS. LASK:  I just realized something.  Could we have a
 9    quick sidebar on this?
10              THE COURT:  No.  Come up to the stand, please.
11              MS. LASK:  Okay.
12              THE COURT:  We've had plenty of opportunity.
13              MS. LASK:  Well --
14    Q.  Ms. Lask, I ask you to take a look at the document that's
15    been put on, the motion in limine, and tell me if you recognize
16    that document.
17    A.  It's a cover page.
18    Q.  Of what?
19    A.  Of an appellate court brief.
20    Q.  Written by whom?
21    A.  It has my name.  It's a cover page that I produced.
22    Q.  And it's the cover page of a brief for defendant appellant
23    Lask, correct?
24    A.  Yes.  It's a cover page of a brief.
25    Q.  A record?
```

O873RHE5                              Lask - Cross

1    A.  Correct.

2    Q.  Matter 201577-CV, and that was an appeal, correct?

3    A.  Correct.  I just said it's a cover page of an appellate

4    brief.

5    Q.  So this is part of Defendant's Exhibit Four, and it

6    contains just two pages of the brief you wrote.  And I'm going

7    to show you --

8             THE COURT:  You said Defendant's Exhibit Four.

9    Q.  I'm sorry.  Plaintiff's Exhibit Four.  Yes.  I'm sorry.

10            And this is page 19 from your brief that you wrote.

11   I'll show you the top just to show you that it's the same

12   document.

13   A.  Yes.  I understand that.

14   Q.  Okay.

15            THE COURT:  Can we just establish very briefly just

16   the context?  This was a --

17            MR. LONERGAN:  Yes.

18            THE COURT:  This was an appeal of what?

19            MR. LONERGAN:  This was an appeal -- well, I'm going

20   to ask the witness.

21            THE COURT:  Okay.  Go ahead.

22   Q.  This was an appeal of what?

23   A.  This was an appeal of something that happened in this case.

24   It's regarding this case.

25   Q.  Okay.  Of what decision?

1   A.  The summary judgment decision.

2   Q.  Okay.

3           MR. DOLLINGER:  That's a federal action, Judge.

4           THE COURT:  I just wanted the jury to understand what

5   they're seeing.  It's connected with this action.  Litigation

6   has a long history, that's all.

7   Q.  Okay.  And was there an issue about the research that you

8   performed for Maggie Karn?  Did that arise in that litigation?

9   A.  You mean this appeal?

10  Q.  Yes.  The appeal --

11  A.  This brief is addressing the research that I did.

12  Q.  Okay.  And then you say, and I'm going to draw your

13  attention to what's subsection six, last bill filed by Karn

14  proved last researching federal issues since June 2012 and into

15  December 2012 long before the first federal action was filed.

16          Do you see that?

17  A.  Yes.

18  Q.  Okay.  And then it goes down to say, the bill is replete

19  with no cases relating to research performed in 2012 for many

20  months before the first federal action was filed, to-wit.  And

21  then it lists up one, two, three, four, five, six, seven, eight

22  entries from your bill.

23          Do you see that?

24  A.  Yes, I do.

25  Q.  Okay.  And then after that you go down to give some sort of

1    an idea of what the entries mean, a legend of sorts.

2            So, first of all, is this a true statement?  This is

3    what you -- these bills, those entries reflect research that

4    you did on the first federal complaint?

5    A.  No.

6    Q.  Okay.  Why did you not make that distinction here?

7    A.  Because, as I said, the cases are inextricably intertwined.

8    Meaning I'm working on a state custody case, doing research on

9    civil rights that I'm arguing before State Referee Burnett in

10   the custody case, so all that research -- of course I was

11   researching civil rights from the start and continuing to

12   research.

13   Q.  And how do you apportion that research among those cases?

14   A.  I thought this was asked.

15           THE COURT:  Yes.  Can you clarify?

16   A.  I thought we were limited to --

17           THE COURT:  Just clarify if you were asking something

18   specific to this document.

19   Q.  I'm asking about these eight entries right there that are

20   on this document.  Okay?

21           Did those eight entries have to do with the first

22   federal complaint?

23   A.  They have to do with the state case and for the federal

24   complaint.

25   Q.  Okay.  You don't mention that, though, in this brief, that

1    it was among various actions, do you?

2    A.   You're only showing me one page of a brief.  That's page

3    19.  If you're -- you're taking it out of context.  If you read

4    the whole brief, which we're limited to that, the brief was

5    making certain arguments.

6    Q.   Okay.  So here's the next page, okay, that continues --

7    actually, let's look at the bottom of this page, because I just

8    want to know where you mention that any of this research had

9    anything to do with anything besides the federal complaint.

10   Okay?

11   A.   Again, I told you it was a 45-page --

12   Q.   So you say --

13   A.   I'm answering your question.  It was a 45-page brief or so.

14   You're showing me this section.  I can tell you about this

15   section, which this section is from the exact bills that we

16   already discussed, each and every one of these.

17   Q.   Right, and you attribute these to the first federal action,

18   right?  You say, research performed in 2012 for many months

19   before the first federal action was filed, to-wit, and you

20   offer these eight entries?

21   A.   To-wit, the sentence is arguing that research was performed

22   long before the first federal action was filed.  Meaning, I

23   said it numerous times, the state case, civil rights cases,

24   *Troxel*, all that started from the beginning.

25           The argument is that one of the things that this brief

O873RHE5                              Lask - Cross

1    was arguing, that the judge said, the Court -- I mean, you're

2    pulling out an appellate brief, and the argument was, Judge

3    said you never researched before October 24, and here it's

4    July 13 I was researching.

5              There's more to this -- that was -- this argument is

6    not just to the federal.  If I'm researching for the state

7    case, the same federal arguments that I'm going to end up using

8    for a federal case, I'm doing research.  Nobody could say, you

9    failed to research before February 21 -- I'm sorry.  I

10   apologize for that.  You failed to research before December 21

11   when all the bills showed I was researching.

12             And Ms. Karn just testified yesterday she was

13   researching from the start.  She was talking about civil rights

14   in the state case.

15   Q.  This refers to the first federal action, yes?

16   A.  No, it does not.

17   Q.  Okay.  The bill is replete with notations relating to

18   research performed in 2012 for many months before the first

19   federal action was filed.

20   A.  The sentence is "research performed," and the context is, I

21   was performing research long before the first federal action

22   was filed.  So it's on the bottom -- the same is true for

23   keeping Karn advised of the ongoing research and strategy in

24   the 12 months before the first federal action was filed on

25   December 22, 2012.

O873RHE5                              Lask - Cross

1   Q.  Why did you not mention any of the state court matters?

2   A.  Because you pulled one page out of a 45-page brief, so if

3   we're going to take things out of context, it's not going to

4   work.

5          THE COURT:  Well, hold on.  The Court ruled that only

6   certain pages could be used, so we don't get confused by other

7   things that are there.  So it's not counsel who is just

8   exerting the page or two.

9          Ms. Lask has testified that she was trying to show

10  that she had done research about federal issues in civil rights

11  prior to the filing of the first federal complaint.

12         THE WITNESS:  Correct.

13  Q.  Bottom of 19 --

14         THE COURT:  Counsel.

15  Q.  Question -- the bottom of 19, the bill at 3/17 -- 3/18

16  shows Lask conferencing with Karn regarding the first federal

17  action.

18  A.  Could you bring that down a little bit so I can see?

19  Q.  Sorry.

20         Before the first federal action, before it was filed,

21  again, to-wit --

22  A.  Same.

23  Q.  And you have two entries there, and you say, again, it is

24  not hard to interpret that difference.  T-C means telephone

25  conference with client.

O873RHE5                              Lask - Cross

1          Question, you don't mention anything besides the first

2     federal action in that clause either, do you?

3     A.  Can you show me the sentence on page 19 that you started

4     with?  The bill that shows conferencing with Karn -- can you go

5     to the next page, please?

6          Right.  So it's the same answer.  I'm talking to her

7     about federal cases and research of civil rights cases, and the

8     same civil rights cases that I argued before Referee Burnett in

9     the family court case, that -- those same cases I've testified

10    30 times and shown you is -- may I finish, please?

11         Those same cases translated to the federal case that

12    was ultimately filed and immediately withdrawn because it

13    wasn't ready.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
 1    Q.  But that's not what you say.  You said bill at 8/13 shows
 2    Lask, you conferencing with Karn regarding the first federal
 3    action.  It doesn't say regarding anything else.  It says
 4    regarding the first federal action?
 5              THE COURT:  At this point the document speaks for
 6    itself.  I think you've made your point.
 7              MR. LONERGAN:  Thank you, Judge.
 8    Q.  All right.  And again, I note that on the second page,
 9    page 20, I picked just the sentence here that is Karn's own
10    admission in the record.
11    A.  Where are you?
12    Q.  I'm in the middle of the page.
13              THE WITNESS:  Your Honor, objection.  I have to say it
14    because Mr. Ferrante wasn't here for this.  You limited it
15    to --
16              THE COURT:  Hold on.  I just want to be oriented to
17    where counsel is addressing.
18              MR. LONERGAN:  Section 7, Judge.
19              THE COURT:  With the sentence starting with "however"?
20              MR. LONERGAN:  The sentence beginning that is Karn's
21    admission in the record that research was in fact conducted in
22    2012 long before filing the first federal action on
23    December 21, 2012.
24    A.  Yes, she admitted I was researching doing my job, that I
25    was conducting research because that's what lawyers do, that's
```

O873RHE7

1    what I do.  I'm researching.

2    Q.  No mention of Article 78, no mention of complaints, no

3    mention of petitions, all you are talking about --

4            THE COURT:  Counsel, enough.  That was not the issue

5    that was being addressed.  So we don't need to go there.

6    Q.  This was from a finding --

7            THE WITNESS:  No, your Honor.

8            THE COURT:  Hold on.  What was the question?

9            THE WITNESS:  Objected to.

10   Q.  This --

11           THE WITNESS:  He's not allowed to talk about this.

12           THE COURT:  What was the question?

13   Q.  This court of appeals resulted from a finding that there

14   was --

15           MR. FERRANTE:  Objection.

16           THE COURT:  Hold on.  This is a filing in?

17           MR. LONERGAN:  Finding.

18           THE COURT:  We're talking about a filing that was

19   submitted in the Second Circuit.  We're not talking about what

20   any finding was made by a court.

21           MR. LONERGAN:  I have no further questions, Judge.

22           THE COURT:  I have a couple questions and then if

23   there is redirect.  I am going to ask counsel, maybe,

24   Mr. Ferrante, you can do so, to bring up on the screen, I am

25   going to talk about Plaintiff's Exhibit 4 which are the billing

O873RHE7

1  records, and Exhibit 6, which Ms. Lask refers to as her

2  underlying notes.

3          MR. FERRANTE:  What would you like, your Honor?

4          THE COURT:  Let's start with, I want to see Exhibit 4

5  which is the bill.

6          MR. FERRANTE:  4 and 5 are the bills.

7          THE COURT:  I want to see the date from November 6.

8          MR. FERRANTE:  November 6.

9          THE COURT:  Whichever one has that.

10         So, everybody see that?  Yes.  We are looking at the

11  billing records, Ms. Lask, the entry at 11/6, November 6 reads

12  draft fed cmpl -- that's for complaint, right?

13         THE WITNESS:  It means complaint, correct.

14         THE COURT:  Then comma research/review cases and there

15  are six hours, right?

16         THE WITNESS:  Correct.

17         THE COURT:  And now go to Exhibit 6 and let's see

18  November 6.  So the November 6 entry at the top you are asked

19  about whether there was anything related to the federal

20  complaint in there, and my notes indicate that there was

21  nothing directly attributed to the federal complaint.

22         And my question is, why then is there reference to the

23  federal complaint in the billing records on November 6?

24         THE WITNESS:  You mean where it says the top draft fed

25  complaint with Article 78 simultaneously?

O873RHE7

1           THE COURT:  Right.  And you testified there was

2     nothing directly attributed to the federal complaint.  And I

3     just want to understand then why the notes say in the billing

4     that that's what was there and there is no reference to

5     anything else except the federal complaint.

6           THE WITNESS:  Oh.  Because sometimes I didn't input

7     everything in but -- I was drafting the federal complaint with

8     the Article 78 simultaneously, so I'm charging her for the

9     Article 78.  What little is left with the federal complaint

10    after I am doing the Article 78.

11          THE COURT:  Okay.  And then on November 7, in your

12    notes, it says .4 and then 2.6 hours, and the .4 is attributed

13    to some work for the federal complaint; is that right?

14          THE WITNESS:  Continue federal complaint research cut

15    and paste.

16          THE COURT:  Then the .4, right?

17          THE WITNESS:  Correct.

18          THE COURT:  Then you have the 2.6 hours for the

19    Article 78 work.  Is that right?

20          THE WITNESS:  Yes.

21          THE COURT:  So, now go if you can, counsel, please put

22    back the billing records that show November 7.  November 7 says

23    continued federal complaint research.  Is that what that refers

24    to?

25          THE WITNESS:  May I see side by side, please?

O873RHE7

1          THE COURT:  I am asking you right now, that says

2      continued federal complaint research.  Is that what those

3      abbreviations stand for?

4          THE WITNESS:  Oh, continue -- it is supposed to say

5      continue federal complaint, research.

6          THE COURT:  It doesn't right now, right?  It just says

7      continue federal complaint research.  Is that right?

8          THE WITNESS:  Correct, it says that.  The comma was

9      left out.

10          THE COURT:  It says three hours.  And if you can go to

11      the underlying notes, please, Exhibit 6.  Show us.

12          And so, here you again said that 2.6 hours was for

13      research devoted to the state matters and .4 for the federal.

14      And my question is why doesn't the November 7 billing entry

15      refer separately to federal complaint, because this does say

16      federal complaint research, and then research for Article 78.

17      Why is there no mention of the state court proceedings in the

18      November 7 billing entry?

19          THE WITNESS:  You mean the Article 78?

20          THE COURT:  Yes.  In your underlying entries there is

21      2.6 hours for the Article 78 research.  That's 2.6 of the three

22      hours charged in your billing records.  .4 in your underlying

23      notes says federal complaint research cut and paste.  You've

24      said that was for cutting and pasting, maybe cutting and

25      pasting research, I don't know.

O873RHE7

1          My question simply is why does the November 7 entry in
2      your billing to Ms. Karn only mention federal?
3          THE WITNESS:  What was the total amount in the
4      November 7 billing?
5          THE COURT:  3 hours, 2.6 of which was devoted to the
6      Article 78.
7          THE WITNESS:  Okay.  So right, not all the time was
8      I -- so why doesn't it say anything about --
9          THE COURT:  You said there is a comma missing I think
10      I heard you say.
11          THE WITNESS:  There was a comma missing from the
12      research.
13          THE COURT:  That's your explanation.
14          THE WITNESS:  Yes.
15          THE COURT:  Okay.
16          THE WITNESS:  And sometimes, you know, typo.
17          THE COURT:  And then one more.  October 31.  Let's
18      look at October 31 on Exhibit 4.  Actually go to Exhibit 6 if
19      you can, I'm sorry, start with Exhibit 6 this time, the notes.
20      I'm sorry.
21          MR. FERRANTE:  What date, your Honor?
22          THE COURT:  October 31.
23          And there you have, am I correct that you have 4 hours
24      attributed to the draft Article 78, and related items, and then
25      .3 for the draft federal complaint.  Do I have that right?

O873RHE7

1              THE WITNESS:  Correct.

2              THE COURT:  So now put up the billing records for

3    October 31 to what was charged -- I'm sorry -- in the invoice.

4    The entry there is continued draft federal complaint, 5 hours.

5    Again, why is there no mention of anything other than drafting

6    the federal complaint?

7              THE WITNESS:  It might have been a misprint, and I

8    omitted it.

9              THE COURT:  Okay.  All right.

10             Since you are up there, Mr. Ferrante, was there

11   anything you wanted to follow up on my questions?

12             MR. FERRANTE:  I don't think so, your Honor.

13             THE COURT:  Okay.  Was there anything you wanted to

14   follow up on my questions?

15             MR. LONERGAN:  No, your Honor.  Thank you.

16             THE COURT:  Ms. Lask, you may step down.

17             I'm sorry.  We have our redirect, of course, my

18   apologies.  How long do you think you have?

19             MR. FERRANTE:  I didn't want to redirect you, your

20   Honor.  That's too much for me.

21             THE COURT:  About how much do you think you have

22   time-wise?

23             MR. FERRANTE:  Maybe 60 seconds.

24             THE COURT:  Go for it.  Everyone should know when a

25   lawyer says 60 seconds, it may not mean 60 seconds.

O873RHE7                         Lask - Redirect

1   REDIRECT EXAMINATION

2   BY MR. FERRANTE:

3   Q.  Ms. Lask, you were just cross-examined for a couple of

4   hours, and most of the questions were about abbreviations

5   hieroglyphics, that sort of thing.  Do you remember that whole

6   range of questions?

7   A.  I sure do.

8   Q.  I am going to show you for what's been marked as Defense

9   Exhibit 17.

10  A.  Okay.

11  Q.  Can you tell me who's writing that and who is receiving it?

12  A.  I'm reading from the top is an August 26, 2013, e-mail from

13  Ms. Karn to me.  And she's talking about I'm so -- that's an

14  e-mail from Ms. Karn to me.  From August.

15  Q.  And again, you remember during the questioning, how many

16  times you heard the words RR, RR.  How is Ms. Karn supposed to

17  understand what RR is.  You heard that over and over again,

18  right?

19  A.  Yes, I did.

20  Q.  I know I did.  And she's writing this, right?

21  A.  Yes.

22  Q.  And how many times do you see RR, referee ref.  She's using

23  your very same shorthand from the billing; isn't that correct?

24  A.  Yes, it's directly from the -- I'm so tired.  I apologize.

25  From the document that I -- yes, she's using the same.

O873RHE7                          Lask - Redirect

1   Q.  It's here each time and she knows exactly what RR is.  And

2   to have the defense attorney crossing you on how confusing and

3   how you can possibly make her decipher hieroglyphics.  She's

4   writing this to you, correct?

5   A.  Correct.

6            MR. FERRANTE:  I have nothing further.  There is one

7   more.

8            THE COURT:  Way past 60 seconds.

9   Q.  Do you remember during the course of your examination you

10  were being questioned about filing a second federal action?

11  A.  Yes.

12  Q.  And I don't want to use the word "insinuations."  There was

13  just this, you filed a federal action, right, and 50,000 and

14  60,000, and the lawyer was up here saying all of that, yeah?

15  A.  Correct.

16           THE COURT:  He didn't actually say those numbers.

17  Q.  Tens of thousands I think it was.

18  A.  Yes, exactly.

19  Q.  This is Defense Exhibit 14.  Can you look on top to see who

20  is writing that e-mail?

21  A.  That is an e-mail from Ms. Karn to me after I withdrew,

22  voluntarily withdrew the first action that she had filed.

23  Q.  And just read that out for us.

24  A.  She's saying don't they know we are going to bring back the

25  federal but -- and she's writing hieroglyphics, BC means

O873RHE7                          Lask - Redirect

1   because -- of the appeal we withdrew.  Also next time we should

2   include Ken on it and Cheryl.

3   Q.   And Ken and Cheryl are who?

4   A.   Ken is the husband.  Cheryl was the husband's lawyer.

5   Q.   Did this give you the impression that she was confused

6   about the work you were doing for her?

7   A.   No, not at all.  She knew exactly and she was telling me to

8   refile the federal.

9   Q.   You remember her saying she didn't know you withdrew it,

10  she didn't find out until much later, correct?  She was in the

11  dark about that?

12  A.   Yes.

13  Q.   This is clearly showing that's not the case, right?

14  A.   It is one e-mail.  We had many phone conversations about

15  this e-mail.

16  Q.   In fact, she's suggesting adding more defendants to it,

17  right?  Like her husband and whoever Cheryl is, right?

18  A.   Correct.

19  Q.   That's in March of 2013?

20  A.   Yes.

21  Q.   By this time she will have received most of the bills we've

22  been discussing from the previous time frame?

23  A.   Correct.

24  Q.   She's not saying can I come to your office and let's go

25  through the hieroglyphics, I'm really confused?  She's not

1   saying that?

2            MR. LONERGAN:  Objection.

3            THE COURT:  Sustained.

4            MR. FERRANTE:  Nothing further, your Honor.  Thank

5   you.

6            MR. LONERGAN:  Quickly?

7            THE COURT:  Quick recross.

8   RECROSS EXAMINATION

9   BY MR. LONERGAN:

10  Q.  Take a look at 1457 if we could.  Okay.  Second line R/R

11  for 518.  R/R.  That's not R capital R, is it?

12  A.  The R.R., if you show the other, the rest of the bills R.R.

13  is all over in the other bills.  R.R. meant Rosemary Rivieccio.

14  She is using them as well.

15  Q.  How about TC and CS, and TT and C and CS and --

16           MR. FERRANTE:  Your Honor, beyond the scope.  I asked

17  about R.R.  Nothing more.  He's had opportunity to talk about

18  TC.

19           THE COURT:  Overruled.  It is not beyond the scope.

20  But the point is obvious.  There are terms in here that weren't

21  used in Ms. Karn's e-mail.  Some were, some weren't.

22           THE WITNESS:  Well --

23           MR. LONERGAN:  I have nothing further.

24           THE WITNESS:  Thank you.

25           THE COURT:  Thank you, Ms. Lask.

O873RHE7

```
 1              (Witness excused)

 2              THE COURT:  Does the defense rest?

 3              MR. FERRANTE:  Yes, your Honor.

 4              THE COURT:  So, jury, we are going to end for the day,

 5    obviously.  I'll have you back in the morning, I will give you

 6    your instructions and you will be sent to deliberate.  Okay?

 7    Again, I remind you, please no discussing with anyone or

 8    amongst yourselves about the case.

 9              (Jury excused)

10              THE COURT:  Is there anything we need to discuss?

11    Plaintiff?

12              MR. DOLLINGER:  No, your Honor.

13              THE COURT:  Defense?

14              MR. FERRANTE:  Your Honor, you mentioned something

15    about exhibits.

16              THE COURT:  Yes.  So, there have been some exhibits

17    that have come in and I've named, you may have named.  I had

18    Defendant's 21 is that highlighted version of the second

19    federal complaint.  There was just a reference to PX 4 which is

20    the Second Circuit excerpt.  And I wanted counsel to meet and

21    confer with each other and just make sure you are all on the

22    same page about what the exhibits are, and if they're not

23    labeled, to label them so that we can send them back with the

24    jury if they want them.  Okay?

25              Was that it?
```

O873RHE7

1          MR. FERRANTE:  What I would say is we did file our

2    exhibits and we followed the list has been the same from 1

3    through 20.  I was calling things 19.

4          THE COURT:  That's fine.

5          MR. FERRANTE:  I was going to suggest that the

6    plaintiffs just download it off the ECF and print it.

7          THE COURT:  I don't think that's the question.  I

8    think the point is there are some exhibits --

9          MR. FERRANTE:  Some of the ones, no, I'm not talking

10   about that.  I think they were talking about some of the ones

11   that were actually provided that they didn't have copies of.

12         THE COURT:  Mr. Dollinger?

13         MR. DOLLINGER:  I think what we want to do is be sure

14   that everything that was provided by the defendants and

15   everything we provided, whatever is in is in.  Okay.  I just

16   want to be certain it's not an extra one here and extra one

17   here, because I'm not certain they've used every one because

18   the number it is.  That's all.

19         THE COURT:  So you'll meet and confer and you'll

20   provide, I would like an actual list of them tomorrow so we're

21   all on the same page.

22         MS. LASK:  Your Honor, they can send an e-mail, we can

23   check, we can send an e-mail and --

24         THE COURT:  It might make sense to talk right now

25   while some of the exhibits are here.  That's all I had in mind.

O873RHE7

1          MS. LASK:  It might be an idea but, yes.

2          MR. FERRANTE:  There's only four of them.

3          MS. LASK:  And then, your Honor, again, I want to be

4   very clear in closing that they don't come up with these

5   insinuations about my education, these insinuations.

6          THE COURT:  No reference to education whatsoever.

7          MS. LASK:  These insinuations.  In your order of

8   August 9, 2023, I'm sorry.  Regarding Exhibit 6.  Constantly,

9   you know, these insinuations of a fraudulent Exhibit 6.  You

10  have already determined and ruled after you gave us all the

11  time and for them to even depose me that Exhibit 6 is an

12  exhibit and it's in.

13         THE COURT:  What I ruled was that I'm not going to

14  question whether it was produced or not, given the history that

15  occurred.  I gave plaintiffs an opportunity to depose you if

16  they wanted about those records.  They are entitled to question

17  the reliability of those records and the timing of when they

18  were made, if they have a basis to do so.  But we're not

19  revisiting it in the discovery context.

20         MR. FERRANTE:  If I may ask then, because I heard a

21  lot that sounded more like a white collar fraud case than a

22  damages case about it's real easy for you, you could have done

23  this 5 years ago.  That seems like a direction they are going

24  in and that's fine.  But if that's the case, then I want to be

25  able to immediately counter that in my closing and say,

O873RHE7

1   everything you just heard, they were given an opportunity to

2   visit the attorney's office and come in and copy files

3   directly.  They could have checked metadata, they could have

4   done anything they wanted.

5          MR. DOLLINGER:  We found out they weren't there and

6   there hadn't been an opportunity.

7          THE COURT:  Counsel, both of you.  We are not going to

8   go that route.

9          You can certainly refer to the fact that these are

10  notes she claims that she has for herself she says she

11  routinely keeps as she does for all her clients.  You can get

12  to the point that it was something that never was provided to

13  the plaintiff.  And that you can certainly say, make a point if

14  you want, that it's convenient for her to have that, whatever.

15  But, hold on.  But we're not going to get into whether it's

16  fraudulent or not.

17         MS. LASK:  Your Honor, when you say, if they're going

18  to do a closing and say this wasn't produced to us.

19         THE COURT:  No, they can't say that.

20         MS. LASK:  I thought I heard you say --

21         THE COURT:  No.  Just the opposite.  Because --

22         MR. DOLLINGER:  Plaintiff testified --

23         THE COURT:  No.

24         MR. FERRANTE:  We heard the other way around.

25         THE COURT:  Just to be clear.  We have gone through

1    this previously.  We are not getting into anything about the

2    production of that document in this case.  That is dead and

3    buried and I didn't hear Mr. Dollinger say he was necessarily

4    going to do that, but just to be clear, that's out.

5             MR. DOLLINGER:  Judge, not in discovery.  But whether

6    or not the defendant provided it to the plaintiff at what point

7    in time.  And in fact, if you listen to her own testimony, she

8    says, oh, I never provide it.  It's my own calendar.

9             THE COURT:  Hold on.  No.  No.  No.  No.  It came up

10   on the eve of trial as an exhibit, we went through the history

11   of how that could have happened, etc.  It is fine to say that

12   Ms. Karn first became aware of it herself through you at a

13   later point in time that's fine.

14            MR. DOLLINGER:  And she's claiming she didn't receive

15   them, and she received them through us.

16            THE COURT:  That's fine.  But the defendant's not

17   claiming she sent them directly to her.

18            MR. DOLLINGER:  She did.

19            THE COURT:  No, she did not testify to that.  She did

20   not testify she provided the so-called underlying notes.

21            MR. DOLLINGER:  I want to apologize.  She is

22   absolutely right.  I was thinking of another document.  You're

23   right.

24            MS. LASK:  But, okay.  So, anyhow, you are saying it's

25   fine to say Karn became aware of it at some time through her

O873RHE7

 1    attorneys, which I just still find kind of --

 2            THE COURT:  That's fine.  No, that's fair game.  The

 3    jury can be told, and you can use it however you want that

 4    those were, that was a document, those were notes that were not

 5    provided to Ms. Karn.  There was no obligation to do so.

 6            MS. LASK:  Exactly.  Thank you.

 7            THE COURT:  Just in terms of her knowledge of it, she

 8    only got that recently.  It's not something she was aware of in

 9    the regular course.

10            MS. LASK:  Something she testified she just saw it

11    three months, when we all know it was July of 2023.

12            THE COURT:  Whenever it was.  I'm not going to worry

13    about that.  We're done.  Thank you.

14            MR. FERRANTE:  Just for scheduling, what are we

15    looking at tomorrow?  Are we walking in the door and starting a

16    closing argument?

17            THE COURT:  We'll do our housekeeping on the exhibits

18    and I will give instructions and then I'll do your closing.

19    And actually, we should discuss length of closings.  Tell me

20    what the plaintiff is anticipating.

21            MR. LONERGAN:  15 minutes.

22            THE COURT:  What is the defense anticipating?

23            MS. LASK:  A half hour at the most.

24            THE COURT:  At most.  Not more than that.  Half hour
      at most per side.  And we will take it from there.
25            (Adjourned until August 8, 2024, at 9:15 a.m.)

O873RHE7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                                    Page

3     MARGARET RHEE-KARN

4    Cross By Ms. Lask . . . . . . . . . . . . . 117

5    Redirect By Mr. Dollinger . . . . . . . . . 148

6    Recross By Ms. Lask . . . . . . . . . . . . 164

7     SUSAN CHANA LASK

8    Direct By Mr. Ferrante . . . . . . . . . . . 171

9    Cross By Mr. Lonergan . . . . . . . . . . . 252

10   Redirect By Mr. Ferrante . . . . . . . . . . 336

11   Recross By Mr. Lonergan . . . . . . . . . . 339

12

13

14

15

16

17

18

19

20

21

22

23

24

25