UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MARGARET RHEE-KARN,                 :

                                         :

                     Plaintiff,       :            15-CV-9946 (RWL)

                                         :

       - against -                :

                                         :        **DECISION & ORDER:**

SUSAN CHANA LASK, ESQ.,         :        **<u>POST-TRIAL MOTIONS</u>**

                                         :

                     Defendant.    :
-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Following summary judgment on liability in favor of Plaintiff Margaret Rhee-Karn and a jury trial on damages, the jury awarded Rhee-Karn $40,300 in compensatory damages for legal malpractice committed by Defendant Susan Chana Lask. The parties now bring several post-trial motions. Lask brings a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 and a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1). Rhee-Karn brings a motion under Federal Rule of Civil Procedure 54(d)(2) seeking sanctions against Lask in the form of attorney's fees and costs, and an application for prejudgment and post-judgment interest. To avoid unnecessary repetition of facts, the Court addresses the parties' motions in a single decision. For the reasons that follow, Lask's motion for judgment as a matter of law is DENIED; Lask's motion for a new trial is DENIED; Rhee-Karn's motion for sanctions is DENIED; and Rhee-Karn's application for prejudgment and post-judgment interest is GRANTED.

## Background

In 2012, Rhee-Karn retained Lask, an attorney, to represent her in child custody proceedings against her former husband in New York state family court. At that time, the

proceedings had been pending in family court for over two years without a trial, and all the while Rhee-Karn had limited visitation rights with her child. Rhee-Karn hired Lask in hopes of expediting the proceedings. Lask advised Rhee-Karn that she could file an action against the family court actors to vindicate what Lask characterized as the denial of Rhee-Karn's due process rights as a parent.

On December 21, 2012, Lask, on behalf of Rhee-Karn, filed an action in the United States District Court for the Southern District of New York against the referee, the law guardian, a court-appointed forensic psychiatrist in the family court proceeding, and the City of New York (the "First Federal Action"). *See* Complaint, *Rhee-Karn v. Burnett*, No. 12-CV-9354 (S.D.N.Y. Dec. 21, 2012), Dkt. 1. Lask advised Rhee-Karn that the family court lacked authority to rule on a constitutional claim, and the action only could be brought in federal court. That advice was incorrect. Under the doctrine established in *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746 (1971), federal courts normally abstain from intervening in pending state court cases even when constitutional issues are being considered. This doctrine is referred to as *Younger* abstention. On February 5, 2013, Rhee-Karn voluntarily dismissed the First Federal Action. On August 30, 2013, however, Rhee-Karn filed a second action in the Southern District against several individuals associated with the family court proceeding (the "Second Federal Action"). *See* Complaint, *Rhee-Karn v. Burnett*, No. 13-CV-6132 (S.D.N.Y. Aug. 30, 2013), Dkt. 1. On September 12, 2014, the district court invoked *Younger* abstention and dismissed the Second Federal Action. *Rhee-Karn v. Burnett*, No. 13-CV-6132, 2014 WL 4494126, at *7 (S.D.N.Y. Sept. 12, 2014).

On December 21, 2015, Rhee-Karn brought the instant action against Lask asserting, *inter alia*, legal malpractice in connection with her representation of Rhee-Karn in the family court proceedings and the First and Second Federal Actions, and seeking damages in the form of reimbursement of legal fees.  (Dkt. 1.)  On September 30, 2018, the Honorable Loretta A. Preska issued an order denying Lask's motion to dismiss Rhee-Karn's malpractice claim.  (Dkt. 97.)  In an opinion and order dated March 4, 2020, the Honorable Denise L. Cote, to whom the case was reassigned after Judge Preska's recusal, granted in part and denied in part the parties' respective motions for summary judgment.  (Dkt. 226.)  Judge Cote held that Lask had committed legal malpractice in connection with the First Federal Action, but that Lask was not liable for malpractice in connection with the family court proceedings or the Second Federal Action.  (*Id.* at 22.)  Lask filed a motion for reconsideration (Dkt. 228), which was denied (Dkt. 229).  The Second Circuit affirmed.  *Rhee-Karn v. Lask*, No. 20-1577, 2022 WL 619695 (2d Cir. March 3, 2022) (summary order).  On November 29, 2022, the parties consented to my jurisdiction for all purposes.  (Dkt. 284.)

Liability having been determined, the sole remaining issue requiring resolution was the appropriate amount of damages, in the form of legal fees, attributable to Lask's legal malpractice in connection with the First Federal Action.  In the leadup to trial, the Court issued several orders resolving lingering damages issues raised by the parties.  First, in its May 24, 2023 ruling on the parties' motions in limine, the Court determined that the relevant dates of billing entries attributable to the First Federal Action were October 24, 2012 to February 5, 2013.  (Dkt. 378 at 4.)  The Court thus calculated Rhee-Karn's claimed damages, in the form of legal fees charged during that time, to be $49,612.50.

(*Id.* at 5-6.)  After additional briefing on damages issues, the Court issued an order on June 28, 2023, permitting Lask to argue to the jury that to the extent legal work performed in connection with the First Federal Action was reused in the Second Federal Action, the damages award could be reduced commensurately, in order to prevent Rhee-Karn from receiving a windfall.  (Dkt. 387 at 1-2.)  At a July 24, 2023 pretrial conference, the Court determined it was Lask's burden to prove by a preponderance of the evidence to what extent, if any, Rhee-Karn's damages should be reduced to prevent a windfall.  (Dkt. 458 17-21.)

Trial began on August 6, 2024.  The jury was instructed that their task was to "determine the amount of fees, if any, for which Ms. Rhee-Karn should be reimbursed by Ms. Lask because of Ms. Lask's negligence in connection with the first federal action … between October 24, 2012, and February 5th, 2013."  (Tr. 43.[1])  The Court further instructed that if the jury determined that work performed in connection with the First Federal Action was later used for the Second Federal Action in place of work that otherwise would have been performed in connection with the Second Federal Action, the jury should reduce the damages award accordingly to avoid a windfall.  (Tr. 420.)  As to respective burdens of proof, the jury was instructed:  "As the plaintiff, Ms. Rhee-Karn must prove by a preponderance of the evidence the amount of damages, if any, caused by Ms. Lask's negligence.  Ms. Lask, however, must prove by a preponderance of the evidence the extent of work, if any, in the first federal action that was reused in the second federal action."  (Tr. 44.)

---

[1] "Tr." refers to the transcript of the trial, a copy of which can be found at Dkt. 456.

Trial spanned three days.  The only testimony was provided by the two parties.  On direct examination by her attorney Douglas R. Dollinger, Rhee-Karn identified certain billing entries from Lask's invoices within the relevant timeframe that were related to the First Federal Action.  (Tr. 55-70.)  Lask, serving as co-counsel for herself, cross-examined Rhee-Karn.  After Rhee-Karn rested her case, Lask testified on direct in response to questioning by her co-counsel, Joseph Ferrante.  Dollinger's co-counsel, Lawrence Lonergan, conducted Lask's cross-examination.

Lask testified that the time information and billing narratives appearing on her invoices were derived from a separate document that Lask maintained and did not regularly share with clients.  She referred to this document as her "calendar" or her "underlying" data, which she claimed contained more detailed information than the invoices she sent Rhee-Karn.  Based on the "underlying data," Lask testified that certain billing entries that Rhee-Karn had identified as associated with the First Federal Action in fact pertained to separate matters.  (Tr. 176-219.)  Lask also testified that, based on a comparison between the complaints filed in the two federal actions, nearly every paragraph from the First Complaint appeared in the Second Complaint.[2]  (Tr. 244-51.)

At the close of evidence, Ferrante moved under Rule 50(a) for judgment as a matter of law.  He argued that, by virtue of the complaint filed in the First Federal Action having been nearly entirely adopted in the Second Federal Action, Rhee-Karn had failed

---

[2] The "First Complaint" refers to the complaint filed in the First Federal Action.  *See* Complaint, *Rhee-Karn v. Burnett*, No. 12-CV-9354 (S.D.N.Y. Dec. 21, 2012), Dkt. 1.  The "Second Complaint" refers to the amended complaint filed in the Second Federal Action. *See* Amended Complaint, *Rhee-Karn v. Burnett*, No. 13-CV-6132 (S.D.N.Y. Nov. 25, 2013), Dkt. 12.  The Court references the amended complaint rather than the initial complaint because Lask used it as a demonstrative during direct examination to compare against the First Complaint.  (*See* Tr. 245-51.)

to meet her burden to show that she had incurred damages.  (Tr. 352-54.)  The Court denied the motion, explaining that "[i]t's a factual question for the jury as to the amount expended for the first federal action and the extent to which they believe it was reused in whole or in part" for the Second Federal Action.  (Tr. 354.)  On the afternoon of August 8, 2024, the jury rendered its unanimous verdict, finding Lask liable to Rhee-Karn in the amount of $40,300.  (Tr. 427; Dkt. 452.)

## I.    Lask Is Not Entitled To Judgment As A Matter Of Law

Lask asserts two bases in her post-verdict Rule 50(b) motion that she contends warrant judgment as a matter of law:  (1) the action was time-barred, and (2) the jury's verdict was unsupported by the evidence.  Neither has merit.  As to the first ground, Lask forfeited her statute-of-limitations argument by failing to include it in her Rule 50(a) motion, and no manifest injustice would result from denying her motion.  As to the second ground, viewing the record in the light most favorable to Rhee-Karn, there was ample support for the verdict.

## A.    Legal Standards

Pursuant to Rule 50, a party is entitled to judgment as a matter of law if there is no "legally sufficient evidentiary basis" for a reasonable jury to find for the party on that issue. Fed. R. Civ. P. 50(a); *see Tse v. UBS Financial Services, Inc.*, 568 F. Supp.2d 274, 286-87 (S.D.N.Y. 2008).  The bar to setting aside a jury verdict is high.  *Lavin-McEleney v. Marist College*, 239 F.3d 476, 479-80 (2d Cir. 2001); *Tse*, 568 F. Supp.2d at 287.  "A jury verdict should be set aside under Rule 50 only where there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture,' or where there is 'such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive

6

at a verdict against [the movant].'" *Tse*, 568 F. Supp.2d at 287 (quoting *Kosmynka v. Polaris Industries, Inc.*, 462 F.3d 74, 79 (2d Cir. 2006)); *see also Lavin-McEleney*, 239 F.3d at 480; *DiSanto v. McGraw-Hill, Inc.*, 220 F.3d 61, 64 (2d Cir. 2000).

In considering the motion, the district court must not make credibility assessments. *Tse*, 568 F. Supp.2d at 287 (citing *Gordon v. Matthew Bender & Co.*, 186 F.3d 183, 184 (2d Cir. 1999)); *Caruso v. Forslund*, 47 F.3d 27, 32 (2d Cir. 1995). The court must view the evidence "in the light most favorable to the non-moving party" and "give that party the benefit of all reasonable inferences that the jury might have drawn in its favor from the evidence." *Slack v. County of Suffolk*, 50 F. Supp.3d 254, 262 (E.D.N.Y. 2014) (internal quotations, elisions, and brackets omitted) (quoting *Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114, 117 (2d Cir. 1994)). A motion pursuant to Rule 50 "is thus proper only if the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable persons could have reached." *Id.* at 263 (internal quotation marks and brackets omitted) (quoting *Fiacco v. City of Rensselaer*, 783 F.2d 319, 329 (2d Cir. 1986)). "Such motions 'should be granted cautiously and sparingly.'" *Id.* (quoting 9A Wright & Miller's Federal Practice & Procedure § 2524 (1995)); *see also Japan Airlines Co. v. Port Authority of New York & New Jersey*, 178 F.3d 103, 112 (2d Cir. 1999).

The purpose of a Rule 50(a) motion, made before a verdict is rendered, is to "inform[] the opposing party of the challenge to the sufficiency of the evidence and afford[] a clear opportunity to provide additional evidence that may be available." Fed. R. Civ. P. 50 advisory committee's note to 2006 amendment; *see* Fed. R. Civ. P. 50(a)(2) (requiring

moving party to "specify the judgment sought and the law and the facts that entitle the movant to the judgment").  To that end, "[b]ecause the Rule 50(b) motion is only a renewal of the preverdict [Rule 50(a)] motion, it can be granted only on grounds advanced in the preverdict motion."  *MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 180-81 (2d Cir. 2016); *see Leniart v. Ellison*, 761 F. App'x 47, 49 (2d Cir. 2019) (summary order) ("A party may renew the motion after an unfavorable verdict on the grounds specifically raised in the prior motion for judgment as a matter of law").  A "Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a [judgment as a matter of law] argument based on the latter." *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012).  In other words, failure to preserve a basis for a Rule 50(b) motion results in forfeiture of that basis for relief.  *See Dalessandro v. County of Nassau*, 758 F. App'x 165, 168 (2d Cir. 2019) (summary order) (affirming district court ruling that plaintiffs "forfeited their right to move for post-verdict judgment as a matter of law pursuant to Rule 50(b) because they failed to make a pre-verdict Rule 50(a) motion").  As the Second Circuit has explained:

> The law is pellucid that a party's failure to move under Rule 50(a) has consequences.  If that party later moves under Rule 50(b), the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or upheld on appeal, except to prevent manifest injustice.  Manifest injustice exists where a jury's verdict is wholly without legal support.

*ING Global v. United Parcel Service Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) (citations omitted); *see Malmsteen v. Berdon, LLP*, 369 F. App'x 248, 249 (2d Cir. 2010) (summary order) (explaining that district courts may grant a Rule 50(b) motion absent a properly made Rule 50(a) motion only if doing so would prevent "manifest injustice" or would correct "purely legal error"); *Scott v. Rosenthal*, 53 F. App'x 137, 140 (2d Cir. 2002)

(summary order) ("the district court may only grant judgment as a matter of law to prevent 'manifest injustice' when the jury's verdict is 'wholly without legal support'") (quoting *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 124, 129 (2d Cir. 1999)).

**B.    Lask Forfeited Her Statute-Of-Limitations Argument**

Under New York law, the statute of limitations for a legal malpractice claim is three years from the date of accrual.  NY CPLR § 214(6).  A cause of action for legal malpractice accrues when an actionable injury from the malpractice occurs.  *Britt v. Legal Aid Society, Inc.*, 95 N.Y.2d 443, 446, 718 N.Y.S.2d 264, 266 (2000).  Because Rhee-Karn belatedly paid the fee to electronically file the complaint that initiated this action, the Court determined that the initial complaint was filed on February 29, 2016.  (*See* Dkt. 29 at 5.)  Lask contends that the malpractice accrued on July 13, 2012, when the negligent advice was given.  Lask further argues that because this action falls outside the three-year statute of limitations in malpractice cases, the Court should enter judgment as a matter of law in her favor.

However, Lask did not raise the statute-of-limitations argument in her Rule 50(a) motion.  Rather, the only basis she asserted for her Rule 50(a) motion was insufficiency of the evidence.  (*See* Tr. 352-54.)  Thus, "because the defendant did not raise a statute of limitations argument in [her] Rule 50(a) motion, [she] may not raise such an argument now on [her] Rule 50(b) motion."  *AIG Global Securities Lending Corp. v. Banc of America Securities LLC*, 646 F. Supp.2d 385, 409 (S.D.N.Y. 2009), *aff'd*, 386 F. App'x 5 (2d Cir. 2010) (summary order).

Perhaps aware of this deficiency, Lask argues that she did, in fact, preserve the statute-of-limitations argument for Rule 50 purposes by asserting the affirmative defense in her answer.  But the procedural rule that a Rule 50(a) motion is a prerequisite for

judgment as a matter of law under Rule 50(b) "may not be waived as a mere technicality." *Cruz v. Local Union No. 3 of International Brotherhood of Electrical Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994). As such, Lask was required to raise it in a Rule 50(a) motion before raising it in a Rule 50(b) motion. Asserting the defense in her answer is insufficient.

Denial of Lask's Rule 50(b) motion would not result in manifest injustice. To be sure, a statute-of-limitations argument potentially would have had merit.[3] But that does not warrant excusing the procedural bar because to do so "would, of course, obviate the need for the procedural requirement in the first place." *See Health Alliance Network, Inc. v. Continental Casualty Co.*, 245 F.R.D. 121, 124 (S.D.N.Y. 2007) (finding no manifest injustice and rejecting movants' argument "that the procedural bar should be waived because they should win on the underlying motion"). Moreover, Lask's inaction is not justified. The Court's May 24, 2023 order concerning the applicable damages period was issued more than a year prior to the commencement of trial. (*See* Dkt. 378.) Despite ample time and opportunity, Lask did not raise a statute-of-limitations argument either in the briefing that led to the May 24, 2023 order, nor any time thereafter. Nor did she move for reconsideration of the May 24, 2023 order. She did not mention a statute-of-limitations defense at trial, and she did not assert it in her Rule 50(a) motion. Although the consequence of her inaction may be detrimental to her, it does not amount to manifest injustice.

---

[3] The latest date by which a legal malpractice claim in connection with the First Federal Action became actionable (i.e., the accrual date) was February 5, 2013, meaning Rhee-Karn had until February 5, 2016, to properly initiate the present action under the applicable statute of limitations. As noted above, the filing date for Rhee-Karn's initial complaint was February 29, 2016.

None of the cases cited by Lask dictate a contrary result.  She argues "a bare allegation of statute of limitations in the defendant's answer preserves the defense … even after a jury trial."  (Dkt. 495-1 at 4.)  Not so.  As explained above, a movant is permitted under Rule 50(b) only to renew the grounds advanced in a Rule 50(a) motion, not assert new grounds (absent manifest injustice).  None of the cases Lask cites involve Rule 50 at all, let alone contradict well-settled federal procedural law.  Rather, they merely support the contention that asserting the defense in an answer preserves it for trial.  (*See id.* (citing *Santos v. District Council of New York City*, 619 F.2d 963 (2d Cir. 1980) (holding that a "statute of limitations defense need not be raised in a pre-answer motion" to survive dismissal under Federal Rule of Civil Procedure 8); *Kulzer v. Pittsburgh-Corning Corp.*, 942 F.2d 122, 125 (2d Cir. 1991) (applying *Santos* and holding that "[t]he assertion of a limitations defense in the answer preserved [defendant]'s right to raise the defense both during the first trial and before the second"); *Jones v. Cattaraugus-Little Valley Central School District*, 96 F.4th 539, 542 (2d Cir. 2024) ("we have held that a defendant may litigate a statute-of-limitations defense even as late as trial so long as the defense was timely asserted under Federal Rule of Civil Procedure 8(c)")).)  Lask's Rule 50(b) motion based on the statute of limitations is denied.

## C.    The Jury's Verdict Was Supported By Sufficient Evidence

Unlike her statute of limitations argument, Lask's argument that the verdict was not sufficiently supported by evidence adduced at trial was properly raised in her Rule 50(a) motion.  (*See* Tr. 352-54.)  Lask argues that she is entitled to judgment as a matter of law because "irrefutable evidence proved Karn received a windfall by entirely reusing Lask's work for the first complaint in the second one."  (Dkt. 495-1 at 8.)  The argument, however, is substantively meritless, especially when viewed in a light most favorable to Rhee-Karn.

"To prevail on a Rule 50 motion based on sufficiency of the evidence, the movant must establish that the evidence is such that, 'without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" *Campodonico v. Wal-Mart Stores East, LP*, No. 18-CV-8606, 2023 WL 6390171, at *7 (S.D.N.Y. Sept. 29, 2023) (alteration in original) (quoting *Caruso*, 47 F.3d at 32).

As the Court articulated when it denied Lask's Rule 50(a) motion, the work and fees associated with the First Federal Action, and whether a reduction was warranted based on Rhee-Karn's benefitting in the Second Federal Action from work performed in the First Federal Action, are quintessential fact questions. (*See* Tr. 354-55.) The jury had ample evidence in the parties' testimony and exhibits to assess the credibility of the witnesses and determine the correct amount of damages. Among other things, the jury was presented with the complaints from both the First and Second Federal Actions. (Tr. 234-51.) Lask testified about work that she performed for both actions, and the work she contended was reused for the Second Federal Action. (*Id*.) The jury was not required to believe that any, or any particular amount of, work conducted in connection with the First Federal Action was reused in the Second Federal Action. And, Lask did not introduce her billing records covering the period in which she worked on the Second Federal Action to give the jury the benefit of comparing the time spent on each action.

In contrast, Rhee-Karn presented the jury with Lask's billing records during the relevant period, cross-examined Lask about them, and provided a demonstrative exhibit summing up the entries she claimed were attributable to the First Federal Action: $40,300. (Tr. 67-69; Pl. Ex. 3.) That is precisely what the jury awarded. Viewing the

evidence in the light most favorable to Rhee-Karn as the non-moving party, the verdict was far from being the "result of sheer surmise and conjecture."  Instead, the result was well supported by evidence presented at trial.  Lask's motion is denied.

## II.      Lask Is Not Entitled To A New Trial

Lask asserts two justifications for a new trial under Rule 59(a)(1):  (1) the jury's verdict went against the weight of the evidence, and (2) Lask was prejudiced by misconduct of counsel by Rhee-Karn's attorneys and Rhee-Karn herself.  (Dkt. 495-1 at 8-31.)  Neither argument has merit.

## A.      Legal Standards

Rule 59(a)(1) permits courts to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  In the Second Circuit, a motion for a new trial may be granted when "the verdict is against the weight of the evidence," *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012), or where the moving party was prejudiced by "misconduct of counsel."  *Crockett v. City of New York*, 720 F. App'x 85, 86-87 (2d Cir. 2018) (summary order).  The standard for a new trial is less onerous than that for judgment as a matter of law in at least two respects:  "(1) a new trial may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  *Tse*, 568 F. Supp.2d at 287 (citing *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998)).

At the same time, "a court should rarely disturb a jury's evaluation of witness credibility."  *Id.* (citing *DLC Management*, 163 F.3d at 134).  "[T]he mere fact that the trial judge disagrees with the jury's verdict is not a sufficient basis to grant a new trial."  *Id.*

(citing *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983)).  Indeed, a "high degree of deference [is] accorded to the jury's evaluation of witness credibility, and … jury verdicts should be disturbed with great infrequency."    *Raedle*, 670 F.3d at 418.  Accordingly, a court will grant a new trial under Rule 59(a)(1) "if and only if the verdict is seriously erroneous or a miscarriage of justice." *Farrior v. Waterford Board of Education*, 277 F.3d 633, 635 (2d Cir. 2002); *see also DLC Management*, 163 F.3d at 134 ("A court considering a Rule 59 motion for a new trial … should only grant such a motion when the jury's verdict is 'egregious'") (citation omitted).

## B.    The Verdict Did Not Go Against The Weight Of The Evidence

Lask argues that comparison of the complaints from the two Federal Actions demonstrates that Rhee-Karn was not entitled to any damages from Lask's malpractice associated with the First Federal Action because the contents of the First Complaint were reused nearly entirely in the Second Complaint.  (Dkt. 495-1 at 9-11.)  That argument falls woefully short of demonstrating serious error or a miscarriage of justice; Lask simply disagrees with the outcome.

For instance, Lask argues that she "proved" that all of the work involved in drafting the First Complaint was reused in the Second Federal Action.  (*Id.*)  According to her, the two complaints are "one and the same."  (*Id.* at 9.)  That simply is not so.  Lask did not simply reuse the First Complaint with a new case number for the Second Federal Action;[4]

---

[4] Lask incorrectly characterizes the First Complaint as containing 218 paragraphs and the Second Complaint as containing 235 (or, elsewhere in her brief, 238).  (Dkt. 495-1 at 1, 10.)  The First Complaint contains 235 numbered paragraphs, and the Second Complaint contains 326 numbered paragraphs (including counts).  (*See* First Complaint ¶¶ 1-235; Second Complaint ¶¶ 1-326.)    Excluding counts, the First Complaint includes 155 numbered paragraphs, while the Second Complaint includes 269 numbered paragraphs. (*See* First Complaint ¶¶ 1-155; Second Complaint ¶¶ 1-269.)

nor did she merely incorporate the First Complaint and build on it. Rather, entire portions of the First Complaint were deleted and the content either kept out or rewritten entirely. For example, one section of the First Complaint contains allegations regarding a commission's recommendations on the New York family court system followed by allegations that the defendants in that action allegedly injured Rhee-Karn "[a]s a result of the Family Court system's known failures" identified by the aforementioned commission. (*See* First Complaint ¶¶ 23-36.) In the Second Complaint, Lask reworded several paragraphs in that section, deleted the paragraphs pertaining to the defendants' alleged injurious behavior, and added for further context allegations about lawsuits that also had been filed against some of the defendants. (*Compare id.*, *with* Second Complaint ¶¶ 41-49.)

Further, mere comparison of the two complaints does not reveal the full story. The First Complaint was filed on December 21, 2012, but the relevant time period for the work Lask performed in connection with the First Federal Action extended through February 5, 2013. (Dkt. 378 at 4.) Thus, the jury was not limited to considering the time spent drafting the two complaints alone when determining damages incurred in connection with the First Federal Action.

Moreover, if, as Lask contends, the Second Complaint was "one and the same" with the First Complaint, one could reasonably expect her billing records related to the Second Federal Action to reveal a negligible time expenditure devoted to drafting the Second Complaint. But Lask did not introduce those billing records. Instead, Lask relied on the uncorroborated "underlying data" she recorded in a different document. The jury's ability to evaluate the extent of the benefit accrued to the drafting of the Second Federal

Action was limited accordingly.  The Court is loath to disturb the jury's verdict simply because Lask subjectively believes that she satisfied her burden of proof.

Separately, Lask disputes whether certain billing entries identified by Rhee-Karn were "proven" to be related to the First Federal Action.  (*See generally* Dkt. 495-1 at 27-31.)  Specifically, Lask contends that Rhee-Karn's testimony, without further proof, is insufficient to tie a given billing entry to the First Federal Action.  (*See, e.g.*, *id.* at 31 ("[Rhee-Karn] simply says 'this is related to the federal court.'  Karn did not show any proof those entries are federal related").)  The "proof" that Lask seems to require is the appearance of the word "federal" or "fed" in a billing narrative.  (*See, e.g.*, *id.* at 30 ("the November 19 [entry] of .25 hours … without citing 'fed' or anything related to federal, is not a proven federal matter").)

But again, Lask's subjective disagreement with the weight accorded by the jury to Rhee-Karn's testimony and other relevant evidence does not render the verdict erroneous.  It is entirely reasonable for a juror to conclude that a given billing entry more likely than not was related to the First Federal Action regardless of whether the entry explicitly contained the word "federal" or another variant.  Lask's own testimony, which underscores Rhee-Karn's intimate familiarity with the work performed by Lask, supports that conclusion.  (*See* Tr. 289 ("[Rhee-Karn] personally understood everything that was happening" in her cases "because she was in it day by day with [Lask]"); *accord* 283 ("[Rhee-Karn] knows what's happening. … She know[s] what her own case is ….  She's not unsophisticated"), 284 ("we're talking almost every day ….  So she knows what we are doing every day"), 289 ("I was with her every day in this case, in the trenches, and

she knew what was happening on November 28, she knew what was happening on November 29. … She knew what was going on").)

In sum, the jury's verdict and damages award is entirely reasonable and consistent with the evidence. No new trial based on the weight of the evidence is warranted.

## C.    Alleged Misconduct Of Counsel Does Not Warrant A New Trial

When a party moves for a new trial on the basis of attorney misconduct, "the key inquiry is whether counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury." *Okraynets v. Metropolitan Transportation Authority*, 555 F. Supp.2d 420, 428 (S.D.N.Y. 2008) (internal quotation marks and citation omitted). The Second Circuit has cautioned that "not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial." *Pappas v. Middle Earth Condominium Association*, 963 F.2d 534, 540 (2d Cir. 1992). Indeed, "[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." *Marcic v. Reinauer Transportation Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (quoting *Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 271 (2d Cir. 1999)). Only when the misconduct "causes prejudice to the opposing party and unfairly influences a jury's verdict" is a new trial warranted. *Pappas*, 963 F.2d at 540; *see also Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998) (declining to revisit issue decided by district court because Rule 59(a)(1) is "not a vehicle for relitigating old issues … or otherwise taking a second bite at the apple").

The Court must consider a claim of attorney misconduct "in the context of the trial as a whole, examining, among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments."

*Okraynets*, 555 F. Supp.2d at 429 (internal quotation marks, alteration, and citation omitted).  "Trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial."  *Matthews v. CTI Container Transportation International Inc.*, 871 F.2d 270, 278 (2d Cir. 1989); *see also Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir. 1990) ("the judge who was present throughout the trial [is] best able to determine the effect of the conduct of counsel on the jury").

Lask lodges a variety of accusations of attorney misconduct against Lonergan and Dollinger, taking issue with dozens of individual remarks and questions largely without making individualized arguments as to why any particular behavior was prejudicial.  For the discussion that follows, the Court groups together Lask's arguments that share a similar factual basis or conclusion.  The Court also organizes the discussion into two sections:  allegations of attorney misconduct during the witness-examination phase of the trial, and allegations of misconduct during opening statements and closing summation.  Notwithstanding that organization, the Court has considered all the alleged incidents of misconduct both individually and collectively and finds no basis for a new trial.

### 1.    No Attorney Misconduct During Witness Examinations

Lask argues that she was subjected to myriad forms of misconduct during Lonergan's cross-examination of her, such as his violating court orders and accusing Lask of crimes and fabricating evidence.  With some exceptions, the conduct of which Lask complains does not arise to what the Court would characterize as misconduct.  But even where counsel's conduct may have crossed the line, whether considered individually or together, any alleged prejudice resulting from such misconduct was mitigated by either a curative instruction or intervention by the Court.  *See Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (new trial not warranted where court followed counsel's improper

remarks with curative instruction); *Ullman v. Starbucks Corp.*, 152 F. Supp.2d 322, 329 (S.D.N.Y. 2001) (finding "no reasonable probability that the jury's verdict was influenced in any way by the alleged statement of defense counsel" where court advised the jury that "[w]hat the lawyers have said in their opening statements, in their closing arguments, in their objections, or in their questions, is not evidence"); *see also Penry v. Johnson*, 532 U.S. 782, 799, 121 S. Ct. 1910, 1922 (2001) (courts may "generally presume that jurors follow their instructions"). Even "plainly ... improper" questioning by counsel does not require a new trial, so long as the trial court has "act[ed] promptly to minimize any damage from it." *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir. 1988).

### a.    Lask's "Underlying Data" And Billing Entries

Lonergan's cross-examination of Lask first centered on the billing entries contained in the invoices Lask sent Rhee-Karn. Lask repeatedly asserted that she needed to reference her underlying calendar data in order to answer questions about what work was performed in connection with a particular billing entry. Lonergan attacked the veracity of her underlying data – undated and devoid of metadata – and suggested through questioning that Lask's underlying data could be fabricated to create the appearance that she billed little time to the First Federal Action, and her intentionally vague billing entries provided her plausible deniability. (*See* Tr. 264-80, 283-88, 290-93, 300-01.) Lask argues that that line of questioning was improper.

First, Lask asserts that Lonergan's suggestion in a question that her billing entries were intentionally vague equated to a prejudicial inference that she fabricated evidence. (*See* Dkt. 495-1 at 21-22; Tr. 305.) The Court sustained Lask's objection to this question. (Tr. 305; *see also* Tr. 278 (similar).)   And, the Court instructed the jury both before and after the presentation of evidence to "ignore the question asked" whenever the Court

sustains an objection.[5]  (Tr. 36, 413.)  Such an instruction under these circumstances militates against finding prejudice.  *See Graham v. City of New York*, 128 F. Supp.3d 681, 703 (E.D.N.Y. 2015) (denying motion for new trial where "[t]he Court instructed the jury at the beginning and end of trial that counsels' questions and arguments were not evidence, and if objections to questions were sustained, the jury should ignore the question"); *Anderson v. Osborne*, No. 17-CV-539, 2020 WL 6151249, at *6 (S.D.N.Y. Oct. 20, 2020) (denying motion for new trial where "the Court responded to each objection individually, and the Court sustained defense counsel's objections when appropriate"); *Alpex Computer Corp. v. Nintendo Co.*, No. 86-CV-1749, 1994 WL 681752, at *34 (S.D.N.Y. Dec. 5, 1994) (denying motion for new trial where the court "sustained [defendant]'s objections and took steps to cure any prejudice"), *aff'd in relevant part*, 102 F.3d 1214 (2d Cir. 1996).

Lask next argues that Lonergan inserted his "personal view of the case and evidence" during cross-examination about Lask's underlying data and lodged "personal

---

[5] Throughout her motion, Lask cites several instances in which the Court variously sustained one of Lask's objections (*e.g.*, Dkt. 495-1 at 19 ("At the height of unethical conduct, [Lonergan] falsely accused Lask in front of the jury that all day she was falsely testifying about the bills, and the court again sustained the objection to this")); overruled one of Dollinger's or Lonergan's objections (*e.g.*, *id.* at 18 (describing the Court's overruling "a long and completely false speaking objection of [Lonergan's] personal comments")); interjected to clarify an issue in her favor (*e.g.*, *id.* at 16 ("During cross of [Rhee-Karn], Dollinger misrepresents in front of the jury that Lask's Underlying Data was not in evidence, and the court responded that was false"), 13 ("the court even interjected that it never found the second federal should not have been brought")); or admonished Rhee-Karn's attorneys (*e.g.*, *id.* at 18 ("[Lonergan] next demanded Lask explain what is in evidence by falsely blaming her for being responsible for evidence, [which] the court [ruled was] false")).  Putting aside Lask's often exaggerated descriptions of the alleged transgressions, this tactic backfires on her.  Intervention by the Court makes it *less* likely that prejudice occurred, not more.  *See Pappas*, 963 F.2d at 540.  The Court has reviewed each alleged instance of attorney misconduct that Lask has linked to a Court intervention and that she contends supports a finding of prejudice, and finds none.

attacks against Lask so prejudicial that it was horrific." (Dkt. 495-1 at 17.) The "attack" to which Lask refers is Lonergan's objection that the exhibit containing Lask's underlying data was unreliable because it "may have been made six months ago." (*Id.*; Tr. 90-91.) Lask contends that this purportedly "false accusation" that Lask "manufactured evidence" had been "deemed frivolous by the court" in an order that supposedly had ruled "that there cannot be questions about any aspect of how or when [the underlying data] was produced." (Dkt. 495-1 at 17 (citing Dkt. 411).) Lask misrepresents the order in every respect. The order explained that "Plaintiff's counsel ma[de] purely speculative allegations that email correspondence [transmitting the underlying data from prior counsel] was fabricated by Defendant," not the exhibit itself. (Dkt. 411 at 1.) The order permitted Rhee-Karn to depose Lask on the underlying data but prohibited Rhee-Karn from "ask[ing] questions at the deposition" about the way in which the underlying data "was produced during discovery." (*Id.* at 1-2.) The order had nothing to do with the manner in which Lask's underlying data was created or its veracity, nor did it pertain in any way to the scope of permitted questioning at trial. To the contrary, the Court considered Lonergan's remark about the contemporaneousness of Lask's underlying data "a fair question, fair point." (Tr. 90-91.)

Lask's complaints about Lonergan's challenges to the veracity of her underlying data do not stop there. (*See* Dkt. 495-1 at 18-19.) During cross-examination, Lonergan asked Lask in reference to the underlying data document: "You can write whatever you want on this, right?" (Tr. 272); "Is there anything that can corroborate your testimony that you didn't write this 5 years after the fact?" (Tr. 273); "And can anything or anybody corroborate that … beyond you in your own little world, [accurately made] th[ese] entries"

(Tr. 273); "You didn't concoct this from whole cloth?" (Tr. 273). Ferrante's objections were overruled. (Tr. 273.) Now, however, Lask argues – without explanation – that "[a]ll of that alone warrants a new trial." (Dkt. 495-1 at 19.) None of the questions were improper. Rather, they sought testimony relevant to Lask's credibility and the veracity of her underlying data, issues which Lask placed directly at issue by relying on her underlying data to enable her to testify about her billing entries. Such credibility issues are ripe for development on cross-examination. *See American Manufacturers Mutual Insurance Co. v. Cosmec, Inc.*, No. 05-CV-7283, 2008 WL 11517682, at *5 (S.D.N.Y. Apr. 14, 2008) ("Both the adequacy of the evidentiary foundation and the veracity of the witness's testimony can and should be tested by counsel by rigorous cross-examination at trial").

Later in the proceedings and outside the presence of the jury, the Court explained, "With respect to that calendar of yours, I do not believe that the counsel for the plaintiff made any accusations about crime, and they were questioning reliability and veracity of that document, which they are entitled to do." (Tr. 366.) Lask provides no argument that the Court should disturb its prior determination.

Lask also complains that some of Lonergan's questions about her underlying data were prejudicial because they sometimes veered into protracted, argumentative diatribes that more closely resembled "speeches." (Dkt. 495-1 at 18-19.) For instance, at one point, Lonergan asked Lask whether anyone besides herself could corroborate her underlying calendar data. In response, Lask asked Lonergan, "Why would anyone else be going over my calendar with me?" to which Lonergan replied: "Because you could fudge them. Because you could conceivably have written these 5 years ago and not at the time in anticipation that maybe there would be some questions in this litigation about

it."  (*Id.* at 19; Tr. 275.)  Although Lask had opened the door to Lonergan's remarks,

Ferrante did not object, and Lask expressed her desire to respond, the Court interjected:

"Whoa, whoa, whoa.  You did make a little speech there. … Please make sure your

questions are questions and not narratives."  (Tr. 275.)

Where and when warranted, the Court's interventions sufficiently addressed the

concerns raised by Lask.

### b.    Lask's Education

Lask argues that Lonergan's asking her on cross examination whether she

possessed a juris doctorate instilled doubt in the jury as to whether she was "a real lawyer"

or whether "something [was] wrong with her education."[6]  (Dkt. 495-1 at 15-16; *see* Tr.

252.)  Leaving aside Lask's speculative assertion of what the jury may have inferred, the

Court struck the questioning regarding Lask's education.  (Tr. 261.)  Moreover, the Court

instructed the jury both before and after the presentation of evidence that struck testimony

---

[6] Lask also argues, correctly, that Lonergan's question about whether she held a J.D. degree violated a court order precluding questioning Lask on collateral matters, including her education, unless Lask herself opened the door.  (Dkt. 424.)  This instance is one of several for which Lask asserts her entitlement to a new trial on the grounds that Rhee-Karn or her attorneys violated court orders.  (*See, e.g.*, Dkt. 495-1 at 1, 3, 12-13, 14, 24, 26.)  However, Lask does not cite, nor is the Court aware of, authority for a *per se* rule that violation of a court order limiting the scope of examination constitutes attorney misconduct requiring a new trial.  To the contrary, courts have denied motions for a new trial even where the opposing party's attorney violated such orders.  *See, e.g.*, *Abel v. Town Sports International, LLC*, No. 09-CV-10388, 2012 WL 6720919, at *12 (S.D.N.Y. Dec. 18, 2012) (denying motion for new trial despite counsel's "patently improper" questioning that was "in direct contravention of a pre-trial ruling by the Court" because "the trial court … acted promptly to minimize any damage from it" by intervening and giving a curative instruction to the jury) (internal quotation marks, brackets, and citations omitted).  The Court thus examines Lask's allegations of attorney misconduct, including violations of court orders, according to the standard utilized by the Second Circuit; i.e., whether the attorney "cause[d] prejudice to the opposing party and unfairly influence[d] [the] jury's verdict."  *Pappas*, 963 F.2d at 540.

"is not evidence and must not be considered."  (Tr. 36, 413.)  The Court's instructions were sufficient to dispel potential prejudice.

### c.    Fees Paid By Rhee-Karn

Lask argues that she was prejudiced by Rhee-Karn's testimony that she had paid Lask over $300,000 in legal fees over the course of the representation, irrespective of whether Rhee-Karn's attorneys elicited the testimony.  Lask argues that reference to the total-fee amount both confused the jury and made the jury "sympathize with Karn for paying so much to a negligent attorney."  (Dkt. 495-1 at 13.)  Those arguments are speculative and meritless.  That the jury was confused as to the amount of damages at issue is implausible because the Court gave clear instructions to determine damages "only for the subset of that work that was performed in connection with the [first] federal complaint" and only to award damages that have been "proven with a reasonable degree of certainty."  (Tr. 403, 421; *accord* Tr. 43-44.)  That the jury awarded Rhee-Karn $9,312.50 less than the potential maximum damages award ($49,612.50) – nowhere near $300,000 – dispels any concerns of jury confusion.

The Court's instruction to the jury to make decisions "with complete fairness and impartiality, and without bias, prejudice, or sympathy for or against the plaintiff or the defendant" (Tr. 411) further mitigated the risk of prejudicial juror sympathy.  *See Manlapig v. Jupiter*, No. 14-CV-235, 2016 WL 4617305, at *4 (S.D.N.Y. Sept. 6, 2016) (declining to order new trial where "the jury instructions directed the jurors not to be swayed by sympathy, and to consider only the evidence in reaching their decision").  Moreover, "the size of [the] jury's verdict" is far from "so excessive as to be 'inherently indicative of passion or prejudice' and [therefore] require a new trial."  *Ramirez v. New York City Off-Track Betting Corp.*, 112 F.3d 38, 40 (2d Cir. 1997) (citation omitted).

Lask makes several other arguments about the total-fee figure based on gross mischaracterizations of the Court's rulings and the record.  First, Lask argues that reference to the total fee was prejudicial because the Court specifically ruled that "any reference to [the total fee] is out."  (Dkt. 495-1 at 12 (citing Tr. 8, 10, 15).)  That is incorrect. The Court merely excluded from evidence checks Rhee-Karn wrote to pay Lask.  (Tr. 10.) Separately, Lask asserts that "the parties stipulated that only the amount paid during the relevant period could be referred to at trial, nothing else."  (Dkt. 495-1 at 12 (citing Tr. 11).) Lask is again incorrect.  The parties merely stipulated that "all amounts charged by [Lask] to [Rhee-Karn] for services rendered for the relevant period were paid."  (Tr. 11.)

Lask further argues that the total-fee figure is prejudicial because it "was never proven," and it "raised an entirely new issue of fact, not within the scope of this trial, that would warrant an entirely different trial" to resolve.  (Dkt. 495-1 at 14.)  Not so.  The jury was adequately instructed that their task was to determine damages based on fees incurred in a limited, specified timeframe.  (*See, e.g.*, Tr. 28, 43, 403, 420.)  And, the contention that the total-fee amount "was never proven" ignores that Rhee-Karn's testimony about what she paid is evidence.  (*See* Tr. 77.)

Relatedly, Lask argues that she was prejudiced by Rhee-Karn's testimony that the retainer agreement she entered into with Lask contained an estimated fee of $70,000 to $100,000.  (Dkt. 495-1 at 14; Tr. 56.)  According to Lask, Rhee-Karn "sought to mislead the jury of an unrelated estimate for work Lask performed."  (Dkt. 495-1 at 14.)  But Lask's prejudice argument is "seriously undercut, if not waived," by her failure to object to it. *Guzman v. Jay*, 303 F.R.D. 186, 195 (S.D.N.Y. 2014).  (*See* Tr. 56.)  And, in any event, any potential prejudice was averted by the Court's clear jury instructions as to the relevant

fees and time period at issue as well as the parties' respective burdens of proof.  (Tr. 403, 421; *accord* Tr. 43-44.)

### d.    Speaking Objections And Other Conduct

Lask argues that she was prejudiced by two of Lonergan's "long speaking objections."  (Dkt. 495-1 at 17-18.)  The first objection expressed doubt as to the contemporaneousness of Lask's underlying data, which, as noted above, the Court did not sustain, but noted that the question posed was "fair."  (Tr. 90-91.)  The second was an admittedly verbose objection to Lask's testimony on the grounds that the testimony about an exhibit went beyond the scope of the document itself; the objection was overruled.  (Dkt. 495-1 at 18; Tr. 206.)  Once again, the Court's instructions cured any potential prejudice.  Specifically, the jury was informed both before and after the presentation of evidence that "objections by the lawyers are not evidence," and that if an objection is overruled, the jury should treat the witness's answer to the question "like any other."  (Tr. 36, 413.)

Nor does Lask demonstrate any prejudice from Lonergan's purportedly "mak[ing] faces when [Lask] answers [questions]" (Dkt. 495-1 at 21; *see* Tr. 297), commenting that dealing with Lask was akin to "pulling teeth" (Dkt. 495-1 at 21; Tr. 303), and accusing Lask of wasting the jury's time (Dkt. 495-1 at 19; Tr. 279).[7]  Lask objected to each comment,

---

[7] Lask contends that "[n]othing could be more sanctionable, unethical and prejudicial than a lawyer telling the jury" that Lask was wasting their time.  (Dkt. 495-1 at 19-20.)  The Second Circuit has held otherwise.  *See, e.g.*, *Marcic*, 397 F.3d at 126-27 (comment by defense counsel that plaintiff "waste[d] the time and money of the court and jurors on his case" was "not so inflammatory … as to affect the integrity of the trial and entitle [plaintiff] to a new trial"); *United States v. Pisani*, 773 F.2d 397, 403 (2d Cir. 1985) (statement by the **court** during criminal trial that a particular line of questioning was "a bore and a waste of time" and implying that defense counsel was misleading the jury did not warrant new trial).

and the Court admonished Lonergan accordingly, directing him to ask questions "without unnecessary intimation," remain professional, and focus on the issues in the case. (Dkt. 495-1 at 19, 21-22; Tr. 279, 295, 303.)

### e. Uncertified Document

Lask takes issue with one of Lonergan's objections to Lask's attempt to introduce into evidence a copy of a decision from the family court case which Lask had filed as an exhibit to her motion to dismiss (*see* Dkt. 76-6). (Dkt. 495-1 at 17-18; Tr. 119-20.) In response to Lonergan's initial objection, Lask argued that the document's PACER headers demonstrated the document's authenticity. (Tr. 120.) Lonergan responded, "I can go and write this document myself in 10 minutes. I need a certified copy." (Tr. 120.) Lask objected to that comment, which the Court overruled. (Tr. 120.) Lask seeks to characterize Lonergan's comment as evincing an "intent to discredit Lask as a criminal" by accusing her of fabricating evidence. (Dkt. 495-1 at 17-18.) That is quite an exaggeration. Lonergan's remarks related to Federal Rule of Evidence 1005, which requires a certified copy of a publicly filed document to prove its contents. Further, the Court overruled Lonergan's objection and permitted Lask to use the document for cross-examination. (Tr. 120.) No reasonable juror would conclude that a federal court permitted an attorney to utilize a fabricated document, whether introduced as an exhibit or used only for cross-examination.

In sum, the conduct of Rhee-Karn's counsel during witness examination, even where unprofessional or violative of a court order, was "*de minimis* in the context of the entire trial." *Pappas*, 963 F.2d at 540. Lask does not "direct[] the Court to any cases where a new trial has been ordered based on similar statements" whether considered singly or together. *Johnson v. City of New York*, 593 F. Supp.3d 58, 72 (S.D.N.Y 2022).

The conduct of Rhee-Karn's counsel during witness examinations does not warrant a new trial.

### f.    Testimony Elicited By Lask From Rhee-Karn

Lask argues that Rhee-Karn herself "escalated the prejudice" by testifying that Lask "creat[ed] … drama" and "caused so much tension" with respect to Rhee-Karn's case in family court.  (Dkt. 495-1 at 15.)  This argument is entirely misplaced and does not change the analysis.  Lask opened the door to this testimony by asking Rhee-Karn about the family court proceeding.  (Tr. 123-25.)   In fact, the Court sustained several objections to Lask's line of questioning that precipitated Rhee-Karn's testimony of which Lask now complains.  (*See* Tr. 124, 125.)  Rhee-Karn's conduct does not warrant a new trial.

### 2.    No Attorney Misconduct During Opening And Summation

"[B]ecause attorneys are given 'wide latitude in formulating their arguments' to the jury, '[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.'"  *Patterson*, 440 F.3d at 119 (citation omitted).  "Not every improper or poorly supported remark made in summation irreparably taints the proceedings."  *Marcic*, 397 F.3d at 127 (internal quotation marks and citation omitted).   "A new trial is only warranted where the attorney's concluding argument 'deprived the opposite party of a fair trial.'"  *Parrish v. Sollecito*, 280 F. Supp.2d 145, 168 (S.D.N.Y. 2003) (citation omitted); *see also Johnson*, 593 F. Supp.3d at 72 (finding that comments made by counsel during opening statements, "where counsel is given more leeway," did not raise severe enough prejudice to warrant new trial).  Lask does not meet this standard.  Just as was the case with respect to Lonergan's conduct during witness examinations, none of the remarks made by Rhee-Karn's attorneys during opening statements or closing summation were

improper and so prejudicial as to require a new trial.  Most of the complained-of remarks either were waived by failure to object or were mitigated by a curative instruction that alleviated any prejudice.

### a.    Lask's Failure To Object

Lask identifies several remarks Lonergan made during summation that she argues prejudiced her, but to which neither she nor her attorney raised an objection.  Those remarks include Lonergan's reference to the total-fee figure (*see* Dkt. 495-1 at 24); Lonergan's comment that it would have been unlikely for insufficient research from the First Federal Action to have been successfully recycled in the Second Federal Action (*see* Dkt. 495-1 at 24-25 (claiming that this comment "poison[ed]" the jury's minds); Lonergan's statement that Lask's underlying calendar data was uncorroborated by anyone other than herself (*id.* at 25; Tr. 392); and Lonergan's purported "misrepresent[ation] that the first complaint was filed by Lask" (Dkt. 495-1 at 24).

Absent plain error, "failure to object to an issue during trial precludes review of that issue on a motion for a new trial."  *Szaroleta v. Metro-North Commuter Railroad*, No. 07-CV-7639, 2008 WL 4681983, at *7 (S.D.N.Y. Oct. 20, 2008) (internal quotation marks and citation omitted); *see Smart v. USA Labor for Hire, Inc.*, No. 24-1791, 2025 WL 1217365, at *3 (2d Cir. Apr. 28, 2025) (summary order) ("Defendants did not contemporaneously object to these statements at trial, and thus did not provide the district court with an opportunity to cure any potential prejudice. Under our precedent, that alone is reason to uphold the district court's refusal to grant a new trial or remittitur on these grounds"); *Malmsteen v. Berdon, LLP*, 595 F. Supp.2d 299, 310 (S.D.N.Y. 2009) ("defendants' claim to have been prejudiced by the summation is considerably undermined by their failure to

object to the statements in question at trial"), *aff'd*, 369 F. App'x 248 (2d Cir. 2010) (summary order).

"When," as here, "the complaining party fails to object at trial to statements made during summation, the court will only grant a new trial when the 'error is so serious and flagrant that it goes to the very integrity of the trial.'" *Id.* at 309 (citation omitted). The Court finds no such error here. Indeed, Lonergan's reference to the total fee paid by Rhee-Karn was proper just as it was during witness examination, particularly in light of the specific instructions provided to the jury about the amount in controversy; Lonergan's comment about the unlikelihood of recycling insufficient research was fair argument, as was Lonergan's statement characterizing Lask's underlying data as uncorroborated; and Lask's gripe with who carried out the ministerial act of filing the First Federal Action is inconsequential given that she provided the advice that was the basis for the malpractice judgment against her and, according to Rhee-Karn, authorized Rhee-Karn to sign Lask's name. (Tr. 64-65.) Lonergan's remarks to which Lask did not object thus provide no basis for a new trial.

Lask also accuses Lonergan of improperly eliciting sympathy from the jury during summation by framing Rhee-Karn as a "victim" who "went through a really tough time." (Dkt. 495-1 at 26; Tr. 395.) Once again, Lask did not object to those remarks. Additionally, the Court mitigated whatever impropriety these remarks carried by instructing the jury both before opening statements and after presentation of evidence to make determinations "dispassionately without regard to sympathy." (Tr. 421; *see* Tr. 34 (instructing jury to make decisions without "sympathy for or against the plaintiff or the defendant").) *See Manlapig*, 2016 WL 4617305, at *4 (rejecting argument that statement

by counsel improperly appealed to jury's sympathy because "the jury instructions directed the jurors not to be swayed by sympathy"). "Thus, the Court does not feel that any improprieties that may have been uttered by [Rhee-Karn's] counsel constituted a miscarriage of justice warranting a new trial in this case." *Parrish*, 280 F. Supp.2d at 168.

Lask also complains of two remarks Dollinger made during opening statements. The first was Dollinger's comment that the Second Federal Action "should [not] have been brought." (*See* Tr. 48-49.) As the trial was limited to damages incurred for the First Federal Action, Dollinger's remark was improper. Unsurprisingly, the Court, *sua sponte*, interjected immediately: "Just to be clear, I want to clarify that last remark. You said 'none of which should have been brought.' There was no malpractice found in connection with the Second Federal Action …. We are only talking about malpractice in connection with the First Federal Action." (Tr. 49.)

Despite that unambiguous clarification heard by the jury, Lask argues that no curative instruction is sufficient to alleviate the prejudice. (Dkt. 495-1 at 13 ("the jury heard this and this bell cannot be unrung").) Such concern is unfounded. In addition to immediately clarifying Dollinger's remark, the Court instructed the jury both before opening statements and after summation that they are not to regard as evidence counsel's remarks made in opening and summation. (Tr. 36, 413.) The jury is presumed to have followed those instructions. *Zafiro v. United States*, 506 U.S. 534, 540-41, 113 S. Ct. 933, 939 (1993). Moreover, the severity of the prejudice that Lask contends arose from Dollinger's remark is belied by the fact that neither she nor her attorney objected to the Court's clarification as given.

The second comment made during opening with which Lask takes issue is Dollinger's statement that "one of the reasons the malpractice occurred" was because Lask's invoices "were so incomplete and so unrelated in content to the complaint." (*See* Dkt. 495-1 at 13; Tr. 47.) Lask argues that Dollinger created prejudice by misrepresenting to the jury that "the ***court*** determined malpractice [had occurred]" because of Lask's invoices. (*See* Dkt. 495-1 at 13 (emphasis added).) That is not what Dollinger said, which perhaps explains why Lask did not object to the remark at any point during trial – another instance in which Lask's failure to object "alone is reason to [refuse] to grant a new trial." *Smart*, 2025 WL 1217365, at *3.

### b.    Counsel's Other Remarks

Lask takes issue with a remark Dollinger made during opening statements that Lask's research "in every respect" was "done incompetently." (*See* Dkt. 495-1 at 13; Tr. 45.) Lask interrupted Dollinger to object to that comment and, away from the jury, argued it implied that "all that wrong research [in the First Federal Action] was just as wrong in the [Second Federal Action]." (Tr. 46.) The Court disagreed with Lask and overruled the objection. (Tr. 46.) Lask's present argument that she deserves a new trial because Dollinger's comment was "false" is unavailing. (Dkt. 495-1 at 13.) Immediately before Dollinger made the comment at issue, he specified the relevant time period for the jury and remarked, "There's no question about the malpractice that occurred." (Tr. 44-45.) His comments clearly were within the context of the First Federal Action. Moreover, at the outset of the case, the Court informed the jury that Lask had been found to have committed malpractice in connection with ***only*** the First Federal Action. (Tr. 27-28.) Dollinger's remark thus was neither improper or prejudicial.

With respect to summation, Lask argues that Lonergan misrepresented the amount of damages sought when he requested the jury award Rhee-Karn $72,475. (Dkt. 495-1 at 26-27; *see* Tr. 381, 395.) As Lask correctly observes, the Court previously had ruled that the upper limit of damages was $49,612.50. (Dkt. 378 at 5-6.) Indeed, the disparity between the two amounts prompted the Court to interrupt Lonergan's summation to seek clarity on the origin of the larger figure. (Tr. 384-85.) Away from the jury, Lask raised an objection and alerted the Court to her concern that Lonergan had "put in [the jurors'] heads it's a $72,000 case." (Tr. 401, 403, 404.) The Court agreed with Lask's concern and acted accordingly. The first post-summation instruction the Court gave to the jury addressed the damages figure specifically: "During closing, you heard counsel for Ms. Karn refer to a figure of $72,000. … His … statement … about that amount is not evidence. You, as the jury, will make your own determinations." (Tr. 410.) The Court's ruling and tailored instruction were more than sufficient to mitigate any risk of prejudice. The actual amount awarded by the jury is proof of that.

Lask also argues that Lonergan's remarks regarding the lack of metadata and timestamps associated with her underlying calendar data were "another breach of the court's directions" because the Court had ruled "that Lask had no obligation to show time stamps." (Dkt. 495-1 at 26.) More accurately, the Court sustained the objection to Lonergan's questioning on cross-examination to the extent that Lonergan's question suggested that the calendar document was required to have timestamps. (Tr. 276-77.) Setting aside the accuracy of Lask's characterization of the Court's ruling, Lonergan did not transgress in his remarks during summation. Even if something is not required, its absence still can be relevant. That the calendar data document was not required to

contain timestamps or metadata thus did not preclude Lonergan from suggesting that the absence of those items may bear on the authenticity or veracity of the document. Further, the Court instructed the jury on the relevant burdens of proof and directed the jury not to regard the arguments made during summation as evidence. (Tr. 36, 413 (specifying that "statements, arguments and questions by the lawyers are not evidence"), 42-44, 417-19 (describing burdens of proof).)

Lask argues that Lonergan made another misrepresentation during summation when he suggested that Lask had failed to satisfy her burden of proof. (Dkt. 495-1 at 25-26.) Specifically, Lonergan said, "I also wish that Attorney Lask had put before the … jury her time sheets from the second federal complaint. … We never saw those. We don't know if [Rhee-Karn] was double billed. We don't know. And I submit to you that was on Attorney Lask really to come up with those time sheets to show [the amount of time she devoted to the Second Federal Action]. They're not here. We don't know." (Tr. 394.) Lask argues those remarks were "a misrepresentation because Lask was not burdened to show if she double-billed the second time." (Dkt. 495-1 at 26.)

Lonergan's comments were not improper. The Court had ruled that while Rhee-Karn had the burden to prove her damages, Lask had the burden to show the extent to which, if any, damages should be reduced because work performed for the First Federal Action was reused in the Second Federal Action. (Tr. 44.) Lask had several avenues by which she could have done so. Lonergan's remarks pertained to one particular avenue. To the extent that time records for the Second Federal Action reflected less time for comparable tasks performed in the First Federal Action, a reasonable inference could be made that Rhee-Karn benefitted in the Second Federal Action from reuse of the work

done in the First Federal Action.  Lonergan simply observed that Lask chose not to introduce billing statements that would have allowed that comparison; instead, she relied on a comparison of the complaints from the two actions and her underlying calendar data that bore no metadata revealing when the document was created or modified and was not independently corroborated beyond Lask's say-so.  Lonergan's remark about double billing merely is in service of the argument that compensating Rhee-Karn for time spent on the First Federal Action would not be a windfall.

Lask should not be surprised that the Court now rejects her double-billing argument for the same reason it overruled an identical objection she made on this point after summation.  Away from the jury, the Court explained to Lask, "it was your burden to show what in the First [Federal Action] was reused in the Second," to which Lask responded, "But not by billing."  (Tr. 406.)  Lask's reasoning rests on her mistaken recollection that during a July 24, 2023 conference, the Court had ruled specifically that it was not Lask's burden to introduce her billing records.  (*See* Tr. 406-07.)  Lask is as wrong now as she was then.  The Court made no such qualification to Lask's burden of proof.  As the Court explained to Lask at trial, "It is your burden, and if those bills could have helped show that," Lask could have used them as part of her case.  (Tr. 407.)  "So," the Court reasoned, Lonergan's argument regarding Lask's failure to introduce the billing statements "was fair game."  (Tr. 407.)  Lask's attempt to relitigate this issue falls flat.  *See Carrier Services, Inc. v. Omni Mail, Inc.*, No. 98-CV-9197, 2000 WL 1072300, at *4 (S.D.N.Y. Aug. 3, 2000) ("Absent a showing of clear error or manifest injustice, it will generally be appropriate to deny relief pursuant to Rule 59 since litigants should neither

be required nor without good cause permitted to relitigate already-decided matters")
(internal quotation marks and citation omitted).

In sum, Lask has not demonstrated any basis for a new trial. Her Rule 59(a)(1)
motion for a new trial is denied.

### III.    Rhee-Karn Is Not Entitled To Attorney's Fees As A Sanction

Rhee-Karn seeks sanctions against Lask in the form of $127,325.00 in attorney's
fees and $3,017.80 in costs incurred in prosecuting the present action. (*See* Dkt. 494-6.)
Rhee-Karn relies on Federal Rule of Civil Procedure 54(d)(2), 28 U.S.C. § 1927, and the
Court's inherent power. Regardless of the authority invoked, the sanctions sought are
not warranted.

### A.    Legal Standards

#### 1.    Federal Rule Of Civil Procedure 54(d)(2)

Federal Rule of Civil Procedure 54(d)(2) is not an independent basis for the Court
to award attorney's fees. *Calka v. Kucker & Bruh, LLP*, No. 99-CV-4999, 2000 WL
557266, at *1 (S.D.N.Y. May 8, 2000), *aff'd sub nom.*, 242 F.3d 364 (2d Cir. 2000). Rather,
it provides the procedural mechanism for a party to assert its entitlement to attorney's
fees pursuant to another statute or a contract. *See ComLab, Corp. v. Kal Tire*, No. 17-
CV-1907, 2019 WL 2144307, at *2 (S.D.N.Y. Apr. 18, 2019), *R. & R. adopted*, 2019 WL
2137135 (S.D.N.Y. May 16, 2019), *aff'd sub nom.*, 815 F. App'x 597 (2d Cir. May 29, 2020)
(summary order). Here, Rhee-Karn advances 28 U.S.C. § 1927 and the Court's inherent
authority to sanction as the bases for an award of attorney's fees. Whether to award
attorney's fees and costs under either authority is within the Court's discretion. *Banus v.
Citigroup Global Markets, Inc.*, 757 F. Supp.2d 394, 399 (S.D.N.Y. 2010).

**2.    28 U.S.C. § 1927**

28 U.S.C. § 1927 provides that "[a]ny attorney" who "so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  While § 1927 is applicable only against attorneys, the Second Circuit has held that § 1927 sanctions may be levied against *pro se* attorney parties.  *See Sassower v. Field*, 973 F.2d 75, 80 (2d Cir. 1992).

"To impose monetary sanctions under § 1927, a court must find clear evidence that (1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith – that is, motivated by improper purposes such as harassment or delay."  *Huebner v. Midland Credit Management, Inc.*, 897 F.3d 42, 55 (2d Cir. 2018) (internal quotation marks, brackets, and citation omitted).  "The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice."  *Sierra Club v. U.S. Army Corps of Engineers*, 776 F.2d 383, 390 (2d Cir. 1985).

"A claim is colorable when it reasonably might be successful, while a claim lacks a colorable basis when it is utterly devoid of a legal or factual basis."  *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999); *see also Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir. 1980) (describing a colorable claim as one that "has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim").

Bad faith requires a court to determine that "the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose."  *Johnson v. University of Rochester Medical Center*, 642 F.3d 121, 125 (2d Cir. 2011) (citation omitted); *see also Eisemann v. Greene*,

204 F.3d 393, 395 (2d Cir. 2000) (explaining that attorney's fees may be awarded as sanctions when "the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons") (internal quotation marks and citation omitted).  The bad faith standard is not easily met in this Circuit.  *See, e.g.*, *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78-82 (2d Cir. 2000) (reversing award of sanctions despite vexatious conduct of counsel, including speaking to news reporter concerning a fraud claim against defendants with the intent to tarnish opponent's reputation; threatening to bring civil RICO claim against opposing attorney; referring to opposing counsel as a "snake"; and writing letter to opposing counsel threatening to attack his reputation with the "legal equivalent of a proctology exam").  While "bad faith may be inferred where the action is completely without merit," *In re 60 East 80th Street Equities, Inc.*, 218 F.3d 109, 116 (2d Cir. 2000), "the court's factual findings of bad faith must be characterized by a high degree of specificity."  *Milltex Industrial Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 38 (2d Cir. 1995) (internal quotation marks and citation omitted).

### 3.    The Court's Inherent Power To Sanction

The Court also may impose sanctions against a party and its attorneys pursuant to its inherent power to sanction.  "The only difference between a sanctions award under § 1927 and a court's inherent power is that 'awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both.'" *United States v. Prevezon Holdings, Ltd.*, 305 F. Supp.3d 468, 478 (S.D.N.Y. 2018) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)).  The standard for determining whether such sanctions are appropriate is the same as § 1927:  the offending

party's claims were entirely without color and were brought in bad faith. *International Technologies Marketing, Inc. v. Verint Systems, Ltd.*, 991 F.3d 361, 368 (2d Cir. 2021).

## B.    Sanctions Against Lask Are Not Warranted

Rhee-Karn argues that sanctions against Lask are warranted because Lask (1) utilized the federal courts to harass Rhee-Karn by filing frivolous, baseless pleadings intended to delay the proceedings; (2) harmed Dollinger's reputation with clients and stalked Judge Preska; and (3) committed perjury.    While Lask's conduct during this litigation has been less than commendable at times, Rhee-Karn fails to articulate a clear factual basis on which the Court may infer Lask acted in bad faith.

### 1.    Attempted Disqualification And Counterclaims

Rhee-Karn asserts that Lask engaged in a two-pronged strategy of harassment, consisting of motions to disqualify Rhee-Karn's attorneys, and, "when that did not work," asserting counterclaims and third-party claims in her answer so as to create a conflict of interest between Rhee-Karn and her attorneys, thus forcing Rhee-Karn to seek new representation.    (Dkt. 494-6 at 5.)    Lask's filings, Rhee-Karn argues, were meritless, brought in bad faith, and only served to delay the proceedings and harass Rhee-Karn and her attorneys.    While Rhee-Karn may have met her burden with respect to lack of merit, she has not demonstrated that the referenced claims were brought in bad faith.

Lask's counterclaims and third-party claims likely lacked merit.    Essentially, Lask used a handful of Rhee-Karn's allegations in her complaint in this action as fodder in counterclaims and third-party claims in which she accused Rhee-Karn, Dollinger, and former counsel for Rhee-Karn Kenneth Craig, of committing fraud against Lask and the Court.    Lask asserted claims for fraud on the court, civil conspiracy, aiding and abetting, abuse of process, prima facie tort, and, as to Rhee-Karn in particular, fraud and breach

of contract.  (Dkt. 121 at 34-41.)  Lask dredged up supposed wrongdoings of Rhee-Karn and her attorneys in unrelated litigation going as far back as 2010 and made scattershot allegations of "fraud," "extort[ion]," and "conspiracy."  (*See generally id.* at 22-30.)

Each counterclaim and third-party claim is vague, terse, and conclusory.  For instance, in support of her prima facie tort claim, Lask alleged that Rhee-Karn, Dollinger, and Craig "intentional [sic] inflicted harm upon Lask by their fraudulent complaint, without excuse or justification and motivated solely by malice by their act or series of acts of filing fraudulent complaints before this court and committing a farud [sic] on this court to harm Lask."  (*Id.* at 39.)  To state an actionable claim, Lask was required, but failed, to "do more than recite the elements of a cause of action in conclusory statements."   *Orenstein v. Figel*, 677 F. Supp.2d 706, 711 (S.D.N.Y. 2009).

Other of Lask's claims also are legally deficient on their face.  For example, the basis of Lask's individual fraud claim against Rhee-Karn is premised entirely on an intent not to perform under her retainer agreement with Lask – exactly the type of fraud claim that, under well-established Second Circuit law, is not actionable as fraud.  *See, e.g.*, *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996) ("[misrepresentation of] intent to perform under the contract … is not sufficient to support a claim of fraud under New York law"); *Pioneer Business Services, LLC v. VistaJet US, Inc.*, No. 22-CV-6206, 2024 WL 1381411, at *5 (S.D.N.Y. March 29, 2024) ("Under the law of this Circuit, merely falsely indicating an intent to perform under a contract is not sufficient to support a claim of fraud") (internal quotation marks and citation omitted).

Notwithstanding the demonstrable legal shortcomings in Lask's counterclaims and third-party claims, Rhee-Karn does not direct the Court's attention to facts, circumstantial

or otherwise, clearly indicating that Lask crossed the line from zealous representation to bad faith.

For one, the record undermines Rhee-Karn's argument that Lask brought the counterclaims and third-party claims only "to create a conflict and … force [Rhee-Karn] to seek new attorneys." (Dkt. 494-6 at 5.)  To the contrary, the Court's order dated March 20, 2019, summarizing a conference held following Lask's bringing of the counterclaims and third-party claims, stated that "Lask agree[s] that any conflict raised by the counterclaim[s] is waivable." (Dkt. 155.)  Indeed, the potential conflict was waived. (Dkt. 156-1.)  In light of this, the "improper purpose" Rhee-Karn attributes to Lask's asserting the counterclaims and third-party claims is not discernible.

Lask's voluntary dismissal of the counterclaims and third-party claims further cuts against a finding of bad faith.  On March 20, 2019, nine days after Rhee-Karn moved to dismiss the counterclaims, the Court bifurcated the counterclaims from Rhee-Karn's claims. (Dkt. 155.)  The Court also denied Rhee-Karn's motion to dismiss without prejudice and stayed the counterclaims until "the Court direct[ed] the parties otherwise." (Dkt. 161; *see also* Dkt. 155.)  After granting summary judgment with respect to Rhee-Karn's claims, the Court directed Lask to provide notice of whether she wished to proceed with the counterclaims. (Dkt. 227.)  Lask voluntarily dismissed the counterclaims and third-party claims a few days later. (Dkts. 231, 232.)  That Lask withdrew her claims early on rather than proceeding with another round of briefing on a motion to dismiss hardly qualifies as "clear evidence" of Lask's "intent to delay the[] proceedings." (Dkt. 494-6 at 6.)  *See Rates Technology Inc. v. Broadvox Holding Co.*, 56 F. Supp.3d 515, 530-31 (S.D.N.Y. 2014) ("While [defendant]'s withdrawal [of its motion] does not by itself

immunize [it] from sanctions, withdrawing, rather than maintaining, the motion dispels the notion that [defendant] acted in bad faith").

Lask's motions to disqualify Rhee-Karn's attorneys likewise do not warrant sanctions. Lask first moved to disqualify Dollinger and opposed Craig's application to appear pro hac vice on May 25, 2017 and June 19, 2017, respectively, alleging that Dollinger and Craig made misrepresentations to the Court. (Dkts. 35, 50.) Judge Preska denied the motion on June 21, 2017, making no mention of frivolousness or anything else suggestive of bad faith. (Dkt. 55.) On August 17, 2022, with leave of court, Lask again moved to disqualify Dollinger based on an alleged "pattern of misconduct" exhibited in this Court and elsewhere. (Dkt. 256.) Six days later, Lask moved to withdraw the disqualification motion. (Dkt. 259.) Dollinger then requested an extension of time to submit a response to the withdrawal motion which he represented would have "provided a good cause basis for a claim of bad faith" and a justification to strike the disqualification motion. (Dkt. 260.)

But by letter dated August 24, 2022, Dollinger withdrew his request, having never articulated his reasons for considering Lask's motion to have been made in bad faith. (Dkt. 262.) That same day, Judge Cote denied Lask's motion to disqualify based on Lask's withdrawal of the motion and without any suggestion that it had been brought in bad faith. (Dkt. 263.)

Finally, on April 18 and 19, 2023, Lask sought leave to file motions for sanctions, disqualification of Dollinger, and dismissal, based on Rhee-Karn's alleged failure to timely provide material for a pre-trial order and jury materials. (Dkts. 316, 320.) The Court denied the motion as baseless and admonished "both parties, particularly … Plaintiff's

counsel and the Defendant herself," for exhibiting "a degree of unprofessionalism ill befitting attorneys appearing in this court" in their correspondence related to Lask's motions.  (Dkt. 327.)

Even were the Court to find Lask's accusations against Rhee-Karn's attorneys lacking in merit, sanctions would not be warranted because, as with Lask's counterclaims, Rhee-Karn has failed to demonstrate that they were made in bad faith.  Rhee-Karn presents nothing beyond conclusory conjecture insufficiently supported by circumstantial evidence. While arguing that the "vexatious, oppressive and improper nature and purpose" of Lask's maneuvering is "readily apparent" (Dkt. 494-6 at 5), Rhee-Karn does not present "clear evidence" to warrant sanctions.

In short, Rhee-Karn's failure to establish that Lask acted in bad faith by filing her disqualification requests, counterclaims, and third-party claims precludes sanctions awarding Rhee-Karn her legal costs in responding to those pleadings.

### 2.    Targeting Dollinger's Reputation And Stalking Judge Preska

Rhee-Karn next complains of Lask's (1) contacting Dollinger's clients "offering to assist them in 'taking him down'" and (2) "stalking" Judge Preska and her family and former chambers staff.  (Dkt. 494-6 at 6.)

First, the contention that Lask maligned Dollinger to his current clients rests on hearsay.  Though "the rules of evidence [do not] necessarily apply to factfinding in the context of sanctions," *Jensen v. Phillips Screw Co.*, 546 F.3d 59, 66 n.5 (1st Cir. 2008), that a finding of bad faith must be established by clear factual evidence warrants caution in awarding sanctions upon allegations that do not bear "indicia of reliability." *Three Headed Productions, Inc. v. Steer Vend, Inc.*, No. 22-CV-247, 2024 WL 3986868, at *3 n.3 (E.D.N.Y. Aug. 29, 2024) (internal quotation marks and citation omitted).  In

considering whether indicia of reliability exist, courts examine whether the allegation is substantiated by documentary evidence.  *See id.*; *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F. Supp.2d 456, 481 n.108 (S.D.N.Y. 2010) (considering, on a sanctions motion, only those portions of hearsay attorney declaration that were substantiated by documentary evidence).

For instance, in *Three Headed Productions*, on a motion for sanctions, defendant sought to rely on a conversation he had with a cashier at a store.  To that end, he submitted a sworn declaration that attached a receipt and a brochure from the store and a photograph he took of the building.  The court acknowledged that the content of the conversation was hearsay but nonetheless accepted the statements because there existed "indicia of reliability" that the conversation occurred.  2024 WL 3986868, at *3 & n.3.  By contrast, in *Rivera v. Mr. Z Towing, Inc.*, the court found that affidavits submitted by defendants attesting to conversations they had with a third party about the conduct of plaintiff "[did] not meet the evidentiary standard required to trigger the imposition of sanctions."  No. 12-CV-3963, 2016 WL 6495364, at * 3 (E.D.N.Y. Sept. 9, 2016), *R. & R. adopted*, 2016 WL 6500624 (E.D.N.Y. Nov. 2, 2016).

Considering this guidance, Dollinger's hearsay allegation that Lask attempted to enlist Dollinger's clients in a scheme to "tak[e] him down" does not bear sufficient indicia of reliability.  Dollinger did not proffer, for example, an affidavit from his client attesting to the content of the alleged conversation.  Rather, the only documentary evidence Dollinger submits to support the allegation is his own letter to the Court in which he first made the unsworn accusation.  (*See* Dkt. 494-6 at 6 (citing Dkt. 434 at 1).)  Such self-serving, hearsay-based allegations lack the indicia of reliability that warrant consideration on a

motion for sanctions.  *See Rivera,* 2016 WL 6495364, at *3.  Thus, sanctions should not

be levied against Lask on this ground.

Lask's stalking of Judge Preska, on the other hand, has ample support in the

record.  In an order dated August 1, 2019, Judge Preska described Lask's shocking

behavior directed at a federal judge, her family, and her judicial clerks:

> [I]n the Court's view, Ms. Lask has stalked the Court and
> chambers staff.  She has alleged that she has been "informed
> that [the Court's] husband owned stock in [a] company" that
> Ms. Lask sued 17 years ago.  Ms. Lask also purports to have
> investigated chambers IP addresses and monitored certain
> sites visited.  Because of these actions, the matter has been
> referred to the United States Marshal.
>
> Ms. Lask has telegraphed additional delay and aggravation –
> she has threatened to seek "a hearing with" … two former law
> clerks of the Court (neither of whom has the remotest possible
> connection to any fact in the underlying action).  Ms. Lask
> purports to have called them after she had an interchange with
> the Court that she deemed unsatisfactory.  (Ms. Lask does not
> explain how she just happened to contact one of the Court's
> former law clerks immediately after the call.)  She also
> purports to have recorded one or both of her calls to [the
> former law clerks] – possibly an illegal and/or unethical act for
> a lawyer.

(Dkt. 184.)  Due to the referral of the matter to the United States Marshal, Judge Preska

recused herself from the matter.  (*Id.*)  Although Lask's outrageous conduct was

unquestionably effectuated in bad faith and without legal color, Rhee-Karn has not

demonstrated that she is entitled to attorney's fees or costs under either § 1927 or the

Court's inherent authority.

The Supreme Court has made clear that "a federal court's inherent authority to

sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees …

is limited to the fees the innocent party incurred solely because of the misconduct – or

put another way, to the fees that party would not have incurred but for the bad faith."

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 103-04, 137 S. Ct. 1178, 1183-84 (2017).  Although the Second Circuit has not explicitly held that § 1927 also is subject to the but-for requirement articulated in *Goodyear* applicable to the court's inherent authority to sanction, *see Liebowitz v. Bandshell Artist Management*, 6 F.4th 267, 288 n.27 (2d Cir. 2021), one court in this District has aptly explained why it is just as applicable in the § 1927 context:

> [T]he Supreme Court suggested that it reads the text of Section 1927 to require a 'causal link' between the misconduct and fees, and other courts have required what amounts to a but-for causal relationship in the Section 1927 context.  This aligns with the text of 28 U.S.C. § 1927 ("Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.").  The reason the Court gave in *Goodyear* that attorneys' fees awarded pursuant to the court's inherent authority be limited to those solely caused by the misconduct was that inherent power sanctions are meant to be "compensatory rather than punitive in nature," and thus "pretty much by definition ... the court can shift only those attorney's fees incurred because of the misconduct at issue."  *Goodyear*, 581 U.S. at 108.

*Hong v. Mommy's Jamaican Market Corp.*, No. 20-CV-9612, 2024 WL 3824394, at *19 (S.D.N.Y. Aug. 14, 2024) (citations omitted) (citing cases); *see also Goodyear*, 581 U.S. at 108 n.5 ("statutory sanction regimes [such as § 1927] similarly require … [a] causal connection [between the misconduct and fees] before shifting fees"); *Craig v. UMG Recordings, Inc.*, No. 16-CV-5439, 2019 WL 2992043, at *4 (S.D.N.Y. July 9, 2019) ("section 1927 allows this Court to award only fees and costs that are 'reasonably incurred because of' an opposing party's sanctionable conduct") (quoting § 1927).

Rhee-Karn did not set forth what expenses, if any, she incurred "because of" Lask's stalking Judge Preska, her family, and her chambers.  *Goodyear*, 581 U.S. at 108.  Judge

Preska recused herself because the referral to the United States Marshal might have resulted in further delay in the proceedings.  (*See* Dkt. 184.)  Although Lask had filed two separate letter motions seeking the disqualification of Judge Preska (Dkts. 181, 183), the record does not reflect any response from Rhee-Karn.  Thus, Rhee-Karn has not informed the Court, nor is the Court able to discern, that Rhee-Karn incurred any expenses that she would not have incurred but for Lask's misbehavior.[8]  Consequently, despite the egregious nature of Lask's misconduct, the Court has no basis from which it may award attorney's fees sanctions to Rhee-Karn.

### 3.    Alleged Perjury

The final basis for which Rhee-Karn seeks sanctions against Lask is the allegation that Lask "committed perjury th[r]ough false claims … [that] Plaintiff forged Lask's

---

[8] After Judge Preska recused herself, the Honorable Alison J. Nathan was briefly assigned to this case and ordered the parties to submit a status letter.  (Dkt. 185.)  Rhee-Karn filed a status letter pursuant to Judge Nathan's order.  (Dkt. 190.)  Though attenuated, it is conceivable that the fees and costs, if any, involved in submitting the status letter would not have been incurred had Lask's behavior not necessitated Judge Preska's recusal.  However, Rhee-Karn does not submit that as a basis for sanctions, and the cost of the status letter would have been trivial.

Moreover, the 78-page fee schedule submitted with Rhee-Karn's sanctions motion fails to attribute any of the attorney's fees and costs she seeks here to a particular instance of Lask's misbehavior.  The document lists nearly every docket entry in this matter and attributes a corresponding amount of attorney's fees sought in connection with each docket entry – including court orders and Lask's filings.  (Dkt. 494-3.)  Despite providing only three discrete bases for attorney's fees sanctions, Rhee-Karn seeks attorney's fees and costs for nearly the entire history of this litigation.  (*See generally id.*; Dkt. 494-6 (seeking $127,325 in attorney's fees and $3,017.80 in costs).)  Curiously, though, no billing entries appear from June 14, 2017 through May 26, 2020; only a "TBP" placeholder appears.  (*Id.* at ECF 5-34.)  Thus, although Rhee-Karn seeks fees for unspecified work on scores of benign docket entries (*see, e.g., id.* at ECF 34 (seeking $175 in attorney's fees for .25 hours pertaining to the filing of a notice of appearance by one of Lask's attorneys), 48 (seeking $175 in connection with an order granting an extension of time, followed by another $175 in connection with a docket entry establishing the new deadlines reflected in the order)), Rhee-Karn fails to substantiate her request even with regard to the fees that feasibly could have been linked to Lask's misconduct.

signature [on the First Complaint]."  (Dkt. 494-6 at 7.)  Once again, however, Rhee-Karn's accusation is entirely conclusory.  She offers no factual evidence that makes it any more or less likely that Lask gave false testimony.  In fact, Lask never testified at the trial that Rhee-Karn forged her signature.  To the contrary, Rhee-Karn testified that she signed Lask's name on the First Complaint, albeit upon request by Lask.  (Tr. 64-65.)  The only locations in the record that Rhee-Karn asserts contain an accusation that she forged Lask's signature is a letter filed by Lask's counsel on October 26, 2022 (Dkt. 494-6 at 7 (citing Dkt. 279)), her own declaration recounting a late October 2022 conference, (Dkt. 494-2 ¶ 2), and Ferrante's summation (Dkt. 494-6 at 7; Tr. 374).  Rhee-Karn has not come close to satisfying her burden to show by clear evidence that Lask's testimony was meritless and asserted in bad faith.  The issue also was immaterial to trial.  Lask already had been found liable for malpractice in connection with the First Federal Action on summary judgment.  To the extent the issue had any relevance at trial, whether Lask or Rhee-Karn signed Lask's name was a matter of credibility that the jury resolved.

To conclude, Rhee-Karn has not established a basis for a sanctions award requiring Lask to pay her attorney's fees.  Rhee-Karn's sanctions motion is denied.

## IV.    Rhee-Karn Is Entitled To Prejudgment And Post-Judgment Interest

Rhee-Karn seeks prejudgment and post-judgment interest on the jury award of $40,300.00.  The Court first examines whether prejudgment interest is merited.  Finding that it is, the Court next determines the proper interest rate and calculates the proper amount of prejudgment interest.  Then, the Court considers whether post-judgment interest also should be awarded.

A.    **Appropriateness Of Prejudgment Interest**

In a diversity case such as this one, "state law governs the award of prejudgment interest." *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008). In New York, a party may be awarded prejudgment interest when "an act or omission depriv[es] or otherwise interfere[es] with title to, or possession or enjoyment of, property." NY CPLR § 5001(a). "The award of interest is founded on the theory that there has been a deprivation of use of money or its equivalent and that the sole function of interest is to make whole the party aggrieved." *Baker v. Dorfman*, 239 F.3d 415, 425 (2d Cir. 2000) (internal quotation marks and citation omitted).

Prejudgment interest is mandatory under Section 5001(a) in an action at law. NY CPLR § 5001(a) (providing that "[i]nterest **shall be recovered**" unless the remedy sought is equitable in nature) (emphasis added); *see, e.g.*, *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 93 (2d Cir. 2000) ("section 5001 imposes an affirmative mandate on trial courts; they have no discretion not to award prejudgment interest under New York law"); *LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp.2d 182, 192 (S.D.N.Y. 2002) ("Because LinkCo is seeking damages, its … claim is an action at law and pre-judgment interest is mandatory"). A legal malpractice claim is an action at law. *See In re Joseph DelGreco & Co.*, No. 10-CV-6422, 2011 WL 350281, at *4 (S.D.N.Y. Jan. 26, 2011) (citing *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 568, 110 S. Ct. 1339, 1346 (1990)). "It is well settled that prejudgment interest shall be granted in cases of legal malpractice." *Baker v. Dorfman*, No. 97-CV-7512, 1999 WL 191531, at *11 (S.D.N.Y. Apr. 6, 1999) (citing cases), *aff'd*, 239 F.3d 415 (2d Cir. 2000). Courts in this District sitting in diversity, applying New York law, regularly award prejudgment interest in legal malpractice actions. *See, e.g.*, *Kuruwa v. Meyers*, 823 F. Supp.2d 253, 260-61

(S.D.N.Y. 2011) (awarding prejudgment interest on damages for legal malpractice claim); *Cury v. Bradshaw*, No. 20-CV-3351, 2021 WL 6289787, at *7 (S.D.N.Y. Dec. 9, 2021) (same), *R. & R. adopted*, 2021 WL 6111867 (S.D.N.Y. Dec. 27, 2021).

The jury awarded Rhee-Karn damages for her malpractice claim. Rhee-Karn therefore is entitled to prejudgment interest under Section 5001(a). Lask's arguments to the contrary are hardly persuasive.

Lask attempts to recast the damages arising from her malpractice as a disgorgement of fees, which, according to Lask, is an equitable remedy for which Section 5001(a) does not mandate prejudgment interest. (Dkt. 512 at 1-4.) Lask is incorrect. "[U]nder New York law, … a 'plaintiff's demand for the return of attorneys' fees it paid to [a negligent attorney] is, essentially, a claim for monetary damages,' even if the term 'disgorgement' is used." *Baring Industries, Inc. v. Rosen*, No. 24-CV-5606, 2025 WL 307654, at *3 (S.D.N.Y. Jan. 27, 2025) (citation and brackets omitted); *see Marcum LLP v. L'Abbate, Balkan, Colavita & Contini, L.L.P.*, 222 A.D.3d 486, 488, 202 N.Y.S.3d 73, 75 (1st Dep't 2023) (affirming trial court's dismissal of the "part of the legal malpractice claim seeking disgorgement of attorneys' fees paid to [defendant], which is, essentially, a claim for monetary damages in connection with its legal malpractice claim"); *Access Point Medical, LLC v. Mandell*, 106 A.D.3d 40, 44, 963 N.Y.S.2d 44, 47 (1st Dep't 2013) ("plaintiffs' demand for the return of attorneys' fees they paid to defendants is, essentially, a claim for monetary damages").

Lask's contention rests on magical thinking. Lask attempts to recharacterize Rhee-Karn's damages as having arisen not from malpractice but rather "negligent legal advice which, as a matter of law, requires deficient advice that causing [sic] a different

and worse outcome in a case."[9]  (Dkt. 512 at 2, 3-4 (citation omitted); *see also* Dkt. 500 at 5.)  As Lask would have it, the First Federal Action was not a "case" in which there was a "worse outcome" because the voluntarily dismissal rendered it "nonexistent."  (Dkt. 512 at 3.)  According to Lask, voluntary dismissal of the First Federal Action meant that it "cannot serve as a basis for legal malpractice damages."  (*Id.*)  Thus, because "there was no case," Lask reasons, "there is no loss … to which prejudgment interest … could attach."[10]  (*Id.*)

Lask's "no case, no malpractice damages" proposition is nonsensical.  For one, an outcome to litigation is not a prerequisite for malpractice.  If Lask were correct, then a client would not be deemed to have incurred damages for malpractice for following the negligent advice of his attorney to, for example, file for bankruptcy under the wrong chapter of the U.S. Bankruptcy Code, *see In re Lindo*, No. 13-CV-6918, 2015 WL 9255561, at *1 (S.D.N.Y. Dec. 18, 2005) (finding attorney who negligently advised taxicab driver client to file for bankruptcy under Chapter 7 rather than Chapters 11 or 13, thus causing client's taxicab and medallion to be liquidated unnecessarily, committed legal malpractice), claim as a deduction an investment that the attorney himself believed likely

---

[9] Lask draws a distinction without a difference.  Negligent legal advice is a variety of legal malpractice.  *See Toussie v. Williams & Connolly, LLP*, No. 20-CV-5921, 2023 WL 5152509, at *6 (E.D.N.Y. July 26, 2023) (providing the elements required "to establish a legal malpractice claim based on 'the negligent giving of advice'") (citation omitted).

[10] Lask also argues that the First Federal Action was not a "case" because Rhee-Karn "never had a retainer agreement" and "never paid a fee" in connection with it.  (Dkt. 512 at 3.)  Obviously, "an attorney-client relationship does not depend on the existence of a formal retainer agreement or upon payment of a fee."  *Abraham v. Leigh*, 471 F. Supp.3d 540, 570 n.20 (S.D.N.Y. 2020).  To the extent that the term "fee" refers to attorney's fees, one need not look further than the occurrence of the trial in this matter to reject the assertion that Rhee-Karn paid no fees in connection with the First Federal Action.  To the extent Lask argues that Rhee-Karn never paid a filing fee, her contention is irrelevant.

would be disallowed by the IRS, *DuPont v. Brady*, 646 F. Supp. 1067, 1076 (S.D.N.Y. 1986) (failure to advise client of tax risks constituted malpractice), *rev'd on other grounds*, 828 F.2d 75 (2d Cir. 1987), or enter into an unenforceable pledge agreement that failed to secure the client's interest in certain collateral, *Hart v. Carro, Spanbock, Kaster & Cuiffo*, 211 A.D.2d 617, 620 N.Y.S.2d 847, 849 (2d Dep't 1995) (failure to advise client as to enforceability of pledge agreement, causing collateral to become "worthless," constituted legal malpractice).  That is obviously not the case.

A different outcome in litigation caused by the attorney's negligence is sufficient, not necessary, to create legal malpractice damages.  Lask's own cited authority makes that apparent.  In *Toussie*, the court explained that a client can demonstrate that the attorney's negligence caused her damages in at least two ways:  "the plaintiff would have succeeded on the merits of the underlying action, *or* would not have sustained actual and ascertainable damages."  2023 WL 5152509, at *5 (emphasis added) (internal quotation marks and citation omitted).  The court elaborated that legal malpractice claims may be based not only "on an underlying litigation," but also "the negligent giving of advice."  *Id.* at 6.  As Lask observes, Rhee-Karn's malpractice claim "rests on … negligent legal advice."  (Dkt. 512 at 3.)  Indeed, the theory of attorney negligence here is not that, but for Lask's negligence, Rhee-Karn would have succeeded in the First Federal Action. Rather, it is that Lask's unreasonable advice caused Rhee-Karn to do "things [s]he would not otherwise have done, … resulting in harm and damage," i.e., pay a negligent attorney $40,300 to pursue a federal action without having properly researched the relevant issues or advised Rhee-Karn of the risks of bringing such an action.  *See Toussie*, 2023 WL 5152509, at *6.

Lask's contention also is contrary to the law established in this case.  As Judge Cote noted, "[t]he legal fees Rhee-Karn incurred from the First Federal Action constitute actual and ascertainable damages."  (Dkt. 226 at 17 n.8.)    Indeed, damages are a required element of a legal malpractice claim.  *See Nordwind v. Rowland*, 584 F.3d 420, 429 (2d Cir. 2009); *Baker*, 239 F.3d at 420; *Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 117 (2d Cir. 2002).  Judge Cote found that Rhee-Karn had established all requisite elements of legal malpractice, including damages (Dkt. 226 at 16-17), and the Second Circuit affirmed.  *Rhee-Karn v. Lask*, No. 20-1577, 2022 WL 619695 (2d Cir. March 3, 2022) (summary order).  Lask cannot make her liability for malpractice damages simply disappear.[11]  Rhee-Karn is entitled to prejudgment interest.

## B.    Interest Rate

"New York law provides for prejudgment interest at 9% [per annum]."  *Charney v. Zimbalist*, No. 07-CV-6272, 2016 WL 4004686, at *5 (S.D.N.Y. July 26, 2016) (citing NY CPLR § 5004), *R. & R. adopted*, 2016 WL 4467547 (S.D.N.Y. Aug. 22, 2016).   Lask requests the Court to lower the prejudgment interest rate to 3.5% per annum because application of the statutory interest rate of 9% per annum would be "punitive" to "an individual not a corporate giant or large law firm that may be able to handle 9%."  (Dkt. 512 at 5.)  The Court cannot accommodate Lask's request.  It is well-settled under New

---

[11] Although Lask couches her argument in the context of damages, her expressed doubt as to whether Rhee-Karn has shown Lask's negligent legal advice caused "a different and worse outcome in a case" (Dkt. 513 at 3) necessarily implies that Lask disputes whether Rhee-Karn has met her burden of proof with respect to the causation element of malpractice.  *See Toussie*, 2023 WL 5152509, at *5 (describing determination of whether "plaintiff would have succeeded on the merits of the underlying action [absent attorney negligence]" as part of proximate causation element) (internal quotation marks and citation omitted).  That question was settled over five years ago, when Lask was found liable for malpractice as a matter of law in connection with the First Federal Action, and was confirmed by the Second Circuit more than three years ago.

York law that in "an action at law, … [where] [t]he cause of action and damages requested were essentially legal in nature, the court must apply the statutory rate of interest." *Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508-09 (2d Cir. 1991); *see Allgaier v. Peterson*, No. 13-CV-5112, 2019 WL 7606045, at *7 (S.D.N.Y. Aug. 13, 2019) (same) (quoting *Action S.A.*, 951 F.2d at 508-09); *Ferguson v. Ferrante*, No. 13-CV-4468, 2016 WL 11947686, at *2 (S.D.N.Y. Apr. 19, 2016) ("This is an action at law; thus, the statutory rate of interest applies"), *R. & R. adopted in relevant part*, 2019 WL 5558194 (S.D.N.Y. Oct. 29, 2019).   A claim for legal malpractice is an action at law.   Thus, the statutory prejudgment interest rate of 9% per annum applies.

## C.    Interest Calculation

Section 5001 "permit[s] an award of prejudgment interest from the date of the accrual of the malpractice action in actions seeking damages for attorney malpractice." *Baker*, 239 F.3d at 425 (internal quotation marks and citation omitted).   Where, as here, damages in connection with legal malpractice are incurred at various times throughout the representation, "interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."   NY CPLR § 5001(b).   "New York law leaves to the discretion of the court the choice of whether to calculate prejudgment interest based upon the date when damages were incurred or a single reasonable intermediate date, which can be used to simplify the calculation." *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 91 (2d Cir. 1998) (internal quotation marks omitted), *modified on other grounds by Baron v. Port Authority of New York & New Jersey*, 271 F.3d 81 (2d Cir. 2001).   Courts in this District typically find the reasonable intermediate date by determining the midpoint date of the period during which plaintiff incurred damages.  *Cury*, 2021 WL 6289787, at *7.

Both parties argue that, to the extent warranted, prejudgment interest should run from the date at which the bills associated with the First Federal Action were paid in full. The parties dispute what date the Court should affix. Neither party, however, has provided calculations that would result in a reasonable intermediate date.

Lask reviews the payments Rhee-Karn made toward a $29,125 outstanding balance on one of Lask's invoices and asserts that the balance was satisfied by Rhee-Karn's payment of $50,000 on May 24, 2013. Setting aside whether that is an appropriate methodology, Lask's calculation is mathematically erroneous. That is, Lask misidentifies a $50,000 payment made by Rhee-Karn on April 5, 2013, as one for $5,000. (*Compare* Dkt. 512 at 5 (invoice from Lask reflecting "$5,000 paid 4/5/13") (citing Dkt. 402-1 at ECF 15), *with* Dkt. 402-1 at ECF 15 (invoice from Lask reflecting "$50,000 (pd 4/5/13)"), *and* Dkt. 455 at ECF 10 (Rhee-Karn bank records reflecting a $50,000 wire payment sent to Lask on April 5, 2013).) Rhee-Karn, for her part, argues that the bills associated with the First Federal Action were paid by February 4, 2013, because that was the date by which Rhee-Karn had paid Lask "a minimum of $80,000." (Dkt. 498-2 at 2-3.) However, Rhee-Karn neither explains the relevance of the $80,000 figure nor accounts for the tens of thousands of dollars of billing accrued prior to the beginning of the damages period here. (*See* Dkt. 455 at ECF 18-19.)

Any attempt by the Court to affix a date certain by which the fees associated with the First Federal Action were satisfied would involve speculation due to the state of the records that exist. Accordingly, the Court finds it reasonable to base the midpoint on the period of Lask's representation of Rhee-Karn in the First Federal Action. *See Cury*, 2021 WL 6289787, at *7. The representation spanned October 24, 2012 through February 5,

2013. Thus, prejudgment interest should run from the midpoint date of December 16, 2012.

Lask further requests the Court deduct three years' worth of accrual of prejudgment interest due to "delays and sideshows" put on by Rhee-Karn and her attorneys throughout this case. Lask does not, however, identify to which "delays and sideshows" she refers. In any event, the Court does not have discretion to deduct an arbitrary amount of time from the duration of prejudgment interest accrual since this case is an action at law, not "an action of an equitable nature." *See* NY CPLR § 5001(a). Rather, the Court must compute interest from a reasonable intermediate date "to the date the verdict was rendered or the report or decision was made." *Id.* § 5001(c). Lask has not cited any authority that permits the Court to deviate from the statutory instruction in like circumstances. Accordingly, Rhee-Karn is entitled to prejudgment interest for the entire period beginning on December 16, 2012.

### D.    Post-Judgment Interest

Though Rhee-Karn does not state the factual or legal basis for her application for post-judgment interest, it is appropriate to award here. Post-judgment interest is governed by 28 U.S.C. § 1961(a), which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court. … Such interest shall be calculated from the date of the entry of the judgment." Even when a federal court sits in diversity, the Second Circuit has "consistently held that an award of postjudgment interest is mandatory." *Schipani*, 541 F.3d at 165. Consequently, Rhee-Karn is entitled to post-judgment interest on the unpaid balance of the judgment "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors

of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a).[12]

## Conclusion

In sum, Lask has not met her burden to show that she is entitled to judgment as a matter of law or a new trial. Accordingly, her motions pursuant to Rule 50(b) and Rule 59(a)(1) are DENIED. Likewise, Rhee-Karn has failed to show that sanctions against Lask are warranted. Accordingly, Rhee-Karn's motion pursuant to Rule 54(d)(2) is DENIED. Prejudgment interest at the statutory rate of 9%, and post-judgment interest at the rate identified above, are mandatory under these circumstances. Accordingly, Rhee-Karn's application for prejudgment and post-judgment interest is GRANTED. A separate judgment will be entered. To the extent not discussed above, the Court has considered the parties' arguments and found them to be either moot or without merit.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 494, 495, and 498, and, upon entry of judgment, to close the case.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: July 17, 2025
       New York, New York

Copies transmitted on this date to all counsel of record.

---

[12] Lask's argument that post-judgment interest should not be awarded because "no judgment exists" is meritless. (Dkt. 512 at 5.)